UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

RONALD VENTURA,

              Plaintiff,

      - against-

MERRILL LYNCH & CO., INC., MERRILL
LYNCH, PIERCE, FENNER & SMITH, INC.,
and HENRY BLODGET,

              Defendants.

-------------------------------------------------------------X



No.

**COMPLAINT**

**JURY TRIAL
DEMANDED**



JUL 2 4 2007

U.S.D.C. S.D.N.Y.
CASHIERS

        Plaintiff complains of defendants upon knowledge as to matters relating to himself and upon information and belief as to all other matters as follows:

### SUMMARY OF ALLEGATIONS

        1.    This is a securities fraud action on behalf of plaintiff Ronald Ventura ("Ventura" or "Plaintiff"), who purchased and held the common stock of CMGI, Inc. ("CMGI" or the "Company") based on the intentional misrepresentations and omissions of material fact by Defendants as alleged herein.   Specifically, Defendants Merrill, Lynch & Co., Inc. ("ML&Co."), Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS" and, together with ML&Co., "Merrill Lynch") and Henry Blodget ("Blodget") issued false and misleading research reports that artificially inflated the market price of CMGI stock and issued false and misleading price targets that did not reflect their true opinions of CMGI, on which Ventura relied in purchasing and holding CMGI shares.

2.    Ventura incurred losses when CMGI shares decreased in price as a result of the materialization of the concealed risks concerning CMGI's true financial condition and Defendants' eventual disclosure of their longstanding concern about CMGI's need to raise additional cash to continue its operations.  When Defendants finally revealed concerns about CMGI's cash flow and cash burn rate on October 3,  2000, CMGI shares fell 11.5%.

## JURISDICTION AND VENUE

3.    The claims asserted herein arise under and pursuant to multiple alleged violations of Sections 10(b) and 20(a) of the Exchange Act 15 U.S.C.  78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission 17 C.F.R.  240.10b-5, and the common law.

4    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.§§ 1331  and 1367 and Section 27 of the Exchange Act 15 U.S.C. § 78aa.

5.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Merrill Lynch maintains (and maintained at all relevant times)  its principal place of business in this District, and the acts complained of (including the trading of the stock based upon misleading information, and the preparation, issuance and dissemination of the materially false and misleading information to the investing public), occurred in substantial part in this District.

6.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the mails and the means and instrumentalities of interstate commerce, including telephonic communications.

## PARTIES

7.      Plaintiff Ventura is and was at all relevant times a natural person residing

in Fairfield County, Connecticut.  Ventura purchased and held CMGI shares in express reliance

on Defendants' price targets and the absence of material negative information and was damaged

as the result of CMGI's falling share price as the concealed risks and material facts concerning,

inter alia, CMGI's cash flow and cash burn rate were revealed.

8.      Defendant ML&Co., a Delaware corporation, is a holding corporation and has its

headquarters at 4 World Financial Center, 250 Vesey Street, New York, New York.  Through its

various subsidiaries, including MLPFS, ML&Co. is the largest securities broker in the United

States.  ML&Co. is one of the world's leading financial management and advisory companies

with offices in 44 countries and total client assets of about $1.6 trillion.  As an investment bank,

ML&Co. is a leading global underwriter of debt and equity securities and a leading strategic

advisor to corporations, governments, institutions, and individuals worldwide.  ML&Co. also is

one of the world's largest asset managers, with hundreds of billions in assets under management.

Through its Global Securities Research & Economics Group, ML&Co. ranks among the leading

research providers in the industry, with analysts and other professionals in 19 countries that cover

approximately 3,200 companies. The Analyst Reports were issued in ML&Co.'s own name and

that of its Global Securities Research & Economics Group.

9.      Defendant MLPFS, a wholly owned subsidiary of ML&Co., is a licensed

broker/dealer in the United States, operates as the brokerage unit of ML&Co., and is controlled

by ML&Co. through stock ownership, contracts, and related officers and directors.  MLPFS, a

Delaware corporation, has its principal office at headquarters located at 4 World Financial Center, 250 Vesey Street, New York, New York. MLPFS provides investment banking services to businesses, and engages in retail and institutional sales to its customers. MLPFS prepared and issued the Analyst Reports itself or through one of its affiliates, and claims the copyright in the Analyst Reports issued by Merrill Lynch.

10.    Defendant Blodget was, at all relevant times, a First Vice President of MLPFS, who was retained by MLPFS to bring investment banking business to MLPFS, and earned many millions of dollars as MLPFS's premier analyst of Internet stocks, the majority of which was based on the amount of investment banking business that he generated. Blodget headed the group of Merrill Lynch analysts who covered Internet stocks ("the Internet Group"). Blodget issued CMGI Analyst Reports in his own name.

11.    Defendants Merrill Lynch and Blodget are collectively referred to herein as "Defendants."

## DETAILED FACTUAL ALLEGATIONS

### DEFENDANTS' RATING SYSTEM FOR ITS ANALYST REPORTS AND THE PURPORTED RATINGS DEFINITIONS IN DEFENDANTS' ANALYST REPORTS

12.    At relevant times, Merrill Lynch had a published uniform, company-wide rating system to be used by its analysts, including Blodget. The recommendation or rating for the time periods covered by the rating purportedly was to be one of the following:

> 1 - BUY;
> 2 - ACCUMULATE;
> 3 - NEUTRAL;
> 4 - REDUCE; or
> 5 - SELL.

4

13.     Defendants often described their ratings of a company by stating the Intermediate-Term rating, followed by a slash, followed by their Long-Term rating. For example, a company that Defendants rated intermediate-term "ACCUMULATE" and long-term "BUY" would be denoted "ACCUMULATE/BUY."

14.     Defendants also described their ratings using the numerical values assigned to each rating, as set forth above, by stating the number for the intermediate-term rating, followed by a dash and then stating the number for their long-term Rating. For example, the ratings of a company that Defendants rated an intermediate-term "ACCUMULATE" and a long-term "BUY," would be denoted "2-1."

15.     Defendants falsely represented that their ratings criteria for the combined intermediate- and long-term ratings on all of the Internet stocks that they rated, including CMGI, were as follows:

BUY/BUY (1-1):

• Dominant leader with a clean story in a sector with strong growth prospects.
• Profitable or on a clear path to profitability within 2-3 quarters (in the more mature sectors).
•   Strong cash position: enough to reach profitability with plenty left over for discretionary investment.
• Valuation attractive, or at least justifiable, on a multiple of visible earnings (or cash flow ("expensive" is okay, if fundamentals remain strong).
• Stock that we believe has a high likelihood of appreciating more than 20% within a year.
• High level of conviction about sector, company, management, and stock.

ACCUMULATE/BUY (2-1):

• Strong company with good growth prospects in a promising sector, or dominant sector leader with issues that we expect to be resolved.
• Profitable or on a clear path to profitability within the next 12-18 months (again, in the more mature sectors).

5

• Solid near-term cash position - enough to reach profitability.
• Valuation justifiable on a multiple of visible earnings or cash flow, or too expensive to be a 1-1.
• Stock that we believe has a high likelihood of appreciating more than 20% in 1-2 years.

ACCUMULATE/ACCUMULATE (2-2):

• Good growth prospects
• Improving financial performance
• Valuation justifiable
• Some uncertainties or reservations remain

NEUTRAL/BUY (3-1):

• Significant issues relating to intermediate-term outlook
• A business model which we believe fundamentally "works"
• Long-term should be okay.

NEUTRAL/ACCUMULATE (3-2):

• Challenging sector, or growth rate less than sector growth rate
• Not yet clear when able to turn profit
• Needs additional cash to turn profitable
• Significant uncertainties or reservations remain.

At relevant times, Merrill Lynch's stated policy on the objectivity of its research analyst opinions was clear:

**Objectivity of Opinions**

Opinions expressed by Analysts must be objective. Any indication that a Research opinion is less than totally objective, or that it may have been influenced by a business relationship of the Firm, could seriously damage the Firm's reputation and lead to potential legal liability. Consequently, although IBK or other personnel may discuss the basis and rationale of a Research opinion with Analysts, attempts to directly or indirectly influence an opinion are prohibited and must be reported immediately to Compliance.

(Merrill Lynch's Policy and Procedures Manual, May 1997, at page 20 (the "Manual"))

16.     During 1999 and 2000, Merrill Lynch's stated policy on the formulation and dissemination of research opinions was also clearly set forth in the "Formulation And Dissemination of Research Opinions" section of the Manual, at page 4:

A. General Policy

Securities industry regulatory rules require that all estimates and opinions communicated to the public have a reasonable basis and be substantiated by current financial, quantitative, economic or technical data. If at any time the Analyst believes that a reasonable basis no longer exists for maintaining an opinion, Global Research Management or Compliance must be notified immediately.

* * *

C. Confidentiality of Pending Opinion or Estimate Changes and Unreleased Research Reports or Comments

* * *

Pending initial opinions, estimate or opinion changes, and decisions to issue research reports or comments may not be disclosed by any means to anyone, either inside or outside the Firm, until the information is disseminated in the appropriately prescribed manner. Exceptions are limited to Global Research Management, Compliance, ML Counsel, the Analyst's associates and support personnel directly involved in the preparation of the report, and, under limited circumstances, management of the subject company. This prohibition is intended to avoid the misuse of market-sensitive information and the appearance of impropriety.

The Manual further stated that:

Analysts must maintain their independence and objectivity. Attempts by an individual or organization to directly or indirectly influence an Analyst's professional judgment, whether originating from within or outside the Firm, must be reported to Global Research Management and Compliance.

17.    The Manual further stated that "[d]uring the course of maintaining regular contact with company management, Analysts may not disclose proposed investment conclusions."

18.    Unbeknownst to investors including Plaintiff, from the time that Blodget began his employment at Merrill Lynch in February 1999 through April 8, 2002, the Internet Group had the policy and pursued the practice of virtually never giving an Internet stock rating or recommendation other than "BUY/BUY" or "ACCUMULATE/BUY." Throughout that entire period, even as a number of stocks he covered declined substantially, Blodget never issued a single Report in which he rated a company's stock "REDUCE" or "SELL."

19.    Defendants maintained and concealed from investors said policy and practice because Defendants believed that giving an Internet stock a rating or recommendation of less than "ACCUMULATE/BUY" would have jeopardized Merrill Lynch's efforts to obtain investment banking and underwriting engagements and fees from the Internet companies the Internet Group covered.

20.    In fact, the Internet Group admitted that their lowest rating was "ACCUMULATE/ACCUMULATE": "We are going to initiate [coverage of ask jeeves] on Monday or Tuesday. We are struggling with the rating. I am personally afraid of the impact we will have on the stock if we do a 3-1 so am leaning towards a 2-2 which is still our lowest rating."

21.    Defendants' CMGI Analyst Reports, and others, lacked candor, particularly with respect to Defendants' uniform practice at relevant times of never publishing a rating or recommendation for CMGI other than "ACCUMULATE/BUY."

22.    Because Defendants avoided the bottom two tiers of its rating system – "REDUCE" and "SELL" – Merrill Lynch's five-point system was a de facto three-point system.

8

23.     The effect of avoiding the bottom two tiers of their rating system was that the Internet Group rarely issued Analyst Reports that reflected their true opinions, but instead issued positive Analyst Reports as part of the overall scheme to attract investment banking business.  In an email from Blodget to Merrill Lynch investment bankers Jim Birle, Parker Weil, and Robert McCann, dated December 1, 2000, Blodget asked these individuals for guidance on how to write his Analyst Reports.  He instructed them to talk to his superior, and told them that if he didn't get clarification on how to proceed, he would start to rate the stocks honestly, no matter what the investment banking consequences were.  Blodget wrote:

**The more I read of these, the less willing I am to cut companies any slack, regardless of predictable temper-tantrums, threats, and/or relationship damage that are likely to follow.**

If you believe that this stance is a bad business decision for Merrill Lynch, please raise this with [senior management].  We all had to spend (waste) an unbelievable amount of time on the latest situation....**If there are no new email forthcoming from Andy [Melnick] on how the instructions below should be applied to sensitive banking clients/relations, we are going to just start calling the stocks (stocks, not companies), including AETH [Aether], like we see them, no matter what the ancillary business consequences are.**

[Emphasis supplied.]

24.     Thus, by Blodget's own admission, even as late as the end of 2000, the Internet Group was not calling stocks as they saw them, but was permitting ancillary business consequences to taint their coverage.

**THE NEW YORK STATE ATTORNEY GENERAL'S INVESTIGATION OF AND DISCLOSURES REGARDING DEFENDANTS' RESEARCH DEPARTMENT AND THEIR RESEARCH ANALYSTS' REPORTS**

25.     On April 8, 2002, the Office of the Attorney General of the State of New York (the "Attorney General") filed an Application for an Order Pursuant to [New York] General Business

Law Sec. 354 ("Application") in the Supreme Court of the State of New York, County of New York, which Application named ML&Co, Blodget, and other past or present officers or employees of Merrill Lynch as Respondents.    In support of the Application, the Attorney General filed an Affidavit in Support thereof sworn to by Eric Dinallo, Chief of the Investment Protection Bureau of the New York State Department of Law ("Dinallo Affidavit" or "Dinallo Aff.").

26.     As stated in the Dinallo Affidavit, the Attorney General drew the following reasonable inferences from the documentary and testimonial evidence gathered in his investigation:

> ...profoundly troubling questions pervade Merrill Lynch's research and rating system, as that system has been employed by the company's Internet group.  Contrary to the image of objectivity that Merrill Lynch has sought to cultivate for its research arm, **the evidence shows that analysts knowingly compromised their honestly held beliefs regarding the merits of particular stocks and skewed the ratings they issued in order to promote the interests of Merrill Lynch's investment banking business**, and that the analysts' involvement in that business netted them substantial monetary rewards.  **The investing public**, of course, knew nothing of the inherent conflict of interest underlying the Merrill Lynch rating system, and **was deprived of the analysts' honest opinions.**

## FACTS CONCERNING DEFENDANTS' FRAUDULENT ANALYST REPORTS REGARDING CMGI

27.     CMGI, incorporated in 1986, went public in 1994.  CMGI is an Internet holding company that develops, operates, and invests in other Internet companies.  During the time period in question, the Company's holdings included majority owned subsidiaries and multiple strategic investments across all sectors of the Internet industry.

28.    Defendants' valuation of CMGI was based on the Company's net asset value

("NAV"). NAV represents the total net value of all of CMGI's holdings. Therefore, as the value

of each of CMGI's holdings changed so did its NAV.

29.    Defendants placed a multiple on CMGI's NAV to establish price targets for CMGI

stock. When Defendants initiated coverage of CMGI on December 20, 1999, the stock was trading

at two times NAV. In their report, Defendants increased their price objective to three times NAV

and commented that this was "substantially higher than CMGI's historical average, which has

usually been around 1X-2X" CMGI's NAV. During the period from December 20, 1999 to October

4, 2000, Defendants issued and maintained artificially inflated price targets and multiples for CMGI

stock in their CMGI Analyst Reports.

## SUMMARY OF DEFENDANTS' FALSE AND MISLEADING STATEMENTS CONCERNING CMGI IN CMGI ANALYST REPORTS

30.    As described in detail herein, during the relevant time period, Merrill Lynch

recognized the potential lucrative investment banking business that could be obtained from CMGI.

CMGI's business agenda, to acquire, grow and then sell off Internet companies, made it a prime

banking target for Merrill Lynch. Defendants used research – analyst reports issued by Blodget –

to gain access to CMGI.

31.    Therefore, Defendants issued positive Analyst Reports and ratings on CMGI stock

that completely contradicted their privately held views of CMGI. Internally, Blodget agreed that

given the number of affiliated businesses that CMGI held, the Company was double - or - triple

counting revenue. "Look too close" at CMGI's numbers, "and it will scare you," he told one person

in a private email only days after naming CMGI one of his stocks of the year for 2000, and the very day that he issued an upbeat report on CMGI, rating the stock "ACCUMULATE/ACCUMULATE."

32.    Blodget's undisclosed, negative view of CMGI was significant for several reasons. First, it contradicted his publicly stated view in CMGI Analyst Reports. Second, it also meant that Blodget knew CMGI faced a risk of cash flows problem in future reporting periods. This is because the income statement, of which revenue and net income are a main part, is used as a barometer to measure future cash flow shortages. Blodget knew and failed to disclose that CMGI faced a risk of cash flow shortages in future reporting periods.

33.    Moreover, CMGI's business model heavily depended on a solid cash position and a controlled cash burn rate. If Blodget had disclosed his true belief about CMGI, it would have been reasonably foreseeable at the time that the market would react negatively, because it would put into question CMGI's cash position, and dramatically increase concern over CMGI's cash burn rate for the future reporting periods. However, such a disclosure would destroy Defendants' chances at getting investment banking business from CMGI and its affiliates, and would likely jeopardize Merrill Lynch's banking business opportunities with other companies.

34.    In fact, internal e-mail between Blodget and others at Merrill Lynch reveals that at relevant times, Defendants followed an undisclosed policy of rating a stock short-term "ACCUMULATE," which means "solid near term cash position," even if in their estimate a company such as CMGI needed cash within the next twelve month period.

35.    Blodget's undisclosed, privately-held concern about the Company grew to the point where he admitted that he should have told investors as early as March 2000 to sell the stock, not

buy it. This completely contradicted his published accumulative ratings, and his public insistence that CMGI was a core stock holdings.

36.     Defendants also failed to disclose their view that CMGI was wasting its money on frivolous items, such as its agreement in August 2000 to pay $7 million per year for stadium naming rights, publishing instead an Analyst Report that praised the decision to have CMGI's name on the New England Patriots' stadium. Defendants' skepticism of the Company's operating and financial soundness grew to such a point that by the end of September 2000, a Merrill Lynch proprietary fund completely liquidated its position in CMGI stock, and Blodget privately warned one investor that the price of CMGI stock could go much lower than $28 per share. Throughout this time, however, Blodget publicly downplayed the risk of an investment in CMGI. He repeatedly designated CMGI as one of his "core holdings." He urged investors to buy the stock, rating it a ACCUMULATE/ACCUMULATE, even though he knew that it faced cash problems, until the very end.

37.     As risks concealed by CMGI's revenue reporting practices materialized, nearly ten months later CMGI faced cash flow and liquidity problems. On October 4, 2000, Defendants issued an Analyst Report on CMGI, in which they expressed a concern about CMGI's cash flow. In their view, the undisclosed risk, of which they had been aware since as early as December 2000, had materialized. This disclosure caused an 11.5% drop in the price of the stock.

38.     Later, on November 14, 2000, Defendants finally downgraded CMGI to "NEUTRAL/ACCUMULATE." Thereafter Blodget confessed he had let the stock "ride for too long at Accumulate."

## FALSE AND MISLEADING STATEMENTS
## CONCERNING CMGI IN CMGI ANALYST REPORTS

39.    During the course of 1999, CMGI and Merrill Lynch engaged in discussions

concerning possible business relationships.  These discussions were not restricted to Merrill Lynch

investment bankers, as would be expected, but included Merrill Lynch analyst Defendant Blodget.

On November 10, 1999, CMGI CEO David Wetherell emailed Henry Blodget concerning the

possible underwriting by Merrill Lynch of the Initial Public Offering of AltaVista, a CMGI company:

> I heard today that the situation for AV [AltaVista] with regard to Merrill's
> participation was different than I thought.  Seems AV was told that if Merrill could
> not be the lead on AV, then you were not interested in participating at all.  This is
> much different from the less than enthusiastic voice mail I received from Tom
> Mizuko (sp?) [Thomas Mazzucco] Merrill Lynch investment banker] that sparked
> my replies.  I had not heard the AV side of the drama when I call you and Tom.
> Seems, as well, that the AV team took the message from Tom to heart and awarded
> the slot to Prudential.  I feel very badly about this on the one hand, as it was
> unnecessary.  As you know, I have been trying very hard to work with Merrill over
> the last six months and thought we were finally there.  **I hope we can put this**
> **unfortuneate [sic] scene behind us and move onto working together to help**
> **build upon the base we have established.  I truely [sic] have the highest regard**
> **for you and your work.**

[Emphasis supplied.]

40.    Thomas Mazzucco, referenced in the foregoing email, was at the time Director -

Internet Group, Merrill Lynch Technology Investment Banking.

41.    Blodget took Wetherell's words to heart.  In advance of CMGI's $1 billion securities

offering, scheduled for December 17, 1999, Blodget and his analyst team prepared an Analyst Report

announcing the initiation of coverage of CMGI stock by Merrill Lynch (the "December 20 Analyst

Report").  Merrill Lynch was not involved in the December 17, 1999 Offering, but was working

to secure business from CMGI in the future.  Ignoring Defendants' own written policies and

procedures, Defendants allowed CMGI's management, including Wetherell, CFO Hajducky, and

Investor Relations Director Cathy Taylor, as well as Merrill Lynch investment bankers, including

Mazzucco, to review and approve the content of their report and their ratings of CMGI's common

stock before issuing the report.

42.    The plan was to release the December 20, 1999 initial CMGI Analyst Report right

after the offering, so that the report would serve as a booster shot on CMGI's stock price.  This was

meant to impress CMGI with Blodget's ability to move the market for its stock, and attract CMGI

to Merrill Lynch for future banking business.  Defendants were careful to get CMGI management's

and Merrill Lynch investment bankers' prior approval of the report's content.  That day, Kirsten

Campbell, who worked for Blodget as a part of his Analyst Group, emailed Blodget with the status

of the report:

> hi. bob dolber is **waiting for a banker to read it** - looking for [thomas] mazzucco.
> stan said it was fine expect [sic] wanted a definition of viral marketing and wanted
> Fundamental Highlights on the front (said Andy gets mad).  **I got an email from
> Cathy Taylor [CMGI] saying she wanted to give us some changes** (didn't say
> what they were) but I haven't been able to reach her. will call you when its ready.

43.    On Friday, December 17, 1999, CMGI filed a Form S-3 with the SEC to sell $1

billion in securities (the "December 17, 1999 Offering"), including common stock, preferred stock,

and convertible preferred stock.  On December 20, 1999, the first business day immediately

following the December 17, 1999 Offering, Defendants issued the December 20 Analyst Report

announcing the initiation of coverage of CMGI.

44.    This December 20 CMGI Analyst Report, like all of the other CMGI Analyst

Reports, prominently displayed Defendant Blodget's and Defendant ML&Co.'s names on the first

page, and Defendant MLPFS's name appeared in a footnote on the last page of the Report.  The fact

that Merrill Lynch investment bankers and the Company's senior management had contributed to the content of the December 20 Analyst Report before it was issued, and the conflicts inherent with that arrangement, were not publicly disclosed by Defendants in that Analyst Report or elsewhere.

45.    On the day that the December 20 Analyst Report was released, Kirsten Campbell emailed a "thank you" note to Cathy Taylor, David Wetherell, and Andrew Hajducky of CMGI, confirming their undisclosed involvement in the drafting of the initial CMGI Analyst Report: "Here is the official copy we put out Monday. Thanks for all your help getting this together." This "thank you" note is just one example of the close communication that the supposedly independent analysts had with CMGI.

46.    In the December 20 Analyst Report Defendants initiated coverage of CMGI with a rating of "ACCUMULATE/BUY," and set a 12- to18- month target price of **$300** ($150 split-adjusted). Defendants further announced in that report that they had elevated CMGI to a "core holding" in Defendants' Internet portfolio, and stated that CMGI "has several characteristics that make it an especially compelling investment."

47.    Market reaction to Defendants' initiation of coverage of CMGI was dramatic, driving CMGI's stock price up by $24.04[1] or 22 percent to $135.13 in one trading day with trading volume of almost double the past month's average volume. By contrast, the NASDAQ Composite index only rose 3 percent that day.

---

[1] All prices of CMGI are split-adjusted reflecting a 2 for 1 splits on May 28, 1999 and January 12, 2000.

48.    A December 20, 1999 story in SmartMoney.com reported as follows:

SHARES OF INTERNET incubator **CMGI** (CMGI) powered ahead this morning, thanks to Merrill Lynch's Internet bull Henry Blodget, who initiated coverage on the company with near-term Accumulate and long-term Buy ratings. He also slapped on a $300 price target.

Blodget labeled the company a "core holding" in his Internet portfolio. According to the now-familiar formula, that's pretty much all it takes for an Internet stock to pop. CMGI shares jumped 21% to $270 this afternoon – hitting a new all-time high along the way.

**"Bottom line, CMGI is long the Internet – and, in our opinion, represents a good way for public market investors to do the same**," Blodget said in his report. [Emphasis supplied.]

* * *

Of course, there's a good amount of risk in so-called private-market investing. **But Blodget insists that risk is mitigated by CMGI's diversity. "Not all of CMGI's companies will grow to the sky; in fact, it is likely that some won't grow at all – and that's OK," he said. "In this industry, a few home runs can offset dozens of strikeouts."** [Emphasis supplied.]

49.    In an email to Blodget on December 22, 1999, Merrill Lynch institutional broker, Frank Laino, ribbed Blodget about the market's immediate and positive reaction to his price target for CMGI in the December 20 CMGI Analyst Report. "Was your 300 dollar price target 12 mos. Or 2 days. It seems like CMGI wants to get there today. Frank"

50.    Notwithstanding the positive ratings stated in the December 20 CMGI Analyst report, internally Virginia Syer, who worked under Blodget, and Blodget emailed each other on December 27, 1999 about the stock prices of the companies they covered, and in the process, revealed their true belief of the market value of CMGI:

Blodget:    How's the damage?  Got an email from frank laino confused about why they were going down.  Have we not been clear?

17

Syer:         ...I've had several conversations w/frank on issue of when these things trade off–not if–looks like it could be starting today[.] he's all into January effect of new money coming to market[.] also frank trades a weird basket – etys, athm, psinet, **cmgi**, **lycos** – nothing else in our universe really[.] [Emphasis supplied.]

Syer:         dude from industry standard just called to ask the same thing – I was like – **not for attribution, but this is not unexpected given the recent run and seasonal trading patterns of these names**... .

[Emphasis supplied.]

In other words, at the time that they were telling investors to buy CMGI stock, they were expecting its stock price to fall ("when ... not if") but did not want to make their views public ("not for attribution").

51.     A December 29, 1999 email from David Streitfeld, a Washington Post reporter whose curiosity about Blodget had been piqued following the remarkable market reaction to Blodget's initiation of coverage of CMGI, was forwarded to Blodget that same day. This email reiterated the generally accepted opinion regarding the powerful effect that Blodget's statements about a company had on that company's stock price, such as in the case of CMGI. In his email Streitfeld wrote:

my editor, the editor of the biz section, is very interested in blodgett [sic], always sending me his reports with notes at the top . . . in the financial world, he's [Blodget] one of the few people who are readily recognizable by their first name, maybe the only. . . . [H]e also, more than anyone, has the power to move stocks. There was an example last week. CMGI? Can't remember. ...

52.     Again on January 3, 2000, CMGI's stock price surged $24.78 to $163.22 when Defendant Blodget picked CMGI as one of his "Stocks of the Year." An article issued that day by

Bloomberg News attributed this "surge" solely to Blodget. Furthermore, no other news occurred that day to otherwise explain this jump. In less than two weeks from Defendants' initiation of coverage of CMGI, the stock rose $52.13, or 32 percent, while the NASDAQ Composite Index only rose 1.4%. Over the next three days, more than 32 million shares were traded, or more than 10 million shares a day, which was more than twice the average daily volume for CMGI for the previous month.

53.     Further demonstrating the lack of objectivity in Defendants' CMGI reports, Blodget and others on his analyst team actively engaged in pitching investment banking ideas to CMGI. On January 10, 2000, Kirsten Campbell, an analyst who worked under Blodget, emailed Blodget:

> cathy taylor (CMGI) called and said she had sent you an email on 12/29 that 1stUp [CMGI holding] specifically requested that we pitch them and hadn't heard back. I asked cathy if there was really an opportunity for us here versus just an exercise, and she said there was, and that the company specificall [sic] asked to see us. If you remember, the CEO is the guy my age who I got to know back in Oct. I can call him and ask what the deal is.

## CMGI ACQUIRES UBID

54.     In the period between late 1999 and early February 2000, CMGI determined to acquire uBid, an online auction site, of which it already owned 1% of the stock, in a stock swap transaction that was valued at approximately $400 million.

55.     CMGI's Form S-4, filed with the SEC on March 10, 2000, in connection with CMGI's acquisition of uBid, sets forth some of the history of the events that led to the uBid acquisition. Since uBid's initial public offering on December 9, 1998, uBid CEO Gregory K. Jones regularly contacted other internet and non-internet companies about establishing various business and strategic relationships with uBid. During this time period, Merrill Lynch served

as uBid's investment banker in connection with its initial public offering and with its September 29, 1999 public offering, for which Merrill Lynch received underwriting commissions and fees totaling $2.1 million. Thomas Mazzucco, a Merrill Lynch investment banker based in Merrill Lynch's offices in Palo Alto, California, was actively involved in all these uBid transactions.

56.     On January 12, 2000, Jones contacted CMGI to explore potentially mutually beneficial business arrangements between their two companies. CMGI responded, on January 14, 2000, that it was interested in acquiring the company.

57.     On January 19, 2000, Jones contacted Merrill Lynch, via Mazzucco, about advising it in connection with the proposed acquisition of uBid by CMGI.

58.     Not coincidentally, on January 19, 2000, Defendants issued an Analyst Report on uBid, maintaining the "BUY/BUY" rating and 12-month target price.

59.     The very next day, on January 20, 2000, Defendants issued an Analyst Report (the "January 20 CMGI Analyst Report") on CMGI maintaining the "ACCUMULATE/BUY" rating. The stated reason for the Report was CMGI's sale of two companies, Flycast and Adsmart. Defendants noted that these sales were "another example of how CMGI creates value for shareholders." Defendants intentionally did not disclose in the January 20, 2000 report the impending acquisition of uBid by CMGI, or Merrill Lynch's involvement as uBid's advisor, which was adverse information known to them when they issued the January 20, 2000 report. Defendants maintained their target price for CMGI stock of $150.

60.     The January 20 CMGI Analyst Report was issued as a part of Defendants' effort to obtain investment banking business from CMGI and/or to ensure that the uBid acquisition was consummated, thereby providing Merrill Lynch with investment banking fees of $2.3 million.

61.    The advisory services that Merrill Lynch provided uBid included attending uBid board of directors meetings and reviewing financial information concerning both companies with the uBid board, and advising the uBid board on the value of the merger combination, possible business alternatives, and the fairness of the exchange ratio, which included an opinion of the value of CMGI stock.

62.    Merrill Lynch's valuation of CMGI was supposedly based on a "sum-of-the-parts" analysis. Its conclusions purported to be based on estimated financial data for CMGI's operating companies and privately held portfolio companies available from publicly available research analysts' estimates, such as Blodget's, and estimates of CMGI management.

63.    However, this "sum of the parts" analysis supposedly done by Defendants was a mere sham. Unbeknownst to investors, also on January 20, 2000, in a private email exchange between Blodget and Ilona Nemeth, of Internet advertising company Doubleclick, regarding Doubleclick's financials, Blodget as much as admitted that his CMGI stock rating and other public statements about CMGI lacked a reasonable basis.

64.    In the January 20 email to Blodget, Nemeth defended Doubleclick's financials by comparing them to CMGI. She asked Blodget if, looking at CMGI's numbers objectively, he agreed that CMGI was double - or triple - counting revenue. Nemeth wrote:

Subject: RE "Morass"/affiliate revenue

Hi Henry,

**when u break out AdForce's [CMGI holding] affiliate revenue, what is left? Do you see CMGI double or triple-counting rev[enue] amongst all various companies - does anyone isolate this impact (Obviously, then compare to DCLK [Doubleclick] real revs)** [sic] I know they're a banking client, but I wonder if anyone has looked at this objectively.

21

Best-Ilona
(PS - Aren't you glad this isn't a note about metrics, GAAP, etc!)

[Emphasis supplied.]

65.    At this point in time, Blodget was supposedly intimately familiar with CMGI's business, operations, and finances, and had already declared himself knowledgeable about CMGI and its investment value. Blodget, an expert in financial analysis, had in published reports on CMGI, and held himself out to the public as an independent financial analyst of CMGI's (and its affiliates') financial condition. He had twice conducted a purportedly thorough analysis of CMGI's and its affiliates' revenues and discussed them with CMGI management within the last 5 weeks. Indeed, Blodget commented in the January 20, 2000 CMGI Analyst Report that he had spoken to CMGI about AdForce and another CMGI holding, YesMail, and that CMGI "was expecting calendar 2000E revenues for AdForce and YesMail to exceed $100mm, **also higher than we expected**," which indicated that he had specifically examined CMGI affiliate revenues. Blodget was therefore in a position to understand if what Nemeth wrote concerning the quality of CMGI's revenues was correct or not.

66.    In fact, in this private email exchange, Blodget did not dispute the criticism directed at CMGI for double-or triple-counting revenue, or the criticism of "what was left" when AdForce's affiliate revenue was broken out. To the contrary, he agreed, and responded by email the same day (January 20):

> CMGI isn't a banking client. **The best approach to that stock is to blur vision and say "long the internet." Look to [sic] close and it can scare you**.
>
> **Not so DCLK [Doubleclick]. Looking close is great. . . .**

[Emphasis supplied.]

This harsh, private assessment of CMGI came only days after Blodget proclaimed that CMGI was a core holding and one of his "Stocks of the Year," and the same day that Blodget issued a positive report on CMGI. There was no disclosure of CMGI double- or triple-counting revenue in any of Defendants' CMGI Analyst Reports. Blodget's true, concealed view of CMGI was completely contradicted by Blodget's public statements.

67.     In further response, Nemeth marveled that no one on Wall Street had focused on the issue of CMGI's double-or triple-counting of revenue:

> . . . [By the way], I didn't mean they were your banking client (I wouldn't know), just of the street in general, yet no one seems to have asked that question.

Id.

68.     Blodget's undisclosed, negative view of CMGI was significant for the obvious reason that he believed the Company's reported revenue figures were inflated. It was significant for the additional reason that the income statement is used as a barometer to measure future cash flows from operations. If revenue- and therefore net income- was overstated, it was reasonably foreseeable that future cash flow would be negatively impacted. CMGI's business model heavily depended on a solid cash position particularly given that it had a very high cash burn rate. Thus, this metric was an important tool to use in valuing the Company.

69.     Blodget knew about, and failed to disclose, the material risk that CMGI would face a cash flow problem within the next few reporting periods. If Blodget had disclosed his true belief about CMGI, it was foreseeable at the time that the market would react negatively, because such a disclosure would put into question CMGI's cash position, and dramatically increase concern over CMGI's ability to continue its operations for a prolonged period without raising additional cash.

70.    On January 22, 2000, Merrill Lynch attended a special meeting to discuss the proposed structure of the merger with CMGI held by the uBid board, and reviewed the proposed transaction, including its financial aspects.   It was asked to continue evaluating the potential transaction and to report its findings at the next meeting on January 26, 2000.

71.    Thomas Mazzucco, the Merrill Lynch investment banker in charge of the uBid/CMGI deal, liked and appreciated Blodget's January 19 Analyst Report on uBid, a copy of which had been forwarded to Mazzucco.  On January 24, 2000, Mazzucco emailed Blodget a short and to the point message: "nice report."

72.    Two days later, at the January 26, 2000 meeting of uBid's Board of Directors, the board formally engaged Merrill Lynch as uBid's financial advisor for the transaction, agreeing to pay Merrill Lynch $2.3 million in cash upon the closing of the merger.  The merger was announced before the opening of the market on February 10, 2000.

73.    On February 10, 2000, Defendants issued a restricted Report on CMGI.  The reason stated for the report was "Company Update."  Defendants announced CMGI's agreement to acquire uBid in an all-stock transaction and that, continuing a long-standing investment banking relationship with uBid, Merrill Lynch was serving as uBid's financial advisor in connection with the acquisition.

74.    The January 20, 2000 CMGI Analyst Report was materially false and misleading and omitted to disclose that 1) Defendants believed that CMGI was double-or triple-counting revenue; 2) Blodget did not believe his analysis of CMGI's affiliates' revenues; 3) Defendants' analysis of CMGI was dramatically flawed; 4) Defendants knew CMGI faced a risk of cash flow problems in future reporting periods;  5) Merrill Lynch  was advising uBid in connection with CMGI's offer to

buy it in exchange for $2.3 million, and Blodget was responsible for landing that business; and 6) Blodget's report was not an objective analysis of CMGI.

75.    Such disclosures would have negatively impacted Defendants' chances at getting investment banking business from CMGI and its affiliates.    Defendants also knew that this report would be considered by the uBid board of directors, and would be relied upon by Merrill Lynch investment banking in connection with the advisory services it was providing uBid.

76.    Had Blodget revealed his true opinion of CMGI, it is highly likely that uBid would not have agreed to be acquired by CMGI, and Merrill Lynch would have lost out on $2.3 million. Blodget did not want to jeopardize the $2.3 million income to Merrill Lynch for which he later took credit in his end of year bonus memo to Merrill Lynch management and jeopardize Merrill Lynch's banking business opportunities with other companies.

**DEFENDANT BLODGET CONTINUES TO CONCEAL HIS CONCERNS ABOUT CMGI'S CASH FLOW**

77.    Despite his privately-voiced reservations about CMGI and the impact that revenue overstatement would have on CMGI's cash flow, publicly Blodget continued to highly tout CMGI. On March 31, 2000, Blodget and his Internet Group issued a research report entitled "Internet Sector: Update/Outlook." This report, which Blodget circulated to members of the press, named CMGI as part of his "core holdings." In the report Defendants stated that "[w]e continue to believe there is long-term upside for the leading Internet stocks." The report continued:

In Q2 and beyond, we would continue to emphasize ... leading B2C companies that are 1) gaining market share, 2) strong internationally, 3) profitable (or showing a clear path to profitability), and 4) have a clear, defensible value proposition. ...

\* \* \*

**Our core holdings include: ... CMGI in B2C ...**

[Emphasis supplied.]

78.    On April 17, 2000, Defendants issued a report on the Internet Sector entitled "Internet Investing While Rome Burns."   Among other things, Defendants repeated that "Our core holdings include ... CMGI ($45; D-1-1-9)" and assigned CMGI the rating of short term "BUY," long term "BUY" (1-1).  The report explained that "core holdings" meant "stocks that we expect to outperform the sector over the long term."  According to Blodget, CMGI had "impressive earnings power"; "strong cash position (not dependent on capital markets to achieve profitability)"; "defensible value proposition"; "market leadership"; and "strong international." (Emphasis supplied).

79.    In fact, Blodget did not truly hold this belief.  The same day, April 17, Blodget privately admitted that CMGI stock had merited a Sell rating as early as March 2000:

Ghachem:      "this [the April 17 report] is brilliant-inspiring."

Blodget:      **"I think 'brilliant' might have applied to a short note entitled 'SELL NOW' back in march, but we must make the best of it."**

Ghachem tried to make light of Blodget's admission, stating:

Ghachem:      "just remember you're not paid to call stocks you're paid to tell a story and give people insights and that you are a master of."

Blodget:   "unfortunately, with retail, we also have to play portfolio manager somewhat...can't ask brokers to pick up all innuendo...also, retail sees us on TV, etc."

Ghachem:   "fair point...good to look out for retail **but retail doesn't vote II [Institutional Investor]...such is the way of the world...our bread and butter has little to do with our comp.**"

[Emphasis supplied.]

80.    For the reason, *inter alia*, that Blodget believed that CMGI should be sold and not bought, the April 17, 2000 Internet Sector report urging investors to buy CMGI was materially false and misleading.

81.    Even though Blodget believed CMGI should be sold and not bought, and agreed that the Company was double or triple counting revenue, on June 9, 2000 and June 14, 2000, Defendants issued additional favorable CMGI Analyst Reports in which they rated the stock "ACCUMULATE/ BUY." The reason given for these CMGI Analyst Reports was "Company Update." In this report Defendants noted that CMGI was a compelling investment. The undisclosed reason for Defendants' continued "ACCUMULATE/BUY" ratings was that Defendants believed that CMGI was still a source for quite a bit of investment banking business. For example, they listed anticipated investment banking business in the June 9 report. In that report, Defendants also stated that "CMGI plans to continue investing in Internet companies at a rapid pace, targeting 1-3 acquisitions and 4-6 [strategic] investments per month" and that they expected 8 CMGI properties and investments to go public within the next year.

82.    Also on June 14, 2000, Merrill Lynch published a 330-page book by Blodget and his research team entitled After The Fall: The Outlook for the Consumer Internet Industry. That day,

eager to get the word of his book out, Blodget circulated a Merrill Lynch press release to various recipients, which highlighted the book's key points, including that a long-term portfolio should include such "core B2C holdings" as CMGI.

83.    Blodget's book was reviewed by Adam Lashinsky, Silicon Valley Columnist, on June 19, 2000, who highlighted and repeated Blodget's recommendation that Internet stock investors own a basket of the best stocks, including CMGI.

84.    Defendants issued six more CMGI Analyst Reports between July 21, 2000 and October 6, 2000. Each Report maintained Defendants' "ACCUMULATE/BUY" rating even as the CMGI's share price dropped from $56 per share on June 14, 2000 to $19 per share as of the October 6, 2000 CMGI Analyst Report.

85.    The August 24, 2000 CMGI Analyst Report gave as a reason for the report: "CMGI and the New England Patriots." The report announced that CMGI had purchased the naming rights for the new Patriots stadium for $7.6 million/year for 15 years. Defendants publicly lauded the business decision in the report. That same day, Edward McCabe, who worked under Blodget, emailed Blodget that "$7.6 mm a year for this seems ridiculous." Defendants failed to disclose in this report that internally, Defendants believed that CMGI was wasting its money on frivolous items such as the stadium naming rights. This information would have been viewed as material because CMGI depended on a strong cash flow and a controlled cash burn rate. The market would have wanted to know that this spending was not considered essential to CMGI's operations because it implied that CMGI was not in control of its cash burn rate.

86.    During this same time period, June to October 2000, while Defendants were publicly touting CMGI stock "ACCUMULATE" and "BUY," **a Merrill Lynch proprietary fund**, the

Global Technology Fund, which held 247,300 shares of CMGI as of March 31, 2000, **liquidated its position in CMGI stock by September 30, 2000**, a move completely inconsistent with the investment advice (buy) that Defendants were providing to the public. This material information also was not disclosed at the time that it was happening.

87.     Moreover, notwithstanding Defendants' "ACCUMULATE/BUY" rating on the stock, during the last week of September, 2000, when the price of CMGI stock traded in the range of $27 to $30 per share, Blodget shared his private view with William Moynihan, a Merrill Lynch financial consultant, that "CMGI could go significantly lower than ... $28 per share."

### DEFENDANTS REVEAL THE MATERIALIZATION OF THE RISK KNOWN TO THEM OF CMGI'S CASH FLOW PROBLEMS.

88.     On October 4, 2000, Defendants issued another Analyst Report, reiterating their "ACCUMULATE/BUY" rating.  The reason given for the report was Company update.  In the October 4, 2000 CMGI Analyst Report, however, Defendants finally revealed their concern about CMGI's cash flow and burn rate.  Blodget noted CMGI's declining net asset value and stated that he did not expect improvements unless CMGI "can illustrate that its operating divisions are making strong progress toward turning cash flow positive."

89.     Market reaction was immediate.  The stock dropped 11.5% from a close on October 3, 2000 of $24.3125 to a close of $21.50 on October 4, 2000.  There was no other news that day that would have otherwise explained the precipitous drop in CMGI's stock price.

90.     In fact, the October 4, 2000 CMGI Analyst Report revealed risks previously undisclosed that, when they were disclosed by Defendants in the analyst report, had a negative impact on the market price of the stock.  Defendants finally revealed their concerns about looking

"too close" at CMGI, which Blodget had previously discussed with Ilona Nemeth on January 20, 2000. If CMGI was double-or triple-counting revenue among its various companies, then its actual revenue would be lower than stated. Defendants knew as early as December 1999 that this createe a material risk of future cash flow problems. According to Blodget in the October 4, 2000 CMGI Analyst Report, this risk, of which he had been aware, as detailed above, had materialized.

91.    In an October 6, 2000 CMGI Analyst Report (which was published that day), Blodget explained "we've received a number of questions about our comments on CMGI's cash position. This note is intended to clarify those comments." There was no disclosure that the report was demanded by CMGI management. Blodget reassured investors that CMGI was taking steps to reduce its burn rate and stated "we do not believe solvency is an issue for CMGI."

92.    Reuters reported in a news article entitled "CMGI Shares Hacked After Cash Statement," dated Friday, October 6, 2000, that "[i]n a critical report Wednesday, Merrill Lynch analyst Henry Blodgett [sic] noted CMGI's declining net asset value, adding that he did not expect improvements unless the company 'can illustrate that its operating divisions are making strong progress toward turning cash flow positive.'" The article noted that the price of CMGI had fallen by 13% as a result.

93.    Revealing the true extent of Blodget's duplicitousness and cynicism, on October 9, 2000, an internal Merrill Lynch email exchange reveals investment bankers and research analysts collaborating to manage the disclosure of negative information about CMGI to avoid further upsetting CMGI's CEO. On October 9, 2000, Peter Bradshaw, a Merrill Lynch analyst in London, emailed Blodget about putting out a note on CMGI, stating: "CMGI now sold 2mm of their 13mm Lycos shares - can we feed this info into the market out **or would you prefer we kept it under our**

hats?" [Emphasis supplied].  On October 16, 2000, Mazzucco and Matthew Pendo (Merrill Lynch investment banking) caught wind of this, and Pendo asked Blodget to intercede:

> mazzucco and I spoke to Peter Bradshaw who said he was going to put out a note saying CMGI was selling LCOS stock.  He said he would clear it with you as it relates to CMGI, **he was speculating CMGI was selling because they had liquidity issues** which I think you ought to give your perspective on—we do not need another call from David Weatherall [sic] if we can avoid it.

Blodget had Kirsten Campbell email and telephone Bradshaw and relay the following:

> Got a panicked email from bankers saying you were going to say CMGI's Lycos sales were the result of "liquidity issues."  **To save us high grief, please just say CMGI has sold some Lycos, thus putting pressure on the stock, without giving any reason as to why** (everyone will know why--I just don't want to hear it from Wetherell again)...
> Thanks hugely. Henry.

[Emphasis supplied.]

> Bradshaw responded the same day:

> tell henry I was never going to mention liquidity issues!   Bankers panicing needlessly! thx peter

This email exchange demonstrates that Defendants knew that CMGI faced a liquidity crisis and was selling Lycos stock to reduce it, but intentionally omitted to publicly discuss it.

94.    The statements made by Defendants in the CMGI Analyst Reports described above including the ratings assigned in such reports to CMGI stock, were false and misleading because:

   a.    they failed to disclose that the rating system publicly represented by Defendants to be based on a five-scale system was instead a de facto three-point system, as Defendants never used the "REDUCE" or "SELL" ratings even when they believed a company's stock was going to decline;

31

b.      they failed to disclose that Defendants believed the stock should not be bought;

c.      they failed to disclose that Defendants initiated coverage of and issued positive recommendations on CMGI stock in an effort to secure investment banking business from uBid and CMGI;

d.      they failed to disclose that the CMGI Analyst Reports represented the views of Merrill Lynch investment bankers and CMGI senior management, and not solely Merrill Lynch analysts, particularly in the case of the December 20, 1999 and October 6, 2000 CMGI Analyst Reports, and although these reports were purported to be the independent, objective, and reliable views of the analysts authoring these reports, the CMGI Analyst Reports in fact were not, for they were subject to approval, review, and comments that were incorporated before these reports were issued, by both Merrill Lynch investment bankers and CMGI senior management;

e.      only one month after Defendants initiated coverage of CMGI with an "ACCUMULATE/BUY" rating on CMGI and classified the stock as a "core holding," and the very day that they issued a second upbeat report on CMGI, privately Blodget agreed that CMGI overstated revenue by as much as 50% to 66%, and that consequently in his view, the best approach to CMGI stock is to **"blur vision;" "look too close and it can scare you"**;

f.      they failed to disclose that by overstating its revenues to such a degree, CMGI concealed the risk that it would experience cash flow shortages in future reporting periods, leading to a liquidity crisis;

g.   they failed to state that even if in their estimate a company such as CMGI faced cash flow shortages within the next twelve month period, Defendants would still rate it short-term "ACCUMULATE," which means "solid near term cash position";

h.   Defendants failed to disclose that the Analyst Reports were neither objective, independent, nor reliable as a result of the conflict of interest arising from Defendants' practice of compensating analysts for their efforts in bringing in investment banking business, including the CMGI - uBid acquisition (in fact, Blodget took credit for the $2.3 million earned by Merrill Lynch on that transaction); and

k.   Defendants knew or should have known that there existed no rational economic basis for their recommendations because CMGI was overstating revenue, which created a material risk of future cash flow problems.

95.   Furthermore, the above facts constitute a scheme and artifice that defrauded investors in CMGI common stock, including Plaintiff.

### MERRILL LYNCH'S COMPENSATION STRUCTURE REWARDED BLODGET AND THE OTHER ANALYSTS IN ITS INTERNET GROUP FOR THE INVESTMENT BANKING FEES THEY GENERATED

96.   Blodget earned millions of dollars as Merrill Lynch's head Internet analyst. Merrill Lynch paid him more than $5 million in 2000 and approximately $12 million in 2001 with some estimates as high as $20 million per year.

97.   Blodget's compensation, as well as the compensation of the other Merrill Lynch Internet analysts, was directly related to the investment banking fees Merrill Lynch obtained as a result of the Internet Analyst Reports Blodget and his Internet Group issued.

98.    Merrill Lynch's stock analysts, including Blodget, participated in a bonus pool that was funded, in part, from investment banking fees Merrill Lynch received.  Merrill Lynch has publicly acknowledged that its analysts received a large portion of their compensation in the form of year-end bonuses, which were primarily funded from a pool of money derived from investment banking fees.  Merrill Lynch has also publicly acknowledged that an analyst's year-end bonus reflected the employee's contribution to obtaining investment banking fees.

99.    Blodget was highly paid by Merrill Lynch because his reputation in the investment community as a top Internet analyst enabled Merrill Lynch to obtain numerous investment banking engagements, along with the lucrative investment banking fees from those engagements.  Blodget also encouraged other analysts in the Internet Group to obtain investment banking deals for Merrill Lynch.

100.    Proof that the compensation of Blodget and the other Internet analysts in his group was directly related to the investment banking fees which they helped Merrill Lynch obtain is highlighted in an interoffice memo from Deepak Raj, Head of Merrill Lynch Global Equity Research, to all U.S. Fundamental Research analysts, dated October 13, 2000:

> **We are once again surveying your contributions to investment banking during the year** . . . .
>
> Please provide complete details on your involvement in the transaction, **paying particular attention the degree that your research coverage played a role in origination, execution and follow-up.**  Please note, as well, **your involvement in advisory work on mergers or acquisitions, <u>especially where your coverage played a role in securing the assignment</u> and your follow-up marketing to clients. Please indicate <u>where your research coverage was pivotal in securing participation in a high yield offering.</u>**

[Bold emphasis supplied.]

101.    Blodget complied with the above request and stated that his group had been involved in over 52 completed or potential investment banking transactions and the completed transactions had earned $115 million for the firm. Shortly after documenting these contributions, Blodget's salary contract -- which contained a guaranteed minimum -- was cancelled and replaced with a substantially larger compensation package. Overall, Blodget's agreed annual compensation, including "guaranteed" minimum cash bonus, increased from $3 million for 1999 to $12 million for 2001. CMGI's acquisition of uBid in 2000 was among the deals for which the Internet Group took credit.

## LOSS CAUSATION

102.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff. Plaintiff purchased CMGI shares at artificially inflated prices caused by Defendants' misstatements and was damaged thereby because the price of CMGI's stock declined when misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the concealed risks to CMGI's business operations and financial operating results, were revealed and/or materialized. These drops in CMGI's share price at the times of the disclosures of material negative facts caused Plaintiff's losses (including without limitation on October 3 and 4, 2000, when Defendants first revealed concerns about CMGI's cash flow and cash burn rate).

103.    Further, Plaintiff's losses were also caused by Defendants' misstatements and omissions due to the fact that Plaintiff was aware of and affirmatively relied upon Defendants' price targets for CMGI stock, including the $300 price target that Defendants put on CMGI on December 20, 1999. CMGI's share price plummeted while Plaintiff held an open long position

in CMGI stock based on Defendants' misrepresentations and omissions, causing Plaintiff's losses.

104.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated CMGI's stock price and operated as a fraud or deceit on purchasers of CMGI stock.  By making the misstatements and omissions of fact alleged herein Defendants misrepresented CMGI's business and prospects.   Defendants repeated and reiterated, and never corrected, their false statements, which caused and maintained the artificial inflation in CMGI's stock price until the truth was revealed.

105.    Defendants' false and misleading statements had the intended effect and caused CMGI's stock to trade at artificially inflated levels.  The decline in CMGI's stock price was a direct and proximate result of the true facts concerning CMGI's cash position and the materialization of the undisclosed risk that CMGI would have liquidity problems finally being revealed to investors and the market.  The timing and magnitude of CMGI's stock price declines negate any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## STATUTORY SAFE HARBOR

106.    The statutory safe harbor provided for forward-looking statements does not apply here as the statements challenged above were not forward-looking.

## ADDITIONAL ALLEGATIONS OF SCIENTER

107.    As more particularly alleged herein, Defendants acted with scienter in that they: a) deliberately and intentionally engaged in acts and practices and a course of conduct which had the effect of artificially inflating maintaining at artificial levels the price of CMGI's common stock in the market; b) knew or recklessly disregarded facts or had access to information suggesting that their public statements were not accurate; and/or c) deliberately engaged in behavior in violation of the Exchange Act.

108.    Further, Defendants knew that their statements, analyst reports and price targets would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

109.    In addition, Defendants had substantial financial motives to make their false statements.  Merrill Lynch gained substantial investment banking fees as the result of its engagement in the CMGI/uBid transaction.  See ¶ 76, supra.  Blodget gained millions of dollars in compensation for the investment banking business generated by his analyst reports.  See ¶¶ 96-101, supra.

## EFFICIENT MARKET ALLEGATIONS

110.    Plaintiff will rely, in part, on the efficient market hypothesis and the "fraud on the market" doctrine.  At all relevant times, the market for CMGI securities was an efficient market for the following reasons.

111.    CMGI stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market.

112.    As a regulated issuer, CMGI filed periodic public reports with the SEC and the Nasdaq. CMGI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

113.    As a result of the foregoing, the market for CMGI securities promptly digested current information regarding CMGI from all publicly-available sources and reflected such information in CMGI stock price. Under these circumstances, Plaintiff was injured by, inter alia, artificially inflated prices and a presumption of reliance applies.

**AS AND FOR A**
**FIRST CLAIM FOR RELIEF**
**(Against All Defendants**
**Under Section 10(b), Exchange Act**
**and SEC Rule 10b-5)**

114.    Plaintiff incorporates by reference the allegations set forth above as though fully set forth herein.

115.    Defendants, and each of them, made untrue statements of material fact, and omitted to disclose material facts, that were intended to and did: (I) deceive the investing public, including Plaintiff, who purchased or otherwise acquired CMGI shares; (ii) artificially inflate and maintain the market price of CMGI stock; and (iii) cause Plaintiff to purchase or otherwise acquire CMGI stock at artificially inflated prices. Defendants' misstatements also caused Plaintiff to continue to hold an open long position in CMGI shares as CMGI's share price fell.

116.   Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading, all in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants' material misrepresentations and omissions concerned, inter alia: (I) the fact that their ratings in many cases did not reflect the analysts' true opinion of CMGI; (ii) that as a matter of undisclosed, internal policy, no "REDUCE" or "SELL" recommendations were issued, thereby converting a published five-point rating scale into a de facto three-point system; (iii) that they failed to disclose that Merrill Lynch's ratings were tarnished by an undisclosed conflict of interest in that the research analysts were acting as quasi-investment bankers for the companies at issue, often initiating, continuing, and/or manipulating research coverage for the purpose of attracting and keeping investment banking clients, thereby producing misleading ratings that were neither objective nor independent, as they purported to be; and (iv) that they failed to comply with the rules and regulations of the SEC, NASD, and other regulatory authorities regarding communications to the investing public.

117.   Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of obtaining lucrative investment banking business from CMGI.

118.   Defendants ML&Co. and MLPFS knew or recklessly disregarded that their statements concerning the integrity and objectivity of their securities research and rating system were false at the time they made these statements, because those statements were flatly contradicted by Defendants' unlawful plan, scheme and course of conduct alleged herein.

119.    Defendants ML&Co. and MLPFS were required to comply with all relevant SEC and NASD regulations.  In addition, said Defendants had a duty to fully disclose the truth concerning their business practices alleged herein by virtue of their issuance of research reports to investors, as a result of Defendant MLPFS' status as a registered U.S. broker/dealer and its wrongful activities in such capacity alleged herein, and as a result of the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X [17 C.F.R. § 210.1, et seq.], S-K [17 C.F.R. § 229.10, et seq.], and other SEC regulations.

120.    Defendants' material misrepresentations and omissions induced a disparity between the transaction price and the true "investment quality" of CMGI stock.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CMGI stock was artificially inflated and Plaintiff was deceived as to the true investment quality of CMGI stock.

121.    In ignorance of the fact that the market price of CMGI stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or upon the integrity of the market in which the stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiff purchased CMGI stock at artificially inflated prices and was damaged thereby. and subsequently held an open long position in CMGI stock in reliance on Defendants' price targets and public statements concerning CMGI.

122.    At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity and believed them to be true.  Had Plaintiff known of the truth of the misrepresentations or known of the omitted material facts, Plaintiff would not have purchased and held his CMGI stock or would not have bought CMGI shares at the artificially inflated prices that he paid.

123.    Plaintiff was injured because the risks that materialized were risks of which he was unaware (but of which Defendants were aware) as a result of Defendants' misrepresentations, omissions, and other fraudulent conduct alleged herein.  Absent Defendants' wrongful conduct, Plaintiff would not have been injured.

124.    By virtue of the foregoing, Defendants each violated section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

125.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with his purchases and holding of CMGI stock in an amount to be proven at trial.

### AS AND FOR A
### SECOND CLAIM FOR RELIEF
### (Against ML&Co. & MLPFS
### Under Section 20(a), Exchange Act)

126.    Plaintiff incorporates by reference the allegations of the paragraphs set forth above as though fully set forth herein.

127.    Defendants ML&Co. and MLPFS acted as control persons of Defendant Blodget within the meaning of Section 20(a) of the Exchange Act.  They reviewed, approved, and controlled the content and dissemination of the Analyst Reports on CMGI, which Plaintiff

contends are misleading. In addition, both ML&Co. and MLPFS, in addition to Defendant Blodget, caused their names to prominently appear on the CMGI Analyst Reports described herein.

128.    Further, ML&Co. is a control person of Defendant MLPFS within the meaning of Section 20(a) of the Exchange Act. MLPFS is a wholly owned subsidiary of ML&Co., and also shares the same management team. ML&Co., Inc. reviewed, approved, and controlled the content and dissemination of the CMGI, Analyst Reports which Plaintiff contends are misleading.

129.    As set forth above, Defendant Blodget violated Section 10(b) of the Exchange Act, and Rule 10b-5(a), (b), and  c) by his acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Defendant Blodget, Defendants ML&Co. and MLPFS are liable as control persons within the meaning of Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages in connection with his purchase and holding of CMGI shares.

### AS AND FOR A
### THIRD CLAIM FOR RELIEF
### (Against All Defendants for Common Law Fraud)

130.    Plaintiff repeats and realleges each of its previous allegations as though fully set forth herein.

131.    As a broker-dealer and associated person, Defendants owed Plaintiff a duty of full disclosure, honesty, candor, and a duty to exercise reasonable care in making public statements regarding CMGI. See ¶ 119, supra. Further, because of their superior knowledge of essential facts concerning CMGI, disseminating Defendants' reports and price targets to investors without

disclosure of their true opinions concerning CMGI and the true risks concerning its cash position was inherently unfair. Further, even if the duty to disclose was not imposed by SEC regulations, Defendants were under a common law duty to disclose under the circumstances, because Defendants' silence as to a material fact in the context of their public statements was misleading.

132.    In furtherance of the unlawful course of conduct alleged herein, and with intent to deceive investors, the Defendants named in this cause of action employed a scheme and artifice to defraud, as a part of which Defendants made and/or participated in the making of the misrepresentations and omissions of fact to Plaintiff regarding CMGI as alleged herein.

133.    The material misrepresentations and omissions of material facts alleged herein were made by the Defendants intentionally, with knowledge that they were false. See ¶¶ 108-09, supra. Defendants knew that the public and purchasers of CMGI stock were relying on their misrepresentations and omissions.

134.    Additionally, Plaintiff was aware of and relied upon certain material, false and misleading statements made by Defendants. Specifically, Plaintiff was aware of and relied upon Defendants' $300 price target for CMGI, knew that CMGI was on Defendant Blodget's recommended list, and knew that Merrill Lynch and Blodget had "buy" ratings on CMGI.

135.    Were it not for Defendants' false and misleading misstatements and omissions, Plaintiff would not have purchased and held CMGI stock.

136.    As a direct and proximate result of Defendants' unlawful conduct and Plaintiff's reliance on the material false statements set forth in ¶ 134, supra, Plaintiff has suffered money damages. Plaintiff purchased and held CMGI stock in reliance on Defendants' misstatements and omissions and later incurred losses as a result of decreases in the price of CMGI shares. The

allegations of loss causation in ¶ 102-05, supra, are incorporated by reference as though fully set forth hereat.

137.    The unlawful conduct set forth in this cause of action constitutes a pattern of fraudulent conduct directed at the public generally. See Walker v. Sheldon, 10 N.Y.2d 401, 404, 223 N.Y.S.2d 488 (1961).  Additionally, Defendants acted with a culpable state of mind.  Defendants' misstatements and omissions of material facts were made wantonly, wilfully, deliberately, intentionally, with an evil state of mind, with indifference to their civil obligations, with circumstances of aggravation and outrage, with wanton dishonesty, with conscious disregard of the rights of others, and in a manner that was morally culpable to an extreme degree. Punitive damages are therefore appropriate.

## JURY DEMAND

138.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Awarding damages against Defendants, jointly and severally, including disgorgement of all unjust enrichment, for damages suffered as a result of Defendants' violation of the securities laws, as well as punitive damages pursuant to the common law ;

B.    Awarding Plaintiff the costs and expenses of this litigation, including reasonable

attorneys' fees, and experts' fees and other costs and disbursements; and

C.    Granting Plaintiff such other and further relief as to the Court may seem just and

proper.

Dated:        New York, New York
              July 23, 2007

                        LAW OFFICE OF
                        CHRISTOPHER J. GRAY, P.C.

                        By: _____
                            Christopher J. Gray (CG 0334)
                        460 Park Avenue, 21ST Floor
                        New York, New York 10022
                        (212) 838-3221

                        *Counsel for Plaintiff*
                        *Ronald Ventura*

45