UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE MERRILL LYNCH RESEARCH           :        02 MDL 1484 (JFK)
REPORTS SECURITIES LITIGATION          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This case relates to:                  :
                                       :
RONALD VENTURA,                        :        07-CV-6677 (JFK)
                    Plaintiff,         :
         -against-                     :
                                       :
MERRILL LYNCH & CO., INC., MERRILL     :
LYNCH, PIERCE, FENNER & SMITH, INC.,   :
and HENRY BLODGET                      :
                                       :
                    Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW OF MERRILL LYNCH & CO., INC. AND MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

Jay B. Kasner
Scott D. Musoff
Joanne Gaboriault
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Defendants Merrill Lynch & Co.,
  Inc. and Merrill Lynch, Pierce, Fenner & Smith
  Incorporated

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        1.   Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        2.   Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.   Merrill Lynch's Research Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.   CMGI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    D.   Merrill Lynch's Coverage of CMGI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT
THE COMPLAINT SHOULD BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.     PLAINTIFF FAILS TO PLEAD LOSS CAUSATION . . . . . . . . . . . . . . . . . . . . . 14

    A.   Plaintiff's Allegations that He "Affirmatively Relied" on Merrill Lynch's
        Price Targets, Even If True, Would Amount Only to Transaction Causation . . . 15

    B.   Plaintiff Fails to Plead that Merrill Lynch or Mr. Blodget "Concealed
        Risks Concerning CMGI's True Financial Condition" . . . . . . . . . . . . . . . . . . . . 16

    C.   The Risks that Allegedly Caused Plaintiff's Purported Losses
        Were Fully Disclosed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    D.   Plaintiff Fails Adequately to Plead Any Economic Loss . . . . . . . . . . . . . . . . . 20

II.    PLAINTIFF FAILS TO PLEAD WITH PARTICULARITY ANY
MATERIAL MISSTATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.   PLAINTIFF FAILS TO PLEAD SCIENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.   PLAINTIFF CANNOT STATE A CLAIM FOR COMMON LAW FRAUD . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

CASES                                                                                   PAGE(S)

<u>ATSI Commcations, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87 (2d Cir. 2007) . . . . . . . . . . . . . . . 23

<u>In re Bayou Hedge Fund Litigation</u>, 2007 U.S. Dist. LEXIS 59145
    (S.D.N.Y. July 31, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723 (1975) . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Central Laborers' Pension Fund v. Integrated Electric Services Inc.</u>,
    No. 06-20135, 2007 U.S. App. LEXIS 19917 (7th Cir. Aug. 21, 2007) . . . . . . . . . . . . 23

<u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . 15, 20

<u>Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.</u>,
    343 F.3d 189 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

<u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763 (2d Cir. 1994) . . . . . . . . . . . . . . 14

<u>Granite Partners, L.P. v. Bear, Stearns & Co.</u>, 58 F. Supp. 2d 228 (S.D.N.Y. 1999) . . . . . . . 24

<u>Hart v. Internet Wire, Inc.</u>, 145 F. Supp. 2d 360 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . 3

<u>Joffee v. Lehman Brothers, Inc.</u>, 410 F. Supp. 2d 187 (S.D. N.Y. 2006), <u>aff'd</u>,
    209 Fed. Appx. 80, 2006 U.S. App. LEXIS 31487 (2d Cir. Dec. 16, 2006) . . . 16, 18, 21

<u>Kalnit v. Eichler</u>, 264 F.3d 131 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>Lasker v. N.Y. State Electric & Gas</u>, 85 F.3d 55 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161 (2d Cir.),
    <u>cert. denied</u>, 546 U.S. 935 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

<u>Levan v. Capital Cities/ABC, Inc.</u>, 190 F.3d 1230 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 5

<u>In re Merrill Lynch & Co. Research Reports Securities Litigation</u>,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

In re Merrill Lynch & Co. Research Reports Securities. Litigation, 02 MDL 1484 (JFK)
    2007 U.S. Dist. LEXIS 65372 (S.D.N.Y. Sept. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

In re Merrill Lynch & Co. Research Reports Securities Litigation,
    273 F. Supp. 2d 351 (S.D.N.Y.), aff'd in part, reversed in part sub nom.,
    Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir.),
    cert. denied, 546 U.S. 935 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 6, 22

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006) . . . . . . . . . . . . . . 15

In re Merrill Lynch Research Reports Securities Litigation,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . 19

Podany v. Roberston Stephens, Inc., 350 F. Supp. 2d 375 (S.D.N.Y. 2004) . . . . . . . . . . . 17, 22

Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146 (S.D.N.Y. 2004) . . . . . . . . . . . . . . 22

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

Serova v. Teplen, 05 Civ. 6748, 2006 U.S. Dist. LEXIS 5781 (S.D.N.Y. Feb. 16, 2006) . . . . . 24

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) . . . . . . . . . . . . . . . . . 23, 24

Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Yurman Design Inc. v. Chaindom Enterprises, Inc., 99 Civ. 9307,
    2003 U.S. Dist. LEXIS 15070 (S.D.N.Y. Aug. 28, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATUTES                                          PAGE(S)

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

15 U.S.C. § 78u-4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15 U.S.C. § 78u-4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## PRELIMINARY STATEMENT

Plaintiff Ronald Ventura, who allegedly purchased the common stock of the high-technology and e-commerce company CMGI, Inc., opted out of the global settlement approved by this Court on September 5, 2007 and re-filed, in his own name, a complaint based on the one filed in the now-settled CMGI class action. That complaint was nearly identical to those dismissed by Judge Pollack and affirmed by the Second Circuit Court of Appeals. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351 (S.D.N.Y.),[1] aff'd in part, rev'd in part on other grounds sub nom., Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir.), cert. denied, 546 U.S. 935 (2005). "The record clearly reveals" that Ventura is one of the "high risk speculators" Judge Pollack referred to in that decision, who "kn[ew] full well or [was] properly chargeable with appreciation of the unjustifiable risks [he] [was] undertaking in the extremely volatile and untested stock[] at issue [here]." Merrill Lynch & Co. Research Reports, 273 F. Supp. 2d at 358. As is evident from the transaction summary he included with his request to be excluded from the settlement, Ventura made millions of dollars in profits on short term trades in the stock of CMGI, which profits began to erode only after the internet bubble began to collapse in March 2000.[2]

As this Court recognized in concluding that the global settlement was fair and

---

[1]    The consolidated amended class action complaint filed in the action captioned In re 24/7 Real Media Research Reports Securities Litigation, 02 Civ. 3210 (MP), dismissed by this opinion, is attached as Exhibit 1 to Declaration of Scott D. Musoff in Support of Merrill Lynch's Motion to Dismiss the Complaint dated October 1, 2007 ("Musoff Decl.").

[2]    Ventura's trading in the stock of CMGI is derived from the document Ventura submitted in connection with his request to be excluded from the global settlement. (See Musoff Decl. Ex. 2.) It appears from that submission that Ventura purchased and sold more than $22 million worth of stock in CMGI. (See id.)

1

reasonable, "[h]ad the plaintiffs not settled and pursued the litigation of these Actions, the almost certain result would have been complete non-recovery" in light of the Second Circuit's decision in <u>Lentell</u>. <u>In re Merrill Lynch & Co. Research Reports Sec. Litig.</u>, 02 MDL 1484(JFK), 2007 U.S. Dist. LEXIS 65372, at *31 (S.D.N.Y. Sept. 5, 2007). As this Court recognized, <u>Lentell</u> compels dismissal of Ventura's claims for failure to plead that any misstatement or omission by Merrill Lynch was the proximate cause of plaintiff's alleged losses. In addition, the research reports as well as CMGI's own statements unambiguously warned investors of the very risks that materialized, specifically, information concerning CMGI's cash position, that CMGI "tend[ed] to trade as a proxy for the health of the Internet sector and the Internet IPO market" and [i]f the Internet sector craters, of course, CMGI will crater along with it," as well as CMGI's volatility and the substantial risks associated with its business model.

Ventura's complaint also fails to plead fraud with particularity. Although he conclusorily alleges that his "losses" resulted from CMGI's undisclosed cash flow problems, plaintiff fails to plead, consistent with the strictures of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), that Merrill Lynch or Mr. Blodget had any undisclosed "longstanding concern about CMGI's cash flow and cash burn rate" or that Merrill Lynch or Mr. Blodget intended to defraud CMGI investors with their research reports on CMGI. Thus as set forth below, the complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND[3]

A.    The Parties

      1.    Plaintiff

Plaintiff Ronald Ventura is an individual who requested exclusion from the CMGI

class settlement on May 18, 2007.  (Musoff Decl. Ex. 2.)  On July 24, 2007, Ventura filed on his

own behalf a complaint which – aside from some omitted paragraphs and citations to Merrill

Lynch documents released to the public by then New York Attorney General Spitzer – is virtually

identical to the proposed second amended consolidated class action complaint filed in the CMGI

class action in October 2005, as well as the complaints that were dismissed by Judge Pollack and

affirmed by the Second Circuit.  (See Musoff Decl. Ex. 1.)[4]

---

[3]    Although the allegations of the Complaint, to the extent they purport to allege facts, must be accepted as true for purposes of this motion only, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions " will not suffice to withstand a motion to dismiss.  Yurman Design Inc. v. Chaindom Enters., Inc., 99 Civ. 9307, 2003 U.S. Dist. LEXIS 15070, at *5 (S.D.N.Y. Aug. 28, 2003) (Keenan, J.); accord Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360, 364-67 (S.D.N.Y. 2001) (Pollack, J.).  The Court may consider "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the [SEC], and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence."  Merrill Lynch & Co. Research Reports, 273 F. Supp. 2d at 356-67 & nn.9-13 (citations omitted).

[4]    In connection with his purchases and sales of the securities of Excite@Home, not at issue here, Mr. Ventura moved for appointment as lead plaintiff in the actions consolidated as In re Merrill Lynch & Co. Excite@Home Research Reports Sec. Litig., 02 CV 3042. (See Musoff Decl. Ex. 3.)  The Court appointed Fred Kaplan instead to serve as lead plaintiff for the putative class.  Ventura has apparently elected to participate in that settlement.

2.    <u>Defendants</u>

Defendant ML & Co. is a financial services holding company that through its wholly-owned subsidiary MLPF&S provides investment banking, research and brokerage services, among others. (Compl. ¶¶ 8-9.) Defendant Henry Blodget was a First Vice President of Merrill Lynch and a former analyst for companies in the Internet sector. (Compl. ¶ 10.)

B.    <u>Merrill Lynch's Research Reports</u>

As with most other financial services firms, Merrill Lynch analysts prepared research reports relating to companies in a number of different areas. With respect to the internet/electronic commerce sector, Merrill Lynch issued research reports on a number of different Internet companies during the what plaintiff describes as the "relevant time period" (December 20, 1999 - October 4, 2000), including CMGI. There were two basic types of research reports: (i) quarterly Sector Reports (or "Quarterly Handbooks") containing in-depth analyses of the industry and each particular company in the sector covered by Merrill Lynch, and (ii) reports focusing on a particular company that took the form of comments, bulletins and notes, which were generally issued in response to news from the issuer or new developments or trends affecting the specific company that was the subject of the report.[5]

As evidenced from the face of these reports (which are all referenced in the complaint), CMGI was the primary source of the factual information contained in the reports. (<u>See, e.g.</u>, Musoff Decl. Ex. 4, CMGI 0018-0019.) The reports also discuss the company's reported financial results, as well as its business model and strategy and CMGI's estimates

---

[5]    The CMGI reports from December 20, 1999 to October 6, 2000 are attached in chronological order at Musoff Decl. Ex. 4.

concerning future performance.  (See id., CMGI 0014-0017.)  They also contain a description of the company's competitive position, risks associated with CMGI in particular and valuations of comparable companies.  (See id.)  The research analysts also included in the reports their own financial models and projections for the company.  (See id.)

As set forth in Judge Pollack's decision dismissing the first two complaints,

Each of the company-specific research reports about which . . . plaintiff[] complain[s] carried a rating consisting of a two-part designation:  (1) a letter (either A, B, C, or D) representing the analysts' opinion of the stock's "Investment Risk Rating," coupled with (2) a pair of numbers (each a numeral between 1 and 5) designating the analysts' opinion of the "Appreciation Potential" of the stock over time.

An Investment Risk Rating of "A" denoted the lowest level of risk.  A stock with an "A" rating was expected to exhibit "modest price volatility," and typically represented a company with strong balance sheets, demonstrated long-term profitability, and "stable to rising dividends."  A "B" rating means that the stock was "expected to entail price risk similar to the market as a whole," and represented a company that had "demonstrated the ability to produce above-average sales, profits and other measures of leadership within its industry."  A "C" rating indicated "above average risk," and represented companies with balance sheets that were average or below average for their respective industries.  The "C" companies in many cases were new to the industry or had erratic earnings.

A "D" rating, which the analysts assigned to all Internet companies . . . denoted the highest level of risk.  In addition to having all of the characteristics of a "C" issuer, "D" companies were so designated because of the analysts' opinion that the company's stock had a "high potential for price volatility."  One or more of the following factors, among others, could have led to a company's receiving a "D" rating:  untested management, lack of earnings history, or heavy dependence upon one product or service.[6]

As noted above, the Investment Risk Rating for each stock was coupled

---

[6]  Thus, analogous to other high risk investments, such as so-called "junk bonds," "D" rated companies with "Buy" or "Accumulate" ratings are highly speculative and risky, but there is the potential for higher returns.  See Levan v. Capital Cities/ABC, Inc. 190 F.3d 1230, 1235 (11th Cir. 1999) ("Junk bonds are bonds that have a high risk of nonpayment and therefore yield a high interest rate.").

with a pair of numbers. The two numbers, each a single digit between one and five, represented the analysts' opinions of the stock's Appreciation Potential. The first digit reflected the analyst's prediction of how the stock would perform over the short term, i.e., within 0-12 months, and the second digit represented the analyst's prediction of performance over the intermediate term, i.e., 12-24 months. The digits signified the following estimates:

1 BUY: Issue was considered to have particularly attractive potential for appreciation and was estimated to appreciate by 20% or more within the given time frame.

2 ACCUMULATE: Issue was considered to have attractive potential for appreciation and was estimated to appreciate by 10-20% within the given time frame.

3 NEUTRAL: Issue was considered to have limited potential for appreciation and was estimated to appreciate/decline by 10% or less within the given time frame.

4 REDUCE: Issue was considered to unattractive for appreciation and was estimated to decline by 10%-20% within the given time frame.

5 SELL: Issue was considered to be particularly unattractive for appreciation and was estimated to decline by 20% or more within the given time frame.

Merrill Lynch & Co. Research Reports, 273 F. Supp. 2d at 361.

The research reports also warned investors not to rely on the reports in isolation for any specific investment decision:

This research report is prepared for general circulation and is circulated for general information only. It does not have regard to the specific investment objectives, financial situation and the particular needs of any specific person who may receive this report. Investors should seek financial advice regarding the appropriateness of investing in any securities or investment strategies discussed or recommended in this report and should understand that statements regarding future prospects may not be realized. . . .

(Musoff Decl. Ex. 4, CMGI 0005.) Moreover, the research reports, in addition to designating

Internet securities (such as CMGI) as "High Risk," contained numerous cautionary disclosures

about the risks of investing in Internet stocks in general and in the particular Internet company

(such as CMGI). The June 7, 2000 Sector Report, for example, cautioned investors that:

"Sector volatility remains extreme. . . . . We expect the leading stocks to remain volatile through the summer, then move toward old highs in the fall."  (Musoff Decl. Ex. 5, at 2.)

"[W]e believe many internet companies will likely fail (we estimate that 75% will disappear within 3-5 years), and many internet stocks are still overvalued."  (Id., at 6.)

"We continue to believe that the B2C sector [consumer internet stocks] is in a shakeout and consolidation phase, and unlike prior periods of weakness, we do not expect the entire sector to recover when the overall technology market turns positive again."  (Id., at 14.)

"With the capital markets tightening, cash is not just king – it's oxygen. . . . If the capital flow shuts down, however – which it will, quickly, if returns on most internet investments continue to be as poor as they have been over the last few months – cash burn becomes a critical investment criterion."  (Id., at 16.)

C.    CMGI

        CMGI incorporated in 1986 and went public in 1994.  (Compl. ¶ 27.)  CMGI is

"a holding company that develops, operates and invests in internet companies" – a so-called

"internet incubator" company – essentially operating as a publicly financed venture capitalist.

(Musoff Decl. Ex. 4, CMGI 0002.)  "The company's holdings comprise[d] both majority-owned

subsidiaries and strategic minority investments. . . .  [and] [we]re concentrated in the Internet

content, commerce, community, advertising services, infrastructure, and B2B sectors."  Id.  The

Company had adopted a strategy of seeking opportunities to realize gains through the selective

sale of investments or having separate affiliates sell minority interests to outside investors.

Shares of CMGI common stock, during the period between December 20, 1999 (when Merrill

Lynch first began covering the stock) and October 4, 2000 traded as high as $327 ($163.50 split

adjusted) on January 3, 2000 and as low as $21.8125 on October 4, 2000.  (Musoff Decl. Ex. 6.)

        CMGI's public filings carried abundant risk disclosures.  Its February 5, 1999

prospectus, for example, cautioned investors that:

7

**"We may not have operating income in the Future.** Recently we have had significant operating losses. We may never have operating income in the future." (Musoff Decl. Ex. 7, at 6.)

**"We may have problems raising money we need in the future.** In recent years, our operating losses have been partially covered by profits we have made by selling our stock in other companies in which we have invested in the past." (Id.)

**"Our Strategy of Expanding our business through acquisitions of other businesses and technologies presents special risks to us** . . . . [M]any of our investments are in early-stage companies, with limited operating histories and limited or no revenues. We may not be able to successfully develop these young companies." (Id., at 9.)

**The Value of Our Business May Fluctuate Due to the Fluctuating Value of Certain Stock Assets We Hold** . . . . Fluctuations in the market price and valuations of the securities we hold in other companies may result in fluctuations of the market price of our stock." (Id., at 10.)

**Our Quarterly Results May Fluctuate Widely.** Our operating results have fluctuated widely on a quarterly basis during the last several years, and we expect to experience significant fluctuations in future quarterly operating results." (Id.)

**The Price of Our Stock Has Been Volatile.** The market price of our stock has been, and is likely to continue to be, volatile, experiencing wide fluctuations. (Id. at 11.)

D.    Merrill Lynch's Coverage of CMGI

        Merrill Lynch issued its first research report on CMGI on December 20, 1999. On

that date, CMGI was trading at $222 3/16 per share. The report had a 12-18 month price target

of $300/share on CMGI's stock price. (Id. Ex. 4, CMGI 0001.) As noted above, CMGI met the

$300 price target: CMGI reached a high trading price of $327 on January 3, 2000. (Id. Ex. 6.)

Throughout the period from December 20, 1999 to October 4, 2000 (e.g., Compl. ¶¶ 29-30 (the

"relevant time period")), Merrill Lynch's rating of CMGI was a D-2-1, denoting the analyst's

opinion that CMGI had "high potential for price volatility," that it was estimated to appreciate by

10-20% within 0-12 months and by 20% or more in 12-24 months. Merrill Lynch issued 13

8

research reports on CMGI between December 20, 1999 and October 4, 2000. That the CMGI reports cautioned investors of the risks associated with CMGI is underscored by the high risk "D" rating that the stock at all times carried. The very first report cautioned investors that:

> "CMGI's stock tends to trade as proxy for the health of the Internet sector and the Internet IPO market. . . . **CMGI is long the internet. As long as the public market for internet stocks does well, CMGI probably will, too.**" (Musoff Decl. Ex. 4, CMGI 0001 (emphasis added).)

> "CMGI, in and of itself, is a basket of investments. The majority of the invest-ment holdings are private companies (although the majority of the estimated net asset value is derived from public or soon to be public companies). **Obviously, there is a large amount of risk in private-market investing.**" (Id., CMGI 0002 (emphasis added).)

> "**Valuing CMGI is difficult at best and futile at worst** . . . . **CMGI is highly volatile** and with a market cap of $25 billion (2X estimated net asset value), it is certainly not inexpensive. . . . **If the Internet sector craters, of course, CMGI will crater along with it.** (Id., CMGI 0003 (emphasis added).)

Mr. Blodget also explained the many assumptions he used "[t]o perform a bottoms-up valuation analysis of CMGI" starting with the four components he used to estimate a net asset value (NAV) for CMGI. (Id., CMGI 0003.) Mr. Blodget's estimate of the value of CMGI's assets was appended to the report. (Id., CMGI 0004.) The text of the December 20, 1999 report also included a section entitled "Key Issues/Metrics to Track," and concluded with a "Risks" summary:

> Like all internet stocks, CMGI is an extremely risky investment. The risks include: volatility (50% moves in either direction with no change in fundamentals are normal); integration (CMGI has been buying 2-3 companies a month for the last six months), and the health of the public market internet sector in general. (Id., CMGI 0003.)

On January 20, 2000, with CMGI's stock price at $122 3/8, Merrill Lynch cut the 12-18 month trading price target to $150/share to reflect the stock split that occurred on January

9

11, 2000 and reported that "CMGI announced today it would sell adnetworks Flycast and Adsmart to Engage for $2.5 billion in stock, approximately the net asset value (NAV) we were assigning these assets." (Id., CMGI 0010.)

On February 10, 2000, with the stock trading at $120 ½, Merrill Lynch issued a restricted report on CMGI: "CMGI announced this morning a definitive agreement to acquire uBid.com in an all-stock transaction valued at approximately $407 million." (Id., CMGI 0012.) The report disclosed that Merrill Lynch was acting as financial advisor to uBid.com which had agreed to pay a fee to Merrill Lynch for its financial advisory services, a significant portion of which was contingent upon the consummation of the proposed transaction. (Id., CMGI 0013.)

Merrill Lynch's next research report on CMGI did not come until four months later, on June 9, 2000, when the stock was trading 50% below the trading price at the time of the last report, at $60-7/16, noting that "[a]s the Internet sector has cratered over the past few months, CMGI cratered along with it, down 60% from March." Merrill Lynch updated and published its current model,[7] and lowered the 12-18 month price objective for CMGI to $100/share. (Id., CMGI 0014.) The June 9, 2000 CMGI report also stated "concerns" about CMGI's "ability to manage subsidiaries and investments across such a wide range of sectors," and "the competitive positioning of some majority-owned companies." (Id., CMGI 0015.)

On June 14, 2000, with the stock having fallen to $58/share, Merrill Lynch dropped the price target altogether and issued a research report entitled "Solid Quarter; Still Liquid Part 2":

---

[7]     The revised Net Asset Model appears at Musoff Decl. Ex. 4, CMGI 0017 and the assumptions underlying Merrill's valuation of CMGI are found at CMGI 0015-16.

10

CMGI reported solid FQ300 results: strong revenue and traffic growth at its operating companies and initial or follow-on investments in 22 companies. . . . **CMGI ended the quarter with $517mm in cash and $1.6 [billion] in market-able securities for total liquid assets of $2.1B. At a current burn rate (including investments) of $75mm a month, this liquidity will last 8-10 quarters.** (Id., CMGI 0020 (emphasis added).)

On July 21, 2000, with the stock trading at $45, Merrill Lynch reported: "CMGI previewed its expected results for its F4Q00 ending July yesterday, indicating that everything is on track. . . . **CMGI corporate currently has about $369mm in cash, down from $517mm at 3Q end**." (Id., CMGI 0022 (emphasis added).)

On September 22, 2000, with the stock trading at $36.44, Merrill Lynch reported:

CMGI announced 4QF00 results last night, breaking out for the first time revenue and operating losses by its 5 operating segments and its @Ventures arm. The break out makes it much easier to understand the business." (Id., CMGI 0038.)

In a section entitled "Liquidity" Merrill Lynch reported:

**CMGI corporate ended the quarter with $654mm in cash and equivalents, and available for sale securities of $1.6B as of the market close yesterday. Total publicly traded holdings total about $5 billion. At a current burn rate, including investments, of $93mm a month ($279mm a quarter up from $225mm rate last quarter) this liquidity should support the company for 8-9 quarters.** . . . CMGI 0039. With the IPO window still shut, CMGI likely has few near term catalysts. However, other types of liquidity events such as the sale of half.com to eBay and eGroups to Yahoo can help the stock. (Id., CMGI 0039-40 (emphasis added).)

Merrill Lynch's next report, entitled "recent weakness" came on October 4, 2000, when the stock was trading at $24.25, reporting:

CMGI stock has been very weak recently, down 35% in the last two weeks. . . . Since CMGI holds a basket of internet stocks, its NAV (50% of which are publicly traded internet stocks) has dropped as the sector has declined. We estimate NAV is now about $25, down from NAV of $36 about two weeks ago. With a declining NAV, improved stock performance would require multiple expansion, which is unlikely in this environment, especially because CMGI's cash

11

position is starting to become an issue. **At the end of the July quarter, CMGI had $654 mm in cash. At July's burnrate of 93mm, the would last about 7 months. Therefore the company will either have to 1) raise additional cash or 2) sell some of its holdings or marketable securities, which at the end of July were valued at $1.6B, or 3) significantly reduce its cash burn.**" (Id., CMGI 0045 (emphasis added).)

Plaintiff's Allegations

Without identifying any dates of purchase or prices paid for shares of CMGI, or any economic injury resulting therefrom, Ventura makes the conclusory allegation that he "incurred losses when CMGI shares decreased in price as a result of the materialization of concealed risks concerning CMGI's true financial condition and Defendants' eventual disclosure of their longstanding concern about CMGI's cash flow and cash burn rate on October 3, 2000, [whereupon] . . . CMGI shares fell 11.5%." (Compl. ¶ 2.)[8] However, the complaint nowhere pleads facts supporting a conclusion that Mr. Blodget or Merrill Lynch possessed any undisclosed "longstanding concern about CMGI's cash flow and cash burn rate." (Id.)

Plaintiff also alleges that he "purchased and held the common stock of CMGI, Inc. . . . [because] Defendants . . . issued false and misleading research reports that artificially inflated the market price of CMGI stock and issued false and misleading price targets that did not reflect their true opinions of CMGI, on which Ventura relied in purchasing and holding CMGI shares." (Compl. ¶ 1.) Once again, however, there are no facts alleged to show that any of the CMGI reports contained "false" information, in particular, facts sufficient to show that Mr. Blodget did not genuinely believe the price targets were achievable at the time the research reports were issued. Indeed, the December 20, 1999 12-18 month price target of $300/share was surpassed on

---

[8]    Merrill Lynch did not issue any research report on CMGI on October 3, 2000.

January 3, 2000.

Although Ventura nowhere alleges he actually read any Merrill Lynch research report, he conclusorily asserts that he "purchased and held CMGI shares in express reliance on Defendants' price targets and the absence of material negative information and was damaged as the result of CMGI's falling share price as the concealed risks and the material facts concerning inter alia CMGI's cash flow and cash burn rate were revealed." (Compl. ¶ 7.)   However, as set forth in the previous section, Mr. Blodget consistently reported facts on CMGI's cash position and cash burn rate on June 14, July 21 and September 22, 2000 and Ventura does not plead any facts from which to infer that Mr. Blodget or Merrill Lynch possessed any other, more negative information about CMGI's cash position at the time the reports were published.  The complaint abounds with similarly unsupported and conclusory allegations.  (See, e.g., Compl. ¶¶ 115, 116.)

Ventura began purchasing CMGI shares at least nine months before Merrill Lynch first began covering the stock on December 20, 1999.  (Musoff Decl. Ex. 2.)  Although plaintiff avers that he "affirmatively relied on" the "$300 price target that Defendants put on CMGI on December 20, 1999" (Compl. ¶ 103), in fact, Ventura sold 17,600 shares on December 20 and 21, 1999, apparently reaping over $500,000 in profits from those sales.  (Musoff Decl. Ex. 2.)

Among other deficiencies in the complaint, as set forth below, and as suggested by the Court in its September 5, 2007 opinion approving the settlement from which Ventura opted to exclude himself, 2007 U.S. Dist. LEXIS 65372, at *31-32, the Second Circuit's Lentell decision compels dismissal of Ventura's complaint.

## ARGUMENT

## THE COMPLAINT SHOULD BE DISMISSED

## I.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

The Second Circuit's decision in Merrill Lynch Research Reports Securities Litigation, Lentell v. Merrill Lynch & Co., 396 F.3d 161, is fatal to Ventura's claims here. As the Second Circuit explained, "[l]oss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Id. at 172 (citing Emergent Capital Inv. Mgmt, LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)). "Thus to establish loss causation 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' . . . *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id. at 173 (citation omitted).

Additionally, where, as here, "'the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails when 'it has not adequately pl[e]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'" Id. at 174 (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771-72 (2d Cir. 1994)). "Though all reasonable inferences are drawn in plaintiff's favor on a motion to dismiss on the pleadings, 'conclusions of law or unwarranted deductions of fact are not admitted.'" Id. at 174-75.

Under the foregoing principles, the complaint fails to plead loss causation.

A.    Plaintiff's Allegations that He "Affirmatively Relied" on Merrill Lynch's Price
      Targets, Even If True, Would Amount Only to Transaction Causation

Ventura's allegations that he was "aware of and affirmatively relied on Defen-

dants' price targets for CMGI stock, including the $300 price target that Defendants put on

CMGI on December 20, 1999 [and that] CMGI's share price plummeted while Plaintiff held an

open long position in CMGI stock based on Defendants' misrepresentations and omissions"[9]

(Compl. ¶ 103), even if true, pleads only *transaction causation*.  See Lentell, 396 F.3d at 175; see

also Emergent Capital, 343 F.3d at 198 (allegation that omission caused plaintiff incorrectly to

appraise the value of the securities, causing it to purchase the securities at inflated price, is

"nothing more than a paraphrased allegation of transaction causation"); Dura Pharms., Inc. v.

Broudo, 544 U.S. 336, 345-46 (2005) (inflated purchase price allegation does not plead loss

causation).  While Ventura's allegations concerning the allegedly false stock price targets, the

allegedly inflated recommendations and the allegedly undisclosed conflicts of interest could bear

upon Ventura's decision to purchase CMGI securities (transaction causation), Ventura has failed

to plead facts to show "a causal link between the alleged [misstatements] and the economic harm

ultimately suffered by the plaintiff" (loss causation).  Emergent Capital, 343 F.3d at 197.  There

is no allegation, for example, that CMGI's share price fell when the market learned that Mr.

Blodget did not genuinely believe his ratings on CMGI or that CMGI could reach a stock price of

$300 per share (or $150 split-adjusted) within 12-18 months.  See Lentell, 396 F.3d at 175-76 &

n.4 ("[P]laintiffs allege no loss resulting from the market's realization that the opinions were

---

[9]    The federal securities laws do not provide a remedy for "holding" or failing to sell shares.
       See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975); see also Merrill
       Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006).

15

false."); see also id. at 177 (no explanation as to how Merrill's allegedly false and misleading 'buy' and 'accumulate' recommendations and undisclosed conflicts of interest "*concealed* the risk of a significant devaluation of [CMGI]"); Joffee v. Lehman Bros., 410 F. Supp. 2d 187, 193 (S.D.N.Y. 2006).

      Moreover, Ventura cannot even plead transaction causation or actual reliance because not only was the $300/share price target achieved, see supra, pp.7-8, but the conclusory allegation that Ventura "affirmatively relied" on it is belied by his own transactions. While Ventura alleges that he "held an open long position" as "CMGI's share price plummeted" based on "the $300 price target that Defendants put on CMGI on December 20, 1999," Ventura actually sold 17,600 shares on December 20 and 21, 1999 – shares he had apparently purchased only weeks earlier – profiting more than $500,000. (See Musoff Decl. Ex. 2.) The $300 price target was not repeated after December 20, 1999. (See id. Ex. 4, CMGI 0010.)

### B.  Plaintiff Fails to Plead that Merrill Lynch or Mr. Blodget "Concealed Risks Concerning CMGI's True Financial Condition"

      Ventura's allegation – based solely on an e-mail written by a competitor of CMGI (Compl. ¶ 63) – that Mr. Blodget or Merrill Lynch "concealed risks concerning CMGI's true financial condition and . . . CMGI's need to raise additional cash" is sorely inadequate to plead that a "misstatement or omission [by Merrill Lynch] concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 173. Fatally for Ventura, Mr. Blodget is neither the author of the e-mail, nor, contrary to plaintiff's suggestions (Compl. ¶¶ 66, 68-69, 74, 77, 81, 90), did Mr. Blodget adopt or otherwise assent to the CMGI competitor's remarks. In all events, "[f]raud may not be alleged based on a tortured

reading that would turn a casual e-mail remark . . . into some sort of 'confession' by [Blodget] that his published analyst reports on th[e] compan[y] were themselves 'fiction.'" Podany v. Roberston Stephens, Inc., 350 F. Supp. 2d 375, 381 (S.D.N.Y. 2004) ("Podany II").

The e-mail from a competitor of CMGI to Mr. Blodget (Compl. ¶ 64) queried:

> "when u break out AdForce's affiliate revenue, what is left? Do you see CMGI double or triple-counting rev amongst all various companies - does anyone isolate this impact (obviously then compare to DCLK real revs) I know they're a banking client but I wonder if anyone has looked at this objectively."

Mr. Blodget responded: "CMGI isn't a banking client. The best approach to that stock is to blur vision and say 'long the internet.' Look to[o] close and it can scare you. Not so DCLK. Looking close is great . . . ." (Id. ¶ 66.)[10] Contrary to the complaint's "tortured reading" (Id. ¶¶ 66, 68-69, 74, 77, 81, 90), Mr. Blodget did NOT state or imply, in any way, shape or form, that he believed or had knowledge that CMGI was "double or triple-counting rev[enue]."

Equally flawed is plaintiff's baseless premise that CMGI was, in fact, "double or triple-counting rev[enue]." (Id. ¶¶ 66-67, 74, 81.) There are no factual allegations in the complaint – in the form of a revenue restatement or otherwise – that CMGI misstated its reported revenues. Moreover, even had Ventura properly pled a revenue misstatement – which he certainly has not – Merrill Lynch's October 4, 2000 research report, which Ventura asserts "caused" his losses, does not disclose a misstatement of reported revenues. (See Musoff Decl. Ex. 4, CMGI 0045-0046.) See also Lentell, 396 F.3d at 173 ("[T]o establish loss causation, a

---

[10]    These statements are consistent with Mr. Blodget's published reports on CMGI. (See Musoff Decl. Ex. 4, CMGI 0003 ("Valuing CMGI is difficult at best and futile at worst"); CMGI 0001 ("CMGI is long the internet."); CMGI 0002 ("CMGI is a complex company with many moving parts"); CMGI 0011 ("Bottom line, we continue to believe that CMGI represents a good way for public market investors to be long the internet).)

plaintiff must allege . . . that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.") (citation omitted).

The complaint also includes several boilerplate allegations (in a separate section of the complaint entitled "loss causation" (Compl. ¶¶ 102-105)), such as that "Plaintiff purchased CMGI shares at artificially inflated prices caused by Defendants' misstatements and was damaged thereby because the price of CMGI's stock declined when misrepresentations were made to the market, and/or the information alleged to have been concealed from the market, and/or the concealed risks to CMGI's business operations and financial operating results, were revealed and/or materialized." (Compl. ¶ 102.) This allegation, similar to others (see Compl. ¶¶ 115-116), is simply "a legal conclusion; missing are the necessary allegations to support the conclusion." Lentell, 396 F.3d at 176.

C.    The Risks that Allegedly Caused Plaintiff's Purported Losses Were Fully Disclosed

As in Lentell, "[t]his case is . . . sharply distinguishable from cases in which some or all of the risk that materialized was clearly concealed by a defendant's misstatements or omissions." Id. at 177.  And as Judge Sweet held in dismissing a research case against Lehman Brothers, "the matters that Plaintiffs claim Lehman failed to disclose had, in fact, been disclosed to the market [by the company] [and in] the Analyst Reports themselves" and accordingly, plaintiff cannot plead any causal connection between his unspecified losses and a "fraud" by Merrill Lynch. Joffee, 410 F. Supp. 2d at 191, aff'd, 209 Fed. Appx. 80, 2006 U.S. App. LEXIS 31487, at *3 (2d Cir. Dec. 16, 2006) ("[A]ll of the facts which plaintiffs allege were concealed were, in fact, revealed in various public filings.").  Moreover, estimates as to the Company's future stock price or how long the Company's cash would hold out are inherently subjective and

18

forward-looking and are therefore protected by the bespeaks caution doctrine. <u>See, e.g.,</u> <u>Olkey v.</u> <u>Hyperion 1999 Term Trust, Inc.,</u> 98 F.3d 2, 5 (2d Cir. 1996) (The central issue is "'whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the [securities]'") (alteration in original and citation omitted).

Ventura's suggestion (Compl. ¶ 2) that Merrill Lynch's October 4, 2000 research report caused his alleged losses when it revealed a fraud or a previously undisclosed risk is unsupportable. First, the Company warned investors, in no uncertain terms, about what could go wrong: "recently we have had significant operating losses [and] [w]e may never have operating income in the future" (Musoff Decl. Ex. 7, at 6); "the price of our stock has been volatile" (<u>id.</u> at 11); "our quarterly results may fluctuate widely" (<u>id.</u> at 10); and "we may have problems raising the money we need in the future" (<u>id.</u> at 6).

Merrill Lynch also repeatedly cautioned investors: "CMGI's stock tends to trade as a proxy for the health of the Internet sector and the Internet IPO market"; "CMGI, in and of itself, is a basket of investments. . . . Obviously, there is a large amount of risk in private-market investing"; "If the Internet sector craters, of course, CMGI will crater along with it"; and "Like all internet stocks, CMGI is an extremely risky investment. The risks include volatility . . . integration . . . and the health of the public market internet sector in general." When the market for internet stocks collapsed, CMGI's stock price "crater[ed]" as Merrill Lynch had warned that it would. Merrill Lynch specifically discussed CMGI's cash position and cash "burn" rate based on information that came from CMGI's own announcements to the market, well before October, 2000, in research reports dated June 14, July 21, and September 22, 2000. (<u>See</u> Musoff Decl. Ex. 4, CMGI 0018, 0022, 0038-0039.) The October disclosure that plaintiff asserts "caused" his

19

alleged losses, is substantively no different than the same disclosure made in September. (Compare id., CMGI 0038-0039 with id., CMGI 0045.) Plaintiff's conclusory and contrived allegations that Merrill Lynch failed to disclose material information in its possession concerning CMGI's cash position are unsupportable. Nor does the complaint adequately plead that Mr. Blodget failed to disclose that he was "concerned" about CMGI's cash flow or cash burn rate.

Here, as in Lentell, "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk." Lentell, 396 F.3d at 177. In such a case, Ventura must:

> allege (i) facts sufficient to support an inference that it was defendant's fraud – rather than other salient factors – that proximately caused the plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment.

Id. at 177. As in Lentell, plaintiff here has done neither.

D.    Plaintiff Fails Adequately to Plead Any Economic Loss

Ventura's claim is defective for the further reason that the complaint is devoid of any dates of purchase or prices paid for shares of CMGI or any economic injury resulting therefrom. Thus, Ventura has failed to plead any economic loss – an element essential to his claims. See Dura Pharms., 544 U.S. at 342 ("economic loss" is an element of a claim under section 10(b) (citing 15 U.S.C. § 78u-4(b)(4)); see also Joffee, 410 F. Supp. 2d at 192 (explaining that, at a minimum, to plead an economic loss, a plaintiff must "couple specific allegations concerning sample transactions with more general allegations concerning the conduct of the defendant"). The complaint here only makes the conclusory allegation that:

> Ventura incurred losses when CMGI decreased in price as a result of the material-ization of the concealed risks concerning CMGI's true financial condition and

Defendants' eventual disclosure of their longstanding concern about CMGI's need to raise additional cash to continue its operations. When Defendants finally revealed concerns about CMGI's cash flow and cash burn rate on October 3, 2000, CMGI shares fell 11.5%.

(Compl. ¶ 2; see also id. ¶¶ 7, 102-103.) Accordingly, the complaint has failed to plead economic loss. See Joffee, 410 F. Supp. 2d at 192.

## II. PLAINTIFF FAILS TO PLEAD WITH PARTICULARITY ANY MATERIAL MISSTATEMENT

"The test for whether a statement is materially misleading under Section 10(b) and Section 11 is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (citation omitted). Further, "[a]ny fraud must be pled with particularity, Fed. R. Civ. P. 9(b); but the rule is applied assiduously to securities fraud." Lentell, 396 F.3d at 168. It is well-established that the Second Circuit requires averments of fraud to:

> "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."

Rombach, 355 F.3d 164, 170 (2d Cir. 2004) (citation omitted).

> Similarly, the PSLRA . . . requires that any securities fraud complaint alleging misleading statements or omission of material fact must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

Id. (quoting 15 U.S.C. § 78u-4(b)(1)). It is not enough to catalog the allegedly false statements, the complaint must "explain[] with adequate specificity how those statements were actually false or misleading." Id. at 172. The complaint does not come close to meeting these requirements.

For example, plaintiff's boilerplate allegations at paragraph 94 of the complaint, setting out several purported omissions supposedly rendering "false and misleading" "[t]he statements made by Defendants in the CMGI Analyst reports described above, including the ratings assigned in such reports to CMGI stock," fail to plead adequately the falsity of any statement. Compare Compl. ¶ 94 with Merrill Lynch & Co. Research Reports, 273 F. Supp. 2d at 370-71 (describing the multiple defects in similar allegations). In particular, the allegations do not adequately plead the falsity of any statement of opinion. See id. at 372-73; see also Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095-96 (1991); Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 153-56 (S.D.N.Y. 2004). As already set forth above, the CMGI competitor's statement cannot be attributed to Mr. Blodget, nor may fraud be alleged "based on a tortured reading that would turn a casual e-mail remark . . . into some sort of 'confession.'" See supra pp.16-17 (quoting Podany II, 350 F. Supp. 2d at 381).[11]

## III.    PLAINTIFF FAILS TO PLEAD SCIENTER

Section 21D(b)(2) of the PSLRA provides that, in order to survive dismissal, "the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), namely "scienter" or an "intent to defraud." See also Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12 (1976); Kalnit v. Eichler, 264 F.3d 131, 139 (2d

---

[11]    Nor does plaintiff offer any reason why Mr. Blodget should have known, or had a duty to disclose, that the Global Technology Fund – managed by independent investment advisors – "liquidated its position in CMGI stock by September 30, 2000." (Compl. ¶ 86.) See In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 248, 263 (S.D.N.Y. 2003) (noting that the Fund and MLPF&S are entirely separate and that the complaint did "not allege *any* communications between MLPF&S and the Fund").

Cir. 2001) (generic motives that are possessed by many in the same position do not plead a

sufficient motive to defraud); In re Merrill Lynch Research Reports Sec. Litig., 289 F. Supp. 2d

416, 427-28 (S.D.N.Y. 2003) (investment banking fees and incentive compensation insufficient).

The Supreme Court recently construed the scienter pleading requirements:

> [T]o determine whether a complaint's scienter allegations can survive threshold
> inspection for sufficiency, a court governed by 21D(b)(2) must engage in a
> comparative evaluation; it must consider, not only inferences urged by the
> plaintiff . . . but also competing inferences rationally drawn from the facts alleged.
> An inference of fraudulent intent may be plausible, yet less cogent than other,
> nonculpable explanations for the defendant's conduct. To qualify as "strong"
> within the intendment of 21D(b)(2), we hold, an inference of scienter must be
> more than merely plausible or reasonable – it must be cogent and at least as
> compelling as any opposing inference of nonfraudulent intent.

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2404-05 (2007). "To determine

whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter,

a court must consider plausible nonculpable explanations for the defendant's conduct, as well as

inferences favoring the plaintiff." Id. at 2510. "[O]missions and ambiguities count against

inferring scienter." Id. at 2511; see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87,

104 (2d Cir. 2007) (generic motives supply a "plausible nonculpable explanation" that is more

likely than an intent to defraud); In re Bayou Hedge Fund Litig., 2007 U.S. Dist. LEXIS 59145,

at *33-37 (S.D.N.Y. July 31, 2007) (alleged failure to adhere to represented standards does not

provide a compelling inference of scienter); Cent. Laborers' Pension Fund v. Integrated Elec.

Servs. Inc., No. 06-20135, 2007 U.S. App. LEXIS 19917, at *19 (5th Cir. Aug. 21, 2007)

(affirming dismissal, holding plaintiffs had failed to plead facts supporting a strong inference of

scienter, among other reasons, because of plaintiffs' "failure to link the misstatements with the

[alleged] bases for inferring scienter").

The facts alleged here do not support a "cogent" and "compelling" inference of scienter that is at least as compelling as any nonculpable explanation. Tellabs, 127 S. Ct. at 2509-10. Plaintiff alleges that "Merrill Lynch's compensation structure rewarded Blodget and other analysts in the internet group for the investment banking fees they generated" (Compl. ¶¶ 96-101), yet alleges few facts in support of this conclusory allegation, and does not even allege that Mr. Blodget profited in any way from his research coverage of CMGI. As the Second Circuit explained in Lentell, "[c]onflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud – let alone furnish a basis sufficiently particular to support a fraud complaint." 396 F.3d at 170. Ventura's fraud by hindsight allegation (Compl. ¶¶ 79-80) is obviously insufficient and he does not allege that Mr. Blodget personally sold any CMGI securities – let alone at suspicious times and in suspicious amounts.[12]

## IV.    PLAINTIFF CANNOT STATE A CLAIM FOR COMMON LAW FRAUD

To plead a fraud claim under New York law, plaintiff must allege "(1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance." Granite Partners, L.P. v. Bear, Stearns & Co., 58 F. Supp. 2d 228, 257 (S.D.N.Y. 1999). The Second Circuit "applies the same standard to pleading fraudulent intent under common law fraud as to pleading scienter in securities fraud," Serova v. Teplen, 05 Civ. 6748, 2006 U.S. Dist. LEXIS 5781, at *26 (S.D.N.Y. Feb. 16, 2006) (citation omitted), which, as noted above, requires Ventura to "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

---

[12]    As plaintiff has failed to plead a claim under section 10(b) of the Exchange Act, the claim under 20(a) necessarily fails. See Lasker v. N.Y. State Elec. & Gas, 85 F.3d 55, 58 (2d Cir. 1996).

speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach, 355 F.3d at 170 (citation omitted).

Ventura's fraud claim fails for the same reasons that his section 10(b) claim fails. As set forth above, in addition to failing to plead any facts supporting his contention that Mr. Blodget made material misrepresentations or omissions of material fact "to Plaintiff regarding CMGI" (Compl. ¶ 132), (i) Ventura did not rely on the $300 price target; (ii) the price target was not false; (iii) Ventura has failed to plead that any false statement by Mr. Blodget was the proximate cause of plaintiff's losses; and (iv) Ventura has failed to plead that any such statement was made with scienter. See supra, pp. 14-24.

## CONCLUSION

For all of the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: New York, New York
      October 1, 2007

Respectfully submitted,

Jay B. Kasner
Scott D. Musoff
Joanne Gaboriault
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Defendants Merrill Lynch & Co.,
Inc. and Merrill Lynch, Pierce, Fenner & Smith
Incorporated

25