UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE MERRILL LYNCH RESEARCH          :          02 MDL 1484 (JFK)
REPORTS SECURITIES LITIGATION         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This case relates to:                 :
                                      :
RONALD VENTURA,                       :          07-CV-6677 (JFK)
                    Plaintiff,        :
        -against-                     :
                                      :
MERRILL LYNCH & CO., INC., MERRILL    :
LYNCH, PIERCE, FENNER & SMITH, INC.,  :
and HENRY BLODGET                     :
                                      :
                    Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


COMPENDIUM OF UNREPORTED CASES


                        Jay B. Kasner
                        Scott D. Musoff
                        Joanne Gaboriault
                        SKADDEN, ARPS, SLATE,
                            MEAGHER & FLOM LLP
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Defendants Merrill Lynch & Co.,
                         Inc. and Merrill Lynch, Pierce, Fenner & Smith
                         Incorporated

TAB

In re Bayou Hedge Fund Litigation, 2007 U.S. Dist. LEXIS 59145
        (S.D.N.Y. July 31, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Central Laborers' Pension Fund v. Integrated Electric Services Inc.,
        No. 06-20135, 2007 U.S. App. LEXIS 19917 (5th Cir. Aug. 21, 2007) . . . . . . . . . . . . B

Joffee v. Lehman Brothers, Inc., 209 Fed. Appx. 80, 2006
        U.S. App. LEXIS 31487 (2d Cir. Dec. 16, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

In re Merrill Lynch & Co. Research Reports Securities. Litigation, 02 MDL 1484 (JFK)
        2007 U.S. Dist. LEXIS 65372 (S.D.N.Y. Sept. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . D

Serova v. Teplen, 05 Civ. 6748, 2006 U.S. Dist. LEXIS 5781 (S.D.N.Y. Feb. 16, 2006) . . . . . E

Yurman Design Inc. v. Chaindom Enterprises, Inc., 99 Civ. 9307,
        2003 U.S. Dist. LEXIS 15070 (S.D.N.Y. Aug. 28, 2003) . . . . . . . . . . . . . . . . . . . . . . . . F

# Tab A

LEXSEE 2007 U.S. DIST LEXIS 59145

**IN RE BAYOU HEDGE FUND LITIGATION; THIS DOCUMENT RELATES TO:
SOUTH CHERRY STREET LLC, Plaintiff, -against- HENNESSEE GROUP LLC,
ELIZABETH LEE HENNESSEE and CHARLES A. GRADANTE, Defendants.**

**06-MDL-1755 (CM), 06-CV-2943 (CM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2007 U.S. Dist. LEXIS 59145*

**July 31, 2007, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *In re Bayou Hedge Fund Litig., 2007 U.S. Dist. LEXIS 60777 (S.D.N.Y., Aug. 15, 2007)*

**COUNSEL:** [*1] For Thomas Gleason, Plaintiff: Kevin P. Conway, LEAD ATTORNEY, Conway & Conway, New York, NY.

For Jewish Federation of Metropolitan Chicago, Plaintiff: Jodi D. Luster, Kent David Ballaty Sinclair, William L. Prickett, LEAD ATTORNEYS, Seyfarth Shaw LLP(Boston), Boston, MA.

For Depauw University, Plaintiff: David Kerr Herzog, Matthew Thomas Albaugh, LEAD ATTORNEYS, Baker & Daniels LLP(Indianapolis), Indianapolis, IN.

For Broad-Bussel Family LP, Marie Louise Michelsohn, Michelle Michelsohn, Herbert Blaine Lawson, Jr., Plaintiffs: Gary D. Bressler, Jennfier R. Hoover, Jonathan M. Stemerman, William R. Hinchman, LEAD ATTORNEYS, Adelman Lavine Gold and Levin, Philadelphia, PA; Gary M. Schildhorn, LEAD ATTORNEY, Law Firm of Adelman Lavine Gold and Levin, PC, Philadelphia, PA; Lane Lanier Vines, Merrill G Davidoff, Lawrence Jay Lederer, LEAD ATTORNEYS, Berger & Montague, P.C, Philadelphia, PA; Neal Arthur DeYoung, William M. Bloss, LEAD ATTORNEYS, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT.

For South Cherry Street LLC, Plaintiff (7:06-md-01755-CM-MDF): Ted Poretz, LEAD ATTORNEY, Bingham McCutchen LLP (NY), New York, NY.

For Bruce Hill, Consolidated Plaintiff: Stephen P. Allison, LEAD ATTORNEY, [*2] Haynes & Boone, San Antonio, TX.

For Broad-Bussel Family Limited Partnership, Individually and on behalf of all other persons and entities similarly situated, Consolidated Plaintiff: Lane Lanier Vines, LEAD ATTORNEY, Merrill G Davidoff, Berger & Montague, Philadelphia, PA.

For Hennessee Group L.L.C., Charles Gradante, E. Lee Hennessee, Defendants (7:06-md-01755-CM-MDF): Anne L. Cowgur, Lee B. McTurnan, Wayne C. Turner, LEAD ATTORNEYS, McTurnan & Turner, Indianapolis, IN; Bennett Falk, Matthew E. Wolper, Brian F. Amery, LEAD ATTORNEYS, Bressler, Amery & Ross, P.C., (FL), Miramar, FL; Lawrence Elliott Fenster, Matthew C Plant, LEAD ATTORNEYS, Bressler, Amery & Ross, PC (NYC), New York, NY; Marc J. Grenier, LEAD ATTORNEY, DePanfilis & Vallerie, LLC, Norwalk, CT.

For James G. Marquez, Defendant: Bradley Drew Simon, LEAD ATTORNEY, Simon & Partners LLP, New York, NY.

For Jeffrey D. Fotta, Eqyty Research & Mgmt, LLC, Eqyty Research & Mgmt Ltd., Defendants: Howard K. Levine, Jay Christopher Rooney, LEAD ATTORNEYS, Carmody & Torrance LLP, New Haven, CT.

For Citibank NA, Defendant: John Kenneth Van de Weert, LEAD ATTORNEY, Sidley Austin LLP(Washington), Washington, DC; Mark Bruce Blocker, LEAD ATTORNEY, [*3] Sidley Austin, LLP(Chic), Chicago, IL.

For Sterling Stamos Capital Mgmt, LP, Defendant: James Erik Breitenbucher, Sung-Hee Suh, LEAD ATTORNEYS, Schulte Roth & Zabel LLP (NY), New York, NY; Patrick John McHugh, William Morten Tong, LEAD ATTORNEYS, Finn Dixon & Herling LLP(CT), Stamford, CT.

For Faust Rabbach & Oppenheim LLP, Steven D. Oppenheim, Defendants: Shari Claire Lewis, LEAD ATTORNEY, Janice J. DiGennaro, Rivkin Radler, LLP, Uniondale, NY.

For Charles J. Gradante, Elizabeth Lee Hennessee, Hennessee Group, LLC, Consolidated Defendants (7:06-md-01755-CM-MDF): Matthew C Plant, LEAD ATTORNEY, Bressler, Amery & Ross, PC (NYC), New York, NY.

For Christopher Hill, Roger Hill, Sr., Travis Co. J.V., Movants: Marvin Grady Pipkin, LEAD ATTORNEY, Pipkin, Oliver & Bradley, LLP, San Antonio, TX.

For South Cherry Street, L.L.C., Plaintiff (1:06-cv-02943-CM): Ted Poretz, LEAD ATTORNEY, Bingham McCutchen LLP (NY), New York, NY.

For Hennessee Group L.L.C., Elizabeth Lee Hennessee, Charles A. Gradante, Defendants (1:06-cv-02943-CM): Matthew C Plant, Bressler, Amery & Ross, PC (NYC), New York, NY.

**JUDGES:** Colleen McMahon, U.S.D.J.

**OPINION BY:** Colleen McMahon

**OPINION**

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

McMahon, [*4] J.:

Plaintiff South Cherry Street, LLC ("South Cherry") brings this action against defendants Hennessee Group, LLC ("Hennessee Group"), Elizabeth Lee Hennessee and Charles J. Gradante, alleging that all three defendants violated *Section 10(b)* of the Securities Exchange Act of 1934, and that Hennessee Group breached its investment advisory contract with South Cherry and breached its fiduciary duty to plaintiff.

This lawsuit stems from the massive fraud associated with Bayou Group, LLC ("Bayou Group"), an affiliated group of legal entities based in Connecticut that created and managed private pooled investment funds, or hedge funds. [1] Bayou Group's principals, Samuel Israel III and Daniel E. Marino, operated Bayou Group as a fraudulent

Ponzi scheme and, by August 2005, Bayou Group collapsed under the weight of its principals' fraudulent acts.

> [1] Bayou Group consists of ten separate entities: Bayou Advisors, LLC, Bayou Equities, LLC, Bayou Superfund, LLC, Bayou No Leverage Fund, LLC, Bayou Affiliates Fund, LLC, and Bayou Accredited Fund, LLC -- all Delaware Limited Liability Companies; Bayou Management, LLC, Bayou Securities, LLC, and Bayou Fund, LLC -- all New York Limited Liability Companies; [*5] and Bayou Group, LLC -- a Connecticut Limited Liability Company.

South Cherry was one of Bayou Group's investors, having invested $ 1.15 million in one of Bayou Group's affiliates -- Bayou Accredited, LLC ("Bayou Accredited") -- from March 2003 to October 2004. According to the Complaint, South Cherry's investment came at the recommendation of Hennessee Group, an investment advisor specializing in hedge funds. According to South Cherry, Hennessee Group represented that it conducted a rigorous five-step due diligence review of a hedge fund before recommending that a client invest in that particular fund. South Cherry further alleges that positive reports issued by Hennessee Group regarding Bayou Accredited -- that were later shown to be inaccurate following discovery of the fraud -- clearly demonstrate that the Group either did not conduct the promised due diligence on Bayou Accredited, or did so in a deficient manner.

Approximately eight months after the Bayou Group fraud became public knowledge, plaintiff commenced the instant lawsuit. Before this court is defendants' motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted. For the reasons [*6] stated below, defendants' motion is granted.

**I. Background**

The following well-pleaded facts are presumed true.

*A. The Hennessee Group Investor Presentation*

Sometime after August 2001, Hennessee Group mailed a written presentation to South Cherry's sole shareholder, Fred Groothuis, entitled, "Hennessee Hedge Fund Advisory Group Investor Presentation" ("Hennessee Investor Presentation"). [2] (Compl. P 21; see also Hennessee Investor Presentation, attached as Ex. A to Declaration of Fred Groothuis ("Groothuis Decl.").) The Hennessee Investor Presentation described the Group as a "'strategic partner in hedge fund investing'" and an "'Industry Leader: the most recognized hedge fund consulting firm in the industry,'" whose Hennessee Hedge Fund Indices are "'the oldest, most widely sourced hedge fund index in the financial industry.'" (Compl. PP 12-13, quoting Hennessee Investor Presentation at 6.) The

Presentation further represented that the Group's principals, Hennessee and Gradante, were "'early pioneers in the [hedge fund] industry,'" who had "'150 direct relationships with hedge funds.'" (Id. P 13, quoting Hennessee Investor Presentation at 6.)

    2  This initial communication apparently occurred [*7] after Hennessee Group met with Craig Bollman, a secured creditor of South Cherry. Several pages of plaintiff's Complaint are devoted to communications between defendants and Mr. Bollman. (See Compl. PP 12-20.) However, prior to the instant motion, defendants moved this court to compel arbitration pursuant to an arbitration clause in an executed Investment Advisory Agreement, between Mr. Bollman and Hennessee Group. That motion was denied on December 5, 2006. This court specifically found that Mr. Bollman was never an employee or agent of South Cherry's, nor was he ever authorized to make investments or enter contracts on South Cherry's behalf, and the Agreement's arbitration clause was therefore not binding on South Cherry. (See Mem. Order Denying Defs.' Mot. to Compel Arbitration, attached as Ex. D to Declaration of Matthew Wolper ("Wolper Decl."), at 5.) Accordingly, any alleged representations made by defendants to Ms. Bollman, and any agreements between Mr. Bollman and Hennessee Group, are irrelevant to this motion. South Cherry's opposition papers do not contend otherwise.

Most significant to plaintiff's Complaint, the Hennessee Investor Presentation outlined the Group's five-step [*8] due diligence process that the Group conducts before recommending that a client invest in a particular hedge fund. Before Hennessee Group subjects a hedge fund to its due diligence review, however, the Presentation indicated that the fund needed to meet several minimum requirements. One of these requirements was that the fund should have "'3 years audited track record.'" (Id. P 15, quoting Hennessee Investor Presentation at 8.)

Assuming the hedge fund meets this and other threshold requirements, Level One of the process entails sending a Manager Information Sheet ("MIS") to the manager of the hedge fund being reviewed. The MIS requests general information about the fund, including "sources of capital," "performance [including audits and monthly historical performances]," "vehicle structure," "tax efficiency," "associated professionals [including the fund's legal, tax and audit teams]," and "SEC [history]." (Hennessee Investor Presentation at 10-11.) Level One also includes a review of the completed MIS, and a determination by the Group whether to proceed to Level Two. (Id. at 10.)

Level Two of Hennessee Group's due diligence includes assessing the hedge fund's "experience," "credibility," [*9] and "transparency." (Id. at 11.) At this level, the Group also generates an "internal quantitative analysis" of the hedge fund, and schedules a meeting with the fund's manager and research staff. (Id.)

For those hedge funds satisfying Level Two review, Level Three requires an on-site meeting at the fund manager's office so that Hennessee Group could "'interact with [hedge fund] Personnel from the top down to develop an impression of overall professionalism, attitude and depth of organization.'" (Compl. P 17, quoting Hennessee Investor Presentation at 12.) The on-site meeting also helps the Group assess certain "qualitative aspects" of the fund, including its "systems," "culture," and "environment." (Hennessee Investor Presentation at 12.) South Cherry alleges that Hennessee Group did not have a face-to-face meeting with Bayou Accredited until long after the Group recommended the hedge fund to South Cherry. (Compl. P 17.)

During Level Four of the due diligence process, Hennessee Group "studied the hedge fund's 'individual positions,' with an emphasis on its long, short, cash and derivative positions, as well as any 'off balance sheet transactions.'" (Id. P 18, quoting Hennessee Investor Presentation at 12.) [*10] Level Four also required the Group to analyze the fund's "individual holdings," "average holding period," and "beta, market capitalization and trade days of portfolio," (Hennessee Investor Presentation at 12), "all factors in determining the degree of risk in the hedge fund's investment." (Compl. P 18.)

If a hedge fund passed these four stages of review, the Hennessee Investor Presentation stated that the fund was subject to Level Five, the final due diligence stage. According to the Presentation, Level Five scrutiny required the Group to conduct a "legal/audit review," that included analysis of the fund's "audited financial statements" and "offering memorandum and limited partnership agreements." (Hennessee Investor Presentation at 13.) During Level Five review, the Group also performed an "internal background check" on fund personnel, confirmed the fund's prime banking relationship, and contacted the prior employers of the fund's key employees. (Compl. P 19.) The Presentation also indicated that the Group would "verify" the hedge fund's auditor. (Id., quoting Hennessee Investor Presentation at 13.) Hennessee Group also reserved the option to retain a private investigator to perform [*11] additional due diligence as circumstances warranted. (Id.)

In addition to the five-step due diligence process, the Hennessee Investor Presentation also represented that the

Hennessee Group conducts ongoing due diligence, after the Group has recommended that its clients invest in a particular hedge fund. According to the Presentation, the Group's ongoing due diligence includes scrutinizing the fund's performance figures and audited financial statements, and compiling monthly portfolio reports. (Id. P 20.) The process also monitors "'style drift'" -- i.e., any variation from a plan in a fund's investment activities. (Id., quoting Hennessee Investor Presentation at 14.)

Thus, according to the Complaint, the Presentation represented that Hennessee Group "evaluated all candidate hedge funds after each level of due diligence review, and that a hedge fund would have to pass all five levels of due diligence before Hennessee Group would recommend the hedge fund to a client." (Id. P 15.) Moreover, if the fund did not pass any single level of the five level process, it would not be passed onto the next level of inquiry and, therefore, could not be recommended to a client. (Id. P 15.)

According to [*12] the Complaint, the Hennessee Investor Presentation, "was specifically intended to induce prospective customers to trust in Hennessee Group's promised extensive due diligence process, and Groothuis relied upon its representations ... when he decided to invest South Cherry's assets in hedge funds, including Bayou [Accredited], that Hennessee Group recommended." (Id. P 21; see also id. P 8.) Moreover,

> it was absolutely material to South Cherry -- which was otherwise inexperienced in hedge fund investing -- that Hennessee Group have conducted a disciplined and complete due diligence process on all recommended investments in hedge funds. Absent Hennessee Group's representation to South Cherry that it conducted the detailed five level due diligence process, and its agreement to conduct the post-investment ongoing due diligence process set forth in the ... Presentation and elsewhere, South Cherry would not have opened a Hennessee Group account, and would not have invested [in] any hedge fund recommended by Hennessee Group, including Bayou [Accredited].

(Id. P 10; see also id. P 8.)

### B. Hennessee Group's Alleged Misrepresentations Regarding Bayou Accredited and Bayou Fund

In addition to its alleged [*13] misrepresentations regarding its five-step due diligence process and ongoing due diligence, Hennessee Group allegedly misrepresented facts to South Cherry concerning Bayou Accredited and its predecessor, Bayou Fund LLC ("Bayou Fund") -- misrepresentations that South Cherry alleges were incorrect precisely because the Group never conducted its promised due diligence.

#### 1. Bayou Accredited's Accountant

Bayou Accredited was formed in January 2003, following the decision of Israel and Marino to replace Bayou Fund "with the several Bayou Family Funds." [3] (Id. P 23.) Bayou Fund had been formed in 1996 and, according to the Complaint, "consistently lost money." (Id.) In order to hide this fact, in 1998, Israel and Marino fired Bayou Fund's hedge fund auditor, Hertz Herson & Co. ("HHCO") and replaced it with "a fake, but purportedly independent, accounting firm, Richmond, Fairfield & Associates ("Richmond-Fairfield")." (Id.) Even though HHCO stopped auditing Bayou Fund in 1998 and never audited any of the Bayou Family Funds established in 2003, Hennessee Group's Vice President, Leeana Piscopo, represented to South Cherry in a February 2003 mailing that Bayou Accredited was audited by HHCO. (Id.) [*14]

> 3 For the purposes of this opinion, "Bayou Accredited" refers to Bayou Accredited, LLC, "Bayou Fund" refers to the original hedge fund Bayou Fund, LLC, "Bayou Family Funds" refers to the hedge funds established in 2003 to replace Bayou Fund (including Bayou Accredited), and "Bayou" refers collectively to all of the Bayou entities.

South Cherry alleges that this false statement demonstrates that Hennessee Group never conducted the due diligence it promised. According to the Complaint, if the Group had taken steps to "'verify'" Bayou's auditors, as promised, it would have learned that HHCO no longer worked for any Bayou entities, and that Richmond-Fairfield's registered principal was Marino and the firm was therefore not a genuine auditor, "could not possibly have been independent," and "never did any auditing." (Id. PP 24, 27.) South Cherry further alleges that Hennessee Group "never had any contact with Richmond-Fairfield," and that it did not properly investigate the purported accounting firm even after one of the Group's investors warned the Group that the firm was not a true independent auditor. (Id. P 27.) Moreover, South Cherry alleges that even if Bayou Accredited employed a proper, [*15] independent accountant, it was not possible for Bayou Accredited -- formed in January 2003 -- to have three years of audited financial statements by the time Hennessee Group recommended the fund in early 2003. (Id.)

#### 2. Bayou Fund's Profitability

In that same February 2003 mailing from Hennessee Group to South Cherry, the Group represented that Bayou Accredited's predecessor, Bayou Fund, had been launched in January 1997, it had a greater than 19% annualized return since its inception, and that it was profitable in 78% of the months since its inception. (Id. P 26.) South Cherry alleges that all of these statements were false -- Bayou Fund was formed in 1996 and had consistently lost money since its inception -- and the statements further demonstrate that Hennessee Group never conducted the due diligence it promised. (Id.; see also id. P 28.)

### 3. Bayou Accredited's Principal

The February 2003 mailing from Hennessee Group to South Cherry also included a written "'Biography'" of Mr. Israel, Bayou Accredited's "'Founder & Principal.'" (Id. P 29.) According to the biography, prior to forming Bayou Fund, Mr. Israel was "head trader for Omega Advisors, managing assets exceeding $ 4 billion for [*16] Leon Cooperman." (Id.) South Cherry asserts that this representation was particularly impressive as Omega Advisors is one of the hedge fund industry's most successful funds, and Mr. Cooperman is widely admired as a "'legendary'" trader; accordingly, South Cherry claims that it relied on this biography when it decided to invest in Bayou Accredited. (Id.)

Again, South Cherry alleges that had Hennessee Group conducted the due diligence it promised, the Group would have discovered that much of the information in its Israel biography was incorrect. According to the Complaint, Mr. Israel was never Omega Advisors's head trader, and never held any position remotely comparable. (Id. P 30.) Indeed, Mr. Cooperman has since described Israel as an "'order taker.'" (Id.) Thus, South Cherry alleges, the Group's background check on Mr. Israel was either never performed or "woefully deficient." (Id.)

### 4. Bayou Accredited's Investment Strategy

South Cherry also alleges that on February 6, 2003, Ms. Piscopo emailed Mr. Groothuis with incorrect information regarding Bayou Accredited's investment strategy. The email advised Groothuis that Bayou Accredited tracks "'250 stocks,'" that the fund "'will have 50+ [*17] investment ideas and because may times they don't get their target price, they only put on 20-30 trades in one day,'" that the fund "'rarely use[s] any leverage at all,'" and that it "'employ[s] stop-loss orders on all securities [Bayou Accredited] trade[s].'" (Id. P 31.)

Again, South Cherry alleges that if Hennessee Group had conducted the promised due diligence, it would have discovered that all of these representations were "false or misleading." (Id.) In support of this contention, South Cherry cites an SEC report that found that the Bayou Fund

began losing money shortly after its inception in 1996, that Messrs. Israel and Marino began lying to investors regarding the Bayou Fund's performance at this time, and that Israel and Marino misappropriated investors' funds from the Bayou Fund and, beginning in 2003, the four successor funds (including Bayou Accredited). (Id.)

### C. South Cherry Invests in Bayou Accredited

Sometime between January 1 and March 3, 2003, Hennessee Group recommended to South Cherry that it invest in Bayou Accredited. (See id. PP 23, 25, 32.) South Cherry alleges that in reliance on Hennessee Group's recommendation, "and in specific reliance" on its understanding [*18] that Bayou Accredited "had passed all stages" of the Group's five-step due diligence process, South Cherry invested $ 2.9 million in Bayou Accredited over the period March 3, 2003 through June 1, 2003. (Id. P 32.) In Spring 2004, South Cherry withdrew $ 1.75 million, but on October 5, 2004, South Cherry invested an additional $ 900,000 in Bayou Accredited, for a total net investment of $ 1.15 million. (Id.)

### D. Hennessee Group's Ongoing Due Diligence

South Cherry states that it continued to invest in Bayou Accredited in reliance on Hennessee Group's assurance that it would conduct ongoing due diligence on the fund. (Id. P 33.)

During the period from South Cherry's first investment in March 2003 through at least July 2005, Hennessee Group mailed regularly monthly reports entitled "Manager Performance Monitor" to South Cherry. (Id.; see also Manager Performance Monitors, attached as Ex. B to Groothuis Decl.) These Manager Performance Monitors are identical in form to the sample report included in the "Ongoing Due Diligence" section of the Hennessee Investor Presentation. (Compare Manager Performance Monitors with Hennessee Investor Presentation at 14-15.) Just before the Bayou fraud was [*19] discovered, Hennessee Group reported to South Cherry that its $ 1.15 million investment had appreciated to approximately $ 1.5 million. (Compl. P 33.)

South Cherry alleges that these Manager Performance Monitors were incorrect and that "none of the . . . reports disclosed the fact that Bayou was a fraudulent scheme." (Id. P 34.) Indeed, because Bayou Accredited was part of a criminal Ponzi scheme, South Cherry alleges that its investments in Bayou securities were at all times essentially worthless. (Id.) In support of these allegations, South Cherry again cites to a September 2005 SEC report that stated that Messrs. Israel and Marino began diverting funds from all Bayou entities in 2003, in order to invest the money in private placements of non-public start-up companies. (Id.) The SEC report also found that as of April 2004, Israel and Marino stopped trading in Bayou

Accredited's accounts, and instead wired all of the fund's remaining assets to another company's Citibank account. (Id. P 35.) South Cherry claims that Hennessee Group did not report any of these activities to its clients, "even though a review of statements from Bayou's prime banker . . . would have disclosed that Bayou [*20] had stopped trading and had drained its accounts." (Id.) Thus, long after Bayou Accredited stopped trading in April 2004, Hennessee Group "continued to express positive views" of the fund, which resulted in South Cherry's $ 900,000 investment in October 2004. (Id.)

### E. The Bayou Fraud is Discovered

On July 27, 2005, Mr. Israel wrote to all Bayou investors, including South Cherry, that the Bayou entities would be liquidated, and that each investor's capital balance would be distributed by the end of August 2005. No distribution was ever made. (Id. P 36.)

Following this correspondence, various state and federal regulators commenced investigations into Bayou's activities. Messrs. Israel, Marino and James Marquez -- a third Bayou principal -- were subsequently indicted and pled guilty to security fraud. The Arizona Attorney General discovered approximately $ 101 million that had been "wire transferred repeatedly among different banks around the world, and caused that money . . . to be frozen pending further proceedings." (Id. P 37.) Other monies were found to be invested in speculative vehicles by entities owned by Israel and Marino, but in which Bayou investors, like South Cherry, had no [*21] interest. (Id.) The Department of Justice and other law enforcement agencies report that they are seeking to forfeit these assets, to the extent they can be located and seized. (Id.)

### F. Procedural History

On April 16, 2006, South Cherry filed its original Complaint. Defendants subsequently filed a motion to compel arbitration pursuant to an arbitration clause in an executed Investment Advisory Agreement, between Mr. Bollman and Hennessee Group. The motion was denied on December 5, 2006, on the basis that Mr. Bollman was not an employee or agent of South Cherry's when he entered into the Agreement, and the Agreement's arbitration clause was therefore not binding on South Cherry.

On February 27, 2007, South Cherry filed an Amended Complaint, alleging three causes of action: 1) violation of *Section 10(b)* of the Securities Exchange Act of 1934, *15 U.S.C.* *78(j)(b)* and *Rule 10b-5* promulgated thereunder, *17 C.F.R.* *240.10b-5* (against all defendants), 2) breach of contract (against Hennessee Group), and 3) breach of fiduciary duty (against Hennessee Group). On April 6, 2007, defendants filed the instant motion to dismiss the amended complaint for

failure to state a claim upon which relief [*22] can be granted.

### II. Standard of Review

*Rule 12(b)(6) of the Federal Rules of Civil Procedure* provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." *Frasier v. General Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991).* The court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. *California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 515, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972).*

"While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)* (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff [*23] must assert "enough facts to state a claim to relief that is plausible on its face." *Id. at 1974.* This "plausibility standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty, 490 F.3d 143, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007).*

In deciding a motion to dismiss, this court may consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000); San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996).*

### III. Discussion

### A. Violation of Section 10(b) of the Securities Exchange Act of 1934

Defendants argue that South Cherry's *10(b)* claim must be dismissed for two reasons: First, defendants contend that South Cherry failed to plead fraud against all three defendants with the particularity required by *Fed. R. Civ. P. 9(b)* and the Private Securities Litigation Reform Act ("PSLRA"), *15 U.S.C.* *78u-4(b).* Specifically, defendants maintain that the [*24] Complaint only alleges that Hennessee Group made representations regarding its due diligence to Mr. Bollman, and that the Hennessee Investor Presentation was merely a marketing

tool. In addition, defendants argue that plaintiff's allegation that Hennessee Group committed a *10(b)* violation by failing to uncover a fraud that Bayou's principals successfully concealed from the entire world for nine years, does not satisfy the level of recklessness required for a *10(b)* violation. Second, defendants claim that the Complaint fails to plead loss causation.

Because this court finds that the Complaint fails adequately to plead scienter, defendants' argument regarding loss causation need not be addressed.

*Section 10(b)* of the Securities Exchange Act of 1934, *15 U.S.C. 78(j)(b)*, and *Rule 10b-5* promulgated thereunder, *17 C.F.R. 240.10b-5*, prohibit fraudulent activities in connection with securities transactions. Section 20(a) of the Exchange Act, moreover, imposes joint and several liability on, "Every person who, directly or indirectly, controls any person liable" under *10(b) or 10b-5. 15 U.S.C. 78t(a)*. In order to state a claim under *Rule 10b-5*, a plaintiff "must plead that in connection [*25] with the purchase or sale of securities, the defendant, *acting with scienter,* made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." *Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995)* (internal quotations marks and citations omitted) (emphasis added); see also *In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 226 (S.D.N.Y. 2006)*.

It is the scienter element of this pleading requirement on which this court will focus.

While *Fed. R. Civ. P. 9(b)* states that "malice, intent, knowledge or other conditions of mind" may be "averred generally," the PSLRA and long-standing law in this Circuit impose more stringent requirements for pleading securities fraud. See *Veeco Instruments, 235 F.R.D. at 230*; see also *In re Carter-Wallace, Inc., Sees. Litig., 220 F.3d 36, 39 (2d Cir. 2000)* ("the relaxation of *Rule 9(b)*'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations."). Thus, in order to state a claim under *10(b)* and *Rule 10b-5*, the PSLRA requires a complaint to "state with particularity facts [*26] giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. 78u-4(b)(2)*. In this Circuit, the required state of mind has been defined as "intent to deceive, manipulate, or defraud, or reckless conduct," *ATSI Communs., Inc. v. Shaar Fund, Ltd., F.3d , 2007 U.S. App. LEXIS 16382, 2007 WL 1989336, at *6 n.3 (2d Cir. Jul. 11, 2007)*, and the PSLRA's requisite 'strong inference' arises where plaintiffs allege either "(1) facts showing that defendants had both motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of conscious misbehavior

or recklessness." *Gabriel Capital, L.P. v. Natwest Finance, Inc., 137 F. Supp. 2d 251, 261 (S.D.N.Y. 2000)*; see also *Ganino v. Citizens Utilities Co., 228 F.3d 154, 168-69 (2d Cir. 2000)*.

South Cherry's Complaint alleges that Hennessee Group's misconduct falls into the latter category -- that the Group acted recklessly when it failed to uncover the Bayou fraud after it promised to conduct due diligence on Bayou Accredited. (See Compl. PP 7, 23, 26, 28, 30.)

The Second Circuit has defined recklessness as conduct that is "highly unreasonable," and that represents "an extreme departure from [*27] the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Veeco Instruments, 235 F.R.D. at 230-31* (internal quotation marks and citations omitted). However, while reckless conduct may satisfy the scienter requirement of *10(b)* and *Rule 10b-5*, "the complaint must make clear that more than mere negligence is alleged." *Modern Settings, Inc. v. Prudential-Bache Secs., Inc., 603 F. Supp. 370, 372 (S.D.N.Y. 1985)*. Thus, conclusory "allegations that a defendant 'knew or [was] reckless in not knowing' the true facts will not satisfy a plaintiff's pleading requirements." *Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360, 365 (S.D.N.Y. 2001)* (quoting *Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1129 (2d Cir. 1994))*. "Even an egregious failure to gather information will not establish *10b-5* liability as long as the defendants did not deliberately shut their eyes to the facts." *Id. at 368-69* (internal quotation marks and citations omitted).

Notably, "Where a plaintiff relies on allegations of recklessness -- as opposed to motive and opportunity -- to plead fraudulent intent, the strength [*28] of the circumstantial allegations must be correspondingly greater," *Gabriel Capital, 137 F. Supp. 2d at 264*; see also *Kalnit v. Eichler. 264 F.3d 131, 142 (2d Cir. 2001)*, "and the plaintiff must allege facts approaching *a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts.*" *Hart, 145 F. Supp. 2d at 367* (emphasis added).

In addition to this increased pleading requirements for *10(b)* violations based on recklessness, plaintiffs must also satisfy the heightened standard recently announced by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*. In Tellabs, the Court held that when a court examines "whether the pleaded facts give rise to a 'strong' inference of scienter," under the PSLRA, "the court must take into account plausible opposing inferences." *Id. at 2509*. Moreover, for an inference of scienter to be "strong," the inference "must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compel-

ling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing [*29] inference one could draw from the facts alleged." *Id. at 2510.* [4]

> 4   In reaching this decision, the Court noted that it had "previously reserved the question whether reckless behavior is sufficient for civil liability under    10(b) and *Rule 10b-5.*" *Tellabs, 127 S. Ct. at 2507, n.3.* Accordingly, the "question whether and when recklessness satisfies the scienter requirement is not presented in this case." Id. However, the PSLRA's "strong inference" pleading requirement does not carve out an exception for    10(b) cases based on recklessness, and the Supreme Court did not exempt allegations of recklessness from the PSLRA's heightened pleading requirements when it interpreted the statute in Tellabs. Until the Supreme Court comes down one way or the other on whether recklessness is enough for scienter, I must follow Second Circuit law, which permits plaintiffs to plead reckless behavior in support of    10(b) liability, and I must apply the heightened pleading requirement announced in *Tellabs* to such pleadings.

Thus, a plaintiff pleading a    10(b) violation based on defendant's recklessness faces two stiff challenges in this Circuit: the strength of the recklessness allegations must be greater   [*30] than that of allegations of garden-variety fraud, *and* the inference of recklessness must be at least as compelling as any opposing inferences. South Cherry's Complaint does not meet the test.

South Cherry alleges three categories of misrepresentations made by Hennessee Group.

First, South Cherry alleges that Hennessee Group provided incorrect information to South Cherry about Bayou Fund's profitability. (See Compl. PP 26, 28.) But any representations regarding Bayou Fund are irrelevant, because the Complaint does not allege that Hennessee Group ever recommended that South Cherry invest in Bayou Fund. And South Cherry does not rely on these misrepresentations to obtain relief. (See infra.)

Second, South Cherry alleges that the Group provided incorrect information to plaintiff about the independence of Bayou Accredited's accountant, the experience of its principal, Israel, and the fund's investment strategy. (See Compl. PP 23-24, 27, 29-31.) However, South Cherry concedes in its opposition papers that it does not seek relief under    10(b) for these misrepresentations either.

Instead, South Cherry states, "The gravamen of the Amended Complaint is simply that Defendant defrauded South Cherry  [*31] by representing that before recommending the Bayou investment to South Cherry, Hennessee Group had conducted a great deal of very specific due diligence about Bayou that it simply did not do." (See Pl.'s Opp. Br. at 6.)

Third, South Cherry alleges that Hennessee Group promised to conduct a five-step due diligence process before recommending a hedge fund for investment (and to perform ongoing due diligence after recommending a fund). The Complaint alleges the Group failed to do either. (See Compl. PP 14-22, 33-35.) South Cherry's Complaint suggests that Hennessee Group's failure to conduct any semblance of "rudimentary" due diligence -- let alone the Group's unique five-step process -- not only led to its failure to uncover reasons why Bayou was not a sound investment, but also fell short of prevailing industry standards, which constitutes evidence of defendants' recklessness. (See id. PP 24, 26, 28, 30.) Put otherwise, South Cherry thus argues that Hennessee Group assumed both an initial and ongoing duty to South Cherry to investigate Bayou thoroughly, that its failure to uncover the Bayou fraud demonstrates that it breached that duty, and that the breach of duty demonstrates the requisite  [*32] recklessness. (Pl.'s Opp. Br. at 9, 19-20.)

The allegation that Hennessee Group promised to conduct a uniquely comprehensive brand of due diligence but failed to do so is insufficient to establish the requisite strong inference of conscious recklessness. "It is . . . unfair to use professionals' *self-imposed standards,* which may exceed industry standards, against them to try to prove fraud. This violates public policy which encourages the highest standards, in order to protect the public." *Hart, 145 F. Supp. 2d at 370* (quoting *In re Worlds of Wonder Sec. Litig., 147 F.R.D. 214, 217 (N.D.Cal. 1992))* (emphasis added). "Courts have refused to assign 10b-5 liability merely for a violation of a defendant's standard practices and procedures." *Id. at 369.*

Even South Cherry's alternative allegation that Hennessee Group failed to perform due diligence commensurate with industry standards is inadequate to plead scienter. See, e.g., *Stevelman v. Alias Research Inc., 174 F.3d 79 (2d Cir. 1999)* (noting violations of industry standards are not enough to show scienter); *Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996)* (finding that "Allegations of a violation of GAAP provisions or SEC regulations,   [*33] without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); *Gabriel Capital, 137 F. Supp. 2d at 264* ("An investment advisor is retained to suggest appropriate investments for its clients, but is not required to assume the role of accountant or private investigator and conduct a thorough investigation of the accuracy of the facts

contained in the documents that it analyzes for the purpose of recommending an investment."); *In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194 (S.D.N.Y. 1999)* (finding that violations of company's accounting policies and various professional standards, without proof of intent to defraud, were not sufficient to allege fraud under 10(b)).

All of the pre-Tellabs law in this Circuit requires a PSLRA pleader who relies on recklessness to establish scienter to plead stronger allegations than a plaintiff who alleges motive and opportunity to participate in the fraud. See *Gabriel Capital, 137 F. Supp. 2d at 264*. Even if using professionals' self-imposed standards against them to prove fraud were acceptable, Hennessee Group's alleged failure to conduct promised due diligence would still fall short of alleging the requisite scienter [*34] because the allegation fails to "show that the defendants acted with fraudulent intent" (i.e., the intention of deceiving the plaintiff), as they must, "even when plaintiff[] rel[ies] on the 'recklessness' prong of scienter." *Hart, 145 F. Supp. 2d at 365* (noting 10(b) complaint based on recklessness that "fails to adduce any specific facts supporting an inference of *knowledgeable participation* in the alleged fraud will not survive a motion to dismiss.") (internal quotation marks and citations omitted) (emphasis in original); see also *Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000)* (observing "conscious recklessness" is "a state of mind approximating actual intent, and not merely a heightened form of negligence") (internal quotation marks and citations omitted).

The failure to conduct due diligence is not the same thing as knowing of or closing one's eyes to a known "danger," or participating in the fraud. "Where third-party advisers are concerned, to meet such a standard the allegations must approximate an actual intent to aid in the fraud being perpetrated by the . . . company." *Gabriel Capital, 137 F. Supp. 2d at 263-64* (internal quotation marks and citations omitted). South Cherry [*35] does not allege that Hennessee Group knew, or even suspected, that Bayou Accredited was a fraudulent enterprise but "deliberately shut [its] eyes to the facts." *Hart, 145 F. Supp. 2d at 365*. Neither does plaintiff allege that the Group recommended investing in Bayou Accredited with intent to cause plaintiff to lose money or to assist in the fraud being perpetrated by Bayou. Indeed, South Cherry alleges no facts that suggest Hennessee Group, knowing or suspecting that Bayou was a Ponzi scheme, intended to deceive South Cherry into believing Bayou Accredited was a sound investment. Without alleging such facts, the mere allegation that Hennessee Group failed to follow through on its promise to conduct due diligence (which I assume to be true) falls short of providing a sufficiently strong inference of recklessness. See *id. at 365* (granting motion to dismiss where plaintiff investors in company

sued wire service for publishing fraudulent -- and negative -- press release written by disgruntled company employee, where plaintiffs alleged it was defendant's standard practice to confirm press releases).

Tellabs -- which requires this court to examine competing inferences when determining whether [*36] scienter has been adequately pled -- only buttresses this conclusion. South Cherry argues that this court may draw a strong inference of recklessness from the allegation that Hennessee Group recommended (and continued to recommend) Bayou Accredited at a time when Accredited was part of a large Ponzi scheme operated by Bayou's principals. From this, plaintiff asserts, the Group could not possibly have conducted the due diligence it promised. (Pl.'s Opp. Br. at 9-10; see also Compl. PP 7, 23, 30.)

But according to the Complaint, "Bayou was at all relevant times a criminal Ponzi scheme," (id. at P 33), and the fraud was not discovered until "subsequent to" the mailing of a July 27, 2005 letter from Israel to Bayou investors, (see id. PP 36-37), despite the fact that it "had been formed in 1996, and had . . . . lost millions of dollars in every single year it traded." (Id. PP 23, 28.)

One substantial competing inference this court may draw from these alleged facts is that due diligence would not have uncovered the fraud. The Complaint alleges that Bayou concealed the fraud from investors, the public, investment advisors, other industry professionals and regulators -- including the SEC -- [*37] for *nine years*. Given that Israel and Marino managed to deceive the entire investing community for nearly a decade, South Cherry's allegation that Hennessee Group would necessarily have uncovered the fraud had it conducted the due diligence it promised is far from compelling.

I therefore find the inference of recklessness alleged by plaintiff -- that the Group's failure to uncover the fraud evidences a reckless lack of due diligence -- to be less compelling than an opposing inference -- that Hennessee Group's failure to discover the fraud merely places it alongside the SEC, the IRS, and every other interested party that reviewed Bayou's finances. The inference proposed by South Cherry is thus not "strong in light of other explanations," and its pleading cannot survive a motion to dismiss. *Tellabs, 127 S. Ct. at 2510*; see also *Modern Settings, 603 F. Supp. at 372* (granting motion to dismiss 10(b) claim, where defendant account manager promised to take precautions to insure correct valuation, and plaintiffs alleged defendant's misvaluation of plaintiffs' assets evidenced recklessness, noting, "the mere occurrence of the error is not sufficient to justify the inference that the promised [*38] [precautions were] not being employed.")

South Cherry also argues that "defendants' continued misrepresentations over a period of years . . . is just an-

other indication of defendants' scienter." (Pl.'s Opp. Br. at 9.) But Hennessee Group's purported misrepresentations regarding the soundness of Bayou Fund and Bayou Accredited do not form the basis of plaintiff's 10(b) cause of action -- they merely provide the context against which plaintiff has attempted to draw a strong inference of recklessness. The alleged misrepresentations regarding due diligence that form the basis of plaintiff's 10(b) claim occurred only once when the Group mailed the Hennessee Investor Presentation to South Cherry sometime after August 2001. (Compl. P 21.)

For all of these reasons, South Cherry has failed to plead scienter adequately, and its 10(b) claim against Hennessee Group must be dismissed. Because South Cherry has failed to plead a primary violation of 10(b), its 20(a) claim against Elizabeth Lee Hennessee and Charles J. Gradante must also be dismissed.

### B. Breach of Contract

South Cherry's second cause of action alleges that Hennessee Group breached its contract with South Cherry by recommending [*39] (and continuing to recommend) Bayou Accredited as an investment without conducting both the initial and ongoing due diligence promised in the Hennessee Investor Presentation. (Compl. PP 44-50.) The Group moves to dismiss this claim because 1) South Cherry failed to allege the essential terms of the alleged oral contract, and 2) the contract violates the Statute of Frauds, both because it is incapable of being performed within one year and because it constitutes "a contract to pay compensation for services rendered . . . in negotiating . . . a business opportunity . . . and partnership interest." N.Y. Gen. Obl. Law 5-701(a)(10) (McKinney 2007).

Regardless of whether South Cherry has pled the essential terms of an oral contract, it is evident that the alleged contract is unenforceable under the Statute of Frauds. Under New York's Statute of Frauds, an agreement that by its terms cannot be performed within one year of its creation is void unless it is in writing. N.Y. Gen. Oblig. Law 5-701(a)(1). In addition, "contracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds." Computech Intern., Inc. v. Compaq Computer Corp., No. 02-CV-2628, 2002 WL 31398933, at *3 (S.D.N.Y. Oct. 24, 2002); [*40] see also United Beer Distrib. Co., Inc. v. Hiram Walker (N.Y.) Inc., 163 A.D.2d 79, 557 N.Y.S.2d 336, 338 (1st Dep't 1990) ("Since the agreement called for performance for an indefinite duration and could only be terminated within one year by its breach during that period, it is not one which by its terms could be performed within one year.").

Here, all allegations regarding the alleged contract terms between South Cherry and Hennessee Group occur in a single paragraph in the Complaint:

> Hennessee Group contracted with South Cherry that it would recommend to South Cherry suitable hedge fund investments which had passed every stage of Hennessee Group's detailed and rigorous five-step due diligence process. In addition, Hennessee Group promised South Cherry that it would continue to perform ongoing due diligence on investments South Cherry would make in reliance on Hennessee Group recommendations. In exchange, South Cherry agreed to pay Hennessee Group an annual commission of 1% of each hedge fund investment South Cherry made as a result of a Hennessee Group recommendation.

(Compl. P 45.) By its pleaded terms, this is a contract of indefinite duration. No termination provision, express or implied, is alleged.

The [*41] contract pleaded by South Cherry thus resembles the alleged oral contracts in United Magazine Co. v. Murdoch Magazines Distribution, Inc., 146 F. Supp. 2d 385 (S.D.N.Y. 2001). In United Magazine, plaintiff magazine wholesalers alleged oral contracts with defendant magazine distributors, under which each wholesaler was "historically" granted "exclusive geographic territories in which it alone sold publications to retailers." Id. at 392. Beginning in 1995, defendant distributors began permitting some non-plaintiff wholesalers -- including one of the named defendants -- to sell publications to retailers without regard to exclusive geographic regions. Id. at 393. Plaintiffs claimed breach of its oral contract for the territory. The court held that the Statute of Frauds voided the alleged contracts because the contracts were for indefinite terms and, "Plaintiffs do not allege that their contracts with the Distributors contained express termination provisions, but only implied termination provisions. Since no express term was ever alleged, the contracts are for an indefinite duration and so not capable of performance within one year." Id. at 404; see also Burke v. Bevona, 866 F.2d 532, 538 (2d Cir. 1989) [*42] ("The New York cases uniformly hold that implied termination terms are not sufficient to take an oral contract out of the statute.").

South Cherry contends that the pleaded contract "is capable of being performed within one year" because "once South Cherry redeems or sells a Hennessee Group-recommended hedge fund -- which it can do any time -- it no longer owes Hennessee Group a commis-

sion." (Pl.'s Opp. Br. at 16.) (emphasis in original.) In support of this argument, South Cherry relies on Rosbach v. Industry Trading Co., Inc., for the proposition that "the Statute of Frauds will not act as a bar" to the enforcement of any contract that "may be fairly and reasonably interpreted such that it may be performed within a year." *81 F. Supp. 2d 522, 525 (S.D.N.Y. 2000).*

Such reliance is misplaced, because plaintiff's interpretation of the pleaded contract is neither 'fair' nor 'reasonable.' The Complaint clearly pleads a single, over-arching advisory agreement, pursuant to which Hennessee Group contracted to recommend hedge fund investments from time to time, in exchange for a 1% commission on each investment that South Cherry chose to make. (Compl. P 45.) That is a classic example of a contract [*43] of indefinite duration.

Furthermore, if the alleged oral contract were terminated every time South Cherry sold all of its Hennessee Group-recommended hedge fund equity, then the contract would only be capable of being terminated within one year by South Cherry, not by Hennessee Group. "'Under New York law, however, if performance within one year depends upon an act solely within the control of the party seeking to enforce the oral agreement, the Statute of Frauds remains applicable.'" *Canet v. Gooch Ware Travelstead, 917 F. Supp. 969, 984 (E.D.N.Y. 1996)* (quoting *Zaitsev v. Salomon Brothers, Inc., 60 F.3d 1001, 1003 (2d Cir. 1995)).*

For these reasons, the alleged oral contract is void under New York's Statute of Frauds, and South Cherry's breach of contract claim must be dismissed.

### C. Breach of Fiduciary Duty

South Cherry's third cause of action alleges that Hennessee Group breached its fiduciary duty as South Cherry's investment advisor. (Compl. PP 51-53.) The Group moves to dismiss this claim on the basis that it is preempted by the Martin Act, New York's blue sky law, which authorizes only the New York attorney general to enforce its provisions. (Def.'s Mot. to Dismiss at 21.) Plaintiff [*44] counters that this cause of action "is created by federal statute, the Investment Advisers Act of 1940, *15 U.S.C.    80b-1 et seq.,*" and it "would be meaningless for an investment advisor to have fiduciary duties to individual customers, if the customers had no individual recourse for the breach of these duties." (Pl.'s Opp. Br. at 18-19.) Moreover, South Cherry contends that a recent Southern District of New York case, *Louros v. Kreicas, 367 F. Supp. 2d 572 (S.D.N.Y. 2005)*, supports a finding that the Martin Act does not preempt plaintiff's claim.

To the extent that South Cherry is now attempting to frame its breach of fiduciary duty claim as a private cause of action based on the 1940 Act, that argument fails. It is well-settled that "no implied private right of action for damages exists under *Section 206* of the Investment Advisers Act of 1940." *In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig., 272 F. Supp. 2d 243, 256 (S.D.N.Y. 2003)* (citing *Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15-16, 100 S. Ct. 242, 62 L. Ed. 2d 146, (1979)).* [5] The Complaint seeks $ 1,150,000 in damages for the Group's breach of fiduciary duty. (Compl. at 24.) Therefore, the Complaint can only plead a claim under [*45] state law.

> 5  A "limited private remedy" for rescission does exist under Section 215(b) of the Act, see In re Bendelac, No. 03-10023, 2005 WL 3789126, at *15 n.5 (Bankr. S.D.N.Y. 2005), but South Cherry does not seek such a remedy.

And unfortunately for South Cherry, its claim is indeed preempted by the Martin Act, which provides the New York Attorney General with the sole discretion to investigate securities violations within or from the state of New York. See *N.Y. Gen. Bus. Law    352(1)* (McKinney 2007). No private right of action exists under the Martin Act, either. See *CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 276-77, 514 N.E.2d 116, 519 N.Y.S.2d 804 (N.Y. 1987).*

Claims relating to "investment advice" have been deemed "activities within the Martin Act's purview." *Sedona Corp. v. Ladenburg Thalmann & Co., No. 03-CV-3120, 2005 U.S. Dist. LEXIS 16382, 2005 WL 1902780, at *21 (S.D.N.Y. Aug. 9, 2005)*, as are claims involving:

> (a) . . . fraud, deception, concealment, suppression, false pretense . . . ;
>
> (b) . . . promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
>
> (c) . . . representation or statement which is false, where the person who made such representation or statement; [*46] (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made . . . .

*N.Y. Gen. Bus. Law    352-c(1).*

The vast majority of state and federal courts have found that "causes of action related to a plaintiff's securities fraud claim that do not include scienter as an essential element are typically preempted by the Martin Act, in contrast to a claim requiring intent, such as a claim for common law fraud." *Sedona Corp.*, 2005 WL 1902780, at *22; *see also Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 355 (S.D.N.Y. 2005) (noting that allowing plaintiff to proceed on claim that lacked scienter element "would effectively permit a private action under the Martin Act, which the New York State Court of Appeals had already determined would be impermissible."). According to Judge Sand, the courts that have made this distinction

> have offered a persuasive justification for so doing: the latter two causes of action [for negligent misrepresentation and breach of fiduciary duty], like the Martin Act itself, do not require proof of deceitful intent; [*47] common law fraud, however, does. Courts concerned with preserving the Attorney General's exclusive domain therefore preclude claims which essentially mimic the Martin Act, but permit common law fraud claims, which require an additional element.

*Nanopierce Techs., Inc. v. Southridge Capital Management LLC*, No. 02-CV-0767, 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003); *accord Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) ("sustaining a cause of action for breach of fiduciary duty in the context of securities fraud would effectively permit a private action under the Martin Act, which would be inconsistent with the Attorney-General's exclusive enforcement powers thereunder.") (citation omitted); *Joffee v. Lehman Bros., Inc.*, No. 04-CV-3507, 2005 U.S. Dist. LEXIS 12313, 2005 WL 1492101, at *14 (S.D.N.Y. June 23, 2005) ("Martin Act does not preclude private litigants from bringing common law fraud claims because such claims require a plaintiff to prove intent or scienter . . . [C]ourts allow these claims to proceed while simultaneously dismissing . . . breach of fiduciary duty claims.").

South Cherry relies exclusively on *Louros v. Kreicas* to support its contention that the Martin Act does not [*48] preempt its breach of fiduciary duty claim. 367 F. Supp. 2d at 595-96. But *Louros* is distinguishable from the instant case. In that case, plaintiff investor sued a trader who was making investments on plaintiff's behalf, claiming *10(b)* violations in addition to several state law claims. On defendant's motion for summary judgment, Judge Kaplan concluded that plaintiff's breach of fiduciary duty claim was not preempted by the Martin Act be-

cause the claim did "not allege any kind of dishonesty or deception" and therefore did not "implicate[] . . . the plain language of the statute []or its policies." *Id.* Because plaintiff's claim "simply alleges that [defendant] breached a fiduciary duty owed to [plaintiff] to manage his accounts in a way that comported with his needs and to keep him informed about the market and the trades in his account," the claim "does not allege deception, deliberate or otherwise. Accordingly, [the claim] does not come within the Martin Act, and it will not be dismissed." *Id. at 596.*

Unlike the claim in *Louros,* South Cherry's breach of fiduciary claim does allege deception. South Cherry claims Hennessee Group was dishonest when it represented that it would never [*49] recommend a hedge fund investment without first conducting due diligence, and then did precisely that. This allegation is part and parcel of plaintiff's claim (see Compl. PP 7-9, 51-52), and South Cherry's claim is therefore distinguishable from the claim discussed in *Louros.*

Moreover, I concur with the analysis set forth in *Castellano,* Nanopierce, and a host of other state and federal decisions finding breach of fiduciary duty claims arising in the securities context to be preempted by the Martin Act. This analysis is consistent with the statute's broad reach and purpose. See *First Energy Leasing Corp. v. Attorney-General,* 68 N.Y.2d 59, 64, 496 N.E.2d 875, 505 N.Y.S.2d 855 (N.Y. 1986) ("the Martin Act should be liberally construed to give effect to its remedial purpose"); accord *People v. Lexington Sixty-First Assocs.,* 38 N.Y.2d 588, 595, 345 N.E.2d 307, 381 N.Y.S.2d 836 (N.Y. 1976). South Cherry has alleged that Hennessee Group has breached its fiduciary duties to plaintiff by not conducting sufficient due diligence either prior to or after recommending Bayou Accredited as an investment. The claim thus arises in the securities context, and the Complaint alleges "a substantial part of the events of omissions giving rise to this claim occurred in" New [*50] York. (Compl. P 6; see *Sedona Corp.,* 2005 WL 1902780, at *21-22* (finding complaint's statement regarding proper venue in New York sufficient to establish Martin Act's geographical prong).) Accordingly, South Cherry's cause of action for breach of fiduciary duty is precluded by the Martin Act and must be dismissed.

### IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss the amended Complaint is granted.

This constitutes the decision and order of the court.

Dated: July 31, 2007

Colleen Mcmahon

U.S.D.J.

# Tab B

LEXSEE 2007 U.S. APP. LEXIS 19917

**CENTRAL LABORERS' PENSION FUND; ET AL Plaintiffs CENTRAL
LABORERS' PENSION FUND Plaintiff-Appellant v. INTEGRATED
ELECTRICAL SERVICES INC; HERBERT ALLEN; WILLIAM W REYNOLDS;
JEFFREY PUGH Defendants-Appellees**

No. 06-20135

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*2007 U.S. App. LEXIS 19917; Fed. Sec. L. Rep. (CCH) P94,378*

**August 21, 2007, Filed**

**PRIOR HISTORY:** [*1]
 Appeal from the United States District Court for the
Southern District of Texas.

**COUNSEL:** For CENTRAL LABORERS' PENSION
FUND, Plaintiff - Appellant: Steven J Toll, Joshua Seth
Devore, Elizabeth Shattuck Finberg, Cohen, Milstein,
Hausfeld & Toll, Washington, DC; Roger B Greeberg,
Kay Johnson Hazelwood, Schwartz, Junell, Greenberg &
Oathout, Houston, TX.

For INTEGRATED ELECTRICAL SERVICES, INC,
Defendant - Appellee: N Scott Fletcher, Michael C
Holmes, Vinson & Elkins, Houston, TX.

For HERBERT ALLEN, Defendant - Appellee: N Scott
Fletcher, Michael C Holmes, Vinson & Elkins, Houston,
TX.

For WILLIAM W REYNOLDS, Defendant - Appellee: N
Scott Fletcher, Michael C Holmes, Vinson & Elkins,
Houston, TX.

For JEFFREY PUGH, Defendant - Appellee: N Scott
Fletcher, Michael C Holmes, Vinson & Elkins, Houston,
TX.

**JUDGES:** Before HIGGINBOTHAM, WIENER, and
CLEMENT, Circuit Judges.

**OPINION BY:** EDITH BROWN CLEMENT

**OPINION**

 EDITH BROWN CLEMENT, Circuit Judge:

 Central Laborers' Pension Fund ("CLPF") appeals the
district court's dismissal with prejudice of its securities
fraud complaint against Integrated Electrical Services
("IES") and several of IES's executive officers for failure
to meet the heightened pleading standards of the Private
Securities [*2] Litigation Reform Act ("PSLRA"), *15
U.S.C. 78u-4*. We AFFIRM.

**I. FACTS AND PROCEEDINGS**

 During the class period, [1] IES, a Houston-based pub-
licly-traded company, provided electrical contracting
services in the United States through a network of more
than 40 subsidiary companies. Despite its extensive use of
subsidiaries, which were managed regionally, IES held
itself out as an integrated company and filed consolidated
financial statements.

   1    The class period is April 1, 2003, through
       August 13, 2004.

 Starting in April 2003, IES made various statements
expressing confidence in the company's financial status,
and over the next 16 months the company's stock price
generally increased. In early August 2004, IES publicly
disclosed that it could not release its quarterly earnings
numbers on time due to an ongoing evaluation of certain
projects. Later in August 2004, the company acknowl-
edged that "material weaknesses" in the company's in-
ternal controls might require restatement of prior financial
figures. Ultimately, IES restated its financial results for
three periods: fiscal year 2002, fiscal year 2003, and the
first two quarters of fiscal year 2004.

 In June 2005, Plaintiff CLPF, a stockholder, [*3]
filed a consolidated amended class action complaint
("CAC") against IES, its President and CEO Herbert
Allen, and two men who served as the company's CFO at

2007 U.S. App. LEXIS 19917, *; Fed. Sec. L. Rep. (CCH) P94,378

different times, William Reynolds and Jeffrey Pugh, alleging violations of *Sections 10(b)* and *20(a)* of the Securities Exchange Act, [2] *15 U.S.C.     78j(b) & 78t(a)*, as well as *Rule 10b-5* promulgated thereunder. The CAC alleges that a number of false or misleading statements by IES regarding the company's financial condition caused an artificial inflation in the market price of IES's securities during the class period. [3] The allegedly false and misleading statements were distributed publicly through press releases, SEC filings, and "Company & Investment Profiles," which were company-created reports providing analysis about the company.

> 2   Pugh was not sued under *Section 10(b)* and was instead only named as a "Control Person" pursuant to *Section 20(a)*.

> 3   The putative class includes:

>> all those who purchased or otherwise acquired the common stock of IES between April 1, 2003 and August 13, 2004, inclusive and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, [*4] members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

The defendants moved to dismiss the CAC under *Rules 9(b)* and *12(b)(6) of the Federal Rules of Civil Procedure*, arguing, *inter alia*, that the CAC did not meet the pleading requirements of the PSLRA. CLPF opposed the motion and included in its response a request to amend the CAC if the court deemed it insufficient to avoid dismissal. The district court granted the motion and dismissed the CAC with prejudice, implicitly refusing to grant CLPF leave to amend. Specifically, the court found that the CAC did not meet the particularity requirement as to scienter.

CLPF timely appealed and raised two arguments. CLPF argues that the CAC's allegations of scienter were articulated with sufficient particularity to defeat a motion to dismiss. Second, CLPF urges that the district court abused its discretion in refusing to permit amendment of the CAC.

## II. STANDARDS OF REVIEW AND APPLICABLE LEGAL STANDARDS

### A. Motion to dismiss

We review de novo a district court's dismissal of a complaint under *Federal Rule of Civil Procedure 12(b)(6)*. *See* [*5] *Nathenson v. Zonagen Inc., 267 F.3d 400, 406 (5th Cir. 2001)*. We must accept all well-pleaded facts alleged in the complaint as true and must construe the allegations in the light that is most favorable to the plaintiff. *Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005)*. Nevertheless, "[w]e do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.*

In order "[t]o state a claim under     *10(b)* and *Rule 10b-5*, a plaintiff must allege, in connection with the purchase or sale of securities[:] (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately [injured him]." *Fin. Acquisition Partners LP v. Blackwell, 440 F.3d 278, 286 (5th Cir. 2006)* (second and third alterations in original) (internal quotation omitted).

Under the PSLRA, a plaintiff alleging securities fraud must plead the substantive elements of the violation with particularity. *Id. at 287*. The PSLRA "appears to comport with this Court's relatively strict interpretation of *Rule 9(b)*, which requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where [*6] the statements were made, and explain why the statements were fraudulent." *ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002)* (internal quotation omitted). "[T]he PSLRA specifically provides in *15 U.S.C.     78u-4(b)(1)* . . . that, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (internal quotation omitted). Failure to do so results in dismissal of the complaint. *Id.*

> In any private action arising under [the PSLRA] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C.     78u-4(b)(2)*. *Section 10(b)* and *Rule 10b-5* violations require proof that the defendant acted with scienter, which means "either intent *or severe recklessness*." *Blackwell, 440 F.3d at 287*. Severe recklessness is

limited to those highly unreasonable omissions or misrepresentations that [*7] involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Nathenson, 267 F.3d at 408* (internal quotation omitted).

The PSLRA did not, however, generally alter the *substance* of the scienter requirement for *Section 10(b)* and *Rule 10b-5* claims. *See Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003).* This court also does not "require[] a plaintiff to present *direct* evidence of scienter in order to withstand dismissal of his securities claims. Allegations of circumstantial evidence justifying a strong inference of scienter will suffice." *Id. at 246.*

Furthermore, "[t]he strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case." *Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 258 (5th Cir. 2005).* It does, however, permit the court to "engage in some weighing of the allegations to determine whether the inferences toward scienter are strong or weak." *See Rosenzweig v. Azurix Corp., 332 F.3d 854, 867 (5th Cir. 2003).* [*8] Importantly, the Supreme Court recently stated that "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2510, 168 L. Ed. 2d 179 (2007).* The Court provided that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre, or even the most plausible of competing inferences. . . . Yet the inference of scienter must be more than merely reasonable or permissible--it must be cogent and compelling, thus strong in light of other explanations." *Id.* (internal citations and quotations omitted). Accordingly, the Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

**B. Refusal to permit amendment**

This court reviews the district court's refusal to grant leave to amend the complaint for abuse of discretion. *See Goldstein, 340 F.3d at 254.* [*9] *Federal Rule of Civil Procedure 15* favors permitting amendment; the district

court's discretion, therefore, must be considered in this context. *See Rosenzweig, 332 F.3d at 863.*

**III. DISCUSSION**

**A. Motion to dismiss for failure to plead scienter with sufficient particularity**

CLPF contends that it pleaded scienter with sufficient particularity to avoid dismissal based on a holistic examination of the various allegations taken in the light most favorable to it. CLPF alleged insider trading, GAAP violations, failure to timely fix an accounting error, the making of false statements about internal controls, and pervasive knowledge of accounting problems throughout IES.

This court must examine these allegations *in toto* when determining whether CLPF adequately pleaded scienter. *Barrie, 397 F.3d at 260.*

**(1) GAAP violations, public statements, and restatement of financials**

The CAC describes IES's alleged GAAP violations in detail. CLPF urges that its assertions in the CAC regarding the accounting errors and internal controls at IES serve as strong circumstantial evidence of, at a minimum, recklessness as to senior management's ignorance of the problems at IES. *See, e.g., Barrie, 397 F.3d at 263-64; In re McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)* [*10] ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves."). However, GAAP violations, without more, do not establish scienter. *Barrie, 397 F.3d at 263-64.* The public statements and subsequent restatement due to GAAP violations provide some basis to infer scienter.

**(2) Confidential sources**

In the CAC, CLPF also points to statements by confidential sources. Confidential source statements are a permissible basis on which to make an inference of scienter. *Tchuruk, 291 F.3d at 353.*

There are two specific, direct allegations in the CAC suggesting that the defendants ignored the accounting problems at IES. First, a former IES network technician claimed that he overheard comments at headquarters about the company's accounting practices indicating that IES lacked the internal controls it repeatedly lauded and embraced a culture of financial manipulation that favored hitting financial numbers rather than accurate accounting. Second, a former senior vice president stated that Allen said that he did not want to know the details of a revenue issue so that he would not be [*11] liable. The CAC includes various other confidential witness accounts containing fewer details.

IES suggests that these confidential source statements are of no scienter value because they lack specific details, such as particular job descriptions, individual responsibilities, and specific employment dates for the witnesses, and that without such information there is an insufficient basis on which to evaluate the presented information. CLPF essentially retorts that these sort of details go to the weight accorded the statements rather than the validity of considering them in ruling on the motion to dismiss. *See Tchuruk, 291 F.3d at 354* (noting that the court considers "each allegation for its particularization" value). We hold that CLPF's confidential source statements lack sufficient detail to credit them as bases for a strong inference of scienter with respect to the particular allegations of fraud in the CAC.

### (3) IES officers' trading

CLPF also alleges that IES's officers' trading of IES stock permits a strong inference of scienter on the part of the officers. More specifically, CLPF argues that a strong inference of scienter is raised by the amount, timing, profit, and profits ratio [*12] to ordinary compensation of the stock sales.

Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts. *See Rubinstein v. Collins, 20 F.3d 160, 169 (5th Cir. 1994)*. "Suspicious" in this context generally means that the "sales are out of line with prior trading practices or at times calculated to maximize personal profit." *Abrams v. Baker Hughes Inc., 292 F.3d 424, 435 (5th Cir. 2002)*. Insider trading alone cannot create a strong inference of scienter, but it "may meaningfully enhance the strength of the inference of scienter." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 368 (5th Cir. 2004)* (internal quotation omitted).

CLPF points to trading by Allen, Reynolds, and non-defendants. IES contends that the sale assertions are insufficient because the CAC lacks information about the sellers' trading history, including prior sales patterns. In other words, IES's position is that the information regarding sales by Allen and Reynolds is meaningless unless it is placed in context with previous trades. *See Ronconi v. Larkin, 253 F.3d 423, 435-37 (9th Cir. 2001)* (stating that plaintiffs "must allege sufficient [*13] context of insider trading for us to determine whether the level of trading is 'dramatically out of line with prior trading practices'").

In this circuit, officer trading may give rise to an inference of scienter if it is unusual in timing or scope. *Nathenson, 267 F.3d at 421*. In other words, prior trading history does not need to be pleaded as a per se matter; instead, the court looks at the information that is pleaded and determines whether the timing or scope is unusual. In doing so, the court must consider plausible nonculpable

explanations for such officer trading, as well as inferences that favor CLPF. *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2510, 168 L. Ed. 2d 179 (2007)*.

#### (a) Allen

During the class period, on March 4, 2004, Allen made a one-time sale of 30,000 IES shares for a profit of more than $ 225,000. Allen owned 734,400 shares prior to this sale and thereafter retained 704,400 shares. CLPF points out that the profit on this sale represented 43% of Allen's 2004 salary and argues that such a figure provides a strong inference of scienter. *See In re: Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 277 (3d Cir. 2006)* (noting that one relevant factor to the scope and [*14] timing of a sale is "whether the profits were substantial relative to the seller's ordinary compensation").

IES responds that Allen only sold 4 % of his shares during the class period and urges that Allen's continued ownership of a large amount of stock compels an inference that he was not involved in a fraud scheme. In other words, the fact that Allen retained over 700,000 shares of IES stock indicates that he did not possess scienter regarding the alleged fraud, because otherwise he would have sold these shares before the price fell. In addition, in *Suprema* the sale at issue increased the defendants' incomes far more substantially than Allen's sale did. *See id. at 278*. The skeletal insider trading allegations against Allen do not contribute to an inference of scienter.

#### (b) Reynolds

During the class period, Reynolds exercised 351,335 options for a profit of approximately $ 1.44 million. Reynolds left the company in March 2004 and retained only 19,781 options as of April 2004. CLPF contends that these sales were suspicious in scope. IES offers innocent explanations for the sales.

First, Reynolds resigned from IES in March 2004, near the end of the period when his relevant stock sales occurred. [*15] IES asserts that it is not unusual for a corporate officer to sell his stock shortly before resigning. Second, IES urges that financial obligations created by a divorce decree, of which IES asks the court to take judicial notice, provide a non-suspicious explanation for the stock sales. Third, IES contends that Reynolds sold much of the stock pursuant to a 10b5-1 plan, rendering the sales non-suspicious. [4]

---

4   A 10b5-1 plan is an agreement "which allows corporate insiders to set a schedule by which to sell shares" over time, and which can "raise an inference that the sales were pre-scheduled and not suspicious." *Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003)*.

CLPF makes four arguments in response. First, it asserts that Reynolds's retirement near the time of sale is suspicious rather than non-suspicious. *See Suprema, 438 F.3d at 278* ("The timing of the sales was also suspect in that they occurred just six weeks before [the defendants] resigned."). We conclude that this argument does not cut deeply in favor of either position.

Second, CLPF contends that the divorce decree should not have been considered, as Fifth Circuit precedent permits admission of public **[*16]** documents only to prove the existence of their written contents, not the truth of those contents. *Cf. Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1017-18 (5th Cir. 1996)* (discussing admission of publicly-available documents filed with the SEC). Here, however, the document's written terms themselves indicate the reason Reynolds had for selling the shares. The "truth" of the document is not at issue, as might be the case if the terms of the divorce were in dispute. The divorce decree was properly considered.

Third, CLPF points out that the divorce decree awarded substantial property to Reynolds, including real estate, a sports car, and a motorcycle. Accordingly, CLPF asserts that it is unclear whether the divorce decree actually created any financial obligations. The implications of the divorce decree are equivocal; they do not counsel a conclusion that it renders the sale non-suspicious.

Fourth, CLPF convincingly suggests that the attempt to use the 10b5-1 Plan as a non-suspicious explanation is flawed because, *inter alia*, Reynolds entered into the Plan during the Class Period. IES fails to provide a direct response to this assertion. Accordingly, the insider trading allegations **[*17]** contribute to an inference of scienter on the part of Reynolds.

### (4) Sarbanes-Oxley certifications

CLPF also points to the Sarbanes-Oxley certifications signed by Allen and Reynolds as indicative of scienter. Reynolds and Allen both signed certifications that were attached to the company's 10-K. The Sarbanes-Oxley Act states that signing officers must certify that they are

> responsible for establishing and maintaining internal controls [and] have designed such internal controls to ensure that material information relating to the [company] and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the period reports are being prepared.

*15 U.S.C.  7241(a)(4).* IES argues that these certifications are irrelevant to scienter because they are merely statements of opinion.

Other courts have viewed such certifications as indicative of scienter. See *In re: Lattice Semiconductor Corp. Sec. Litig., 2006 U.S. Dist. LEXIS 262, No. CV 04-1255-AA, 2006 WL 538756, at *18 (D. Or. Jan. 3, 2006)* ("The **[*18]** Sarbanes-Oxley certifications, [combined with other allegations], are sufficient to create a strong inference of actual knowledge or of deliberate recklessness."); *cf. In re: Michaels Stores, Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 24919, No. 3:03-CV-0246, 2004 WL 2851782, at *12 & n.11 (N.D. Tex. Dec. 10, 2004)* (rejecting use of Sarbanes-Oxley certifications as a basis for drawing a strong inference of scienter because the statements in the particular certification were not sufficiently related to the alleged misstatements in the complaint).

The Eleventh Circuit recently addressed the interaction of Sarbanes-Oxley and the scienter requirement for securities fraud claims in *Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006).* The court rejected a reading that would permit a strong inference of scienter from the certification alone. "If we were to accept [this] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." *Id.* The court, however, went on to hold that such an inference was proper "if **[*19]** the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Id.* This interpretation of the statute is plausible.

CLPF does not clearly explain the link between these statements about the internal controls and the actual accounting and reporting problems that arose. IES urges that there is not an allegation that on the particular date the certifications were made, the internal controls at IES were inadequate. We hold that the Sarbanes-Oxley certifications at issue here do not permit an inference of scienter. [5]

> 5    The CAC contains various other allegations that arguably permit an inference of scienter. We conclude that these other allegations do not contribute to a strong inference of scienter.

### (5) Collective impact

The tension between the parties, unsurprisingly, is over how specifically the allegations in the CAC must be pleaded in order to avoid dismissal. The flaw in CLPF's argument is its failure to link the misstatements with the

2007 U.S. App. LEXIS 19917, *; Fed. Sec. L. Rep. (CCH) P94,378

bases for inferring scienter. CLPF's allegations read *in toto* do not permit a **[\*20]** strong inference of scienter. Therefore, we conclude that the CAC fails to meet the pleading requirements of the PSLRA and must be dismissed.

### B. Amendment

CLPF contends that, even if the CAC failed to satisfy the PSLRA's particularity requirement, the district court abused its discretion in refusing to permit amendment. In responding to the motion to dismiss, CLPF sought leave to amend the CAC "[i]f indeed there were defects in Plaintiffs' Complaint," on the basis of information obtained during depositions of two former IES employees taken in a California state court proceeding. The district court did not explicitly address this request but implicitly rejected it by entering a judgment of dismissal with prejudice. CLPF argues that the district court's failure to provide reasons for not permitting amendment requires reversal. The Supreme Court has stated that

> [o]f course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).* **[\*21]** CLPF notes that the district court did not provide a reason for its denial of leave to amend. "When the reason for the denial is readily apparent, however, a district court's failure to explain adequately the basis for its denial is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." *Mayeaux v. La. Health Serv. and Indem. Co., 376 F.3d 420, 426 (5th Cir. 2004)* (internal quotation omitted). IES does not dispute either the general legal principles regarding leave to amend or the contention that the district court articulated no reasons for denying the motion. Instead, IES asserts that the justifications for denying the motion were readily apparent.

IES contends that CLPF failed to affirmatively make a motion for leave to amend but instead merely mentioned amendment in passing, noting that it should be allowed "to fix any infirmity" on the basis of the two deposition transcripts that allegedly included evidence of other problems at a different IES subsidiary. We generally will not construe unelaborated, nested requests for amendment as motions to amend. "[A] bare request in an opposition to a motion to dismiss--without any **[\*22]** indication of the particular grounds on which the amendment is sought--does not constitute a motion within the contemplation of *Rule 15(a)*." *United States ex rel. Willard v. Humana Health Plan of Tex. Inc., 336 F.3d 375, 387 (5th Cir. 2003)* (alteration in original) (internal quotation and citation omitted).

While relatively vague, the request for leave to amend in CLPF's response was not devoid of any indication of the grounds for amendment. It included a statement that CLPF possessed corroborating testimony from two additional sources. CLPF asserts that the amendment would corroborate its allegations, thus rendering the complaint sufficient to avoid dismissal. Though we discourage litigants from moving to amend in haphazard fashion, we construe CLPF's request "to fix any infirmity" as a proper motion to amend.

Permissible reasons for denying a motion for leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman, 371 U.S. at 182.*

IES asserts that CLPF's request to amend **[\*23]** was futile because the deposition transcripts do not identify Reynolds at all and only mention Allen in passing during what is essentially speculation by the deponent. As such, amendment with information from these depositions would not have cured the defects in the CAC. We agree and accordingly hold that amendment would have been futile. The district court did not abuse its discretion in denying the motion to amend.

### IV. CONCLUSION

The judgment of the district court, dismissing the CAC with prejudice, is AFFIRMED.

# Tab C

LEXSEE 2006 U.S. APP. LEXIS 31487

**DAVID JOFFEE ET AL., Plaintiffs-Appellants, v. LEHMAN BROTHERS INC. ET AL., Defendants-Appellees, THE ELISABETH HERMAN TRUST ET AL., Plaintiffs.**

No. 06-0903-cv

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*209 Fed. Appx. 80; 2006 U.S. App. LEXIS 31487; Fed. Sec. L. Rep. (CCH) P94,136*

**December 19, 2006, Decided**

**NOTICE:** **[\*\*1]** RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Southern District of New York (Sweet, J.).
*Joffee v. Lehman Bros., 410 F. Supp. 2d 187, 2006 U.S. Dist. LEXIS 1550 (S.D.N.Y., 2006)*

**COUNSEL:** For Plaintiffs-Appellants: CURTIS V. TRINKO (Kenneth F. McCallion, Thomas A. Holman, on the brief), New York, N.Y.

For Defendants-Appellees: TODD R. GEREMIA (Jayant W. Tambe, Aviva Warter Sisitsky, on the brief), New York, N.Y.

**JUDGES:** Present: HON. WILFRED FEINBERG, HON. THOMAS J. MESKILL, HON. ROBERT A. KATZMANN, Circuit Judges.

**OPINION**

**[\*81] SUMMARY ORDER**

On consideration whereof, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the order of the district court, dated January 18, 2006, be and it hereby is **AFFIRMED**.

Plaintiffs-appellants David Joffee *et al.* appeal the order dismissing their third amended complaint ("TAC") which alleged, in pertinent part, that defendants violated *10(b)* of the Securities Exchange Act and the regulations promulgated thereunder. *See 15 U.S.C. 78j(b),*

*78t(a); 17 C.F.R. 240.10b-5* **[\*\*2]** . We assume the parties' familiarity with the facts, the proceedings below, and the specification of issues on appeal.

To state a claim under *10(b),* plaintiffs must allege (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, *i.e.,* a causal connection between the material misrepresentation and the loss. *See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).* The district court here held that plaintiffs failed to adequately plead loss causation, and we review this decision *de novo. Lentell v. Merrill Lynch & Co., 396 F.3d 161, 167 (2d Cir. 2005).*

The primary thrust of the plaintiffs' complaint is that various conflicts-of-interest led defendants to "issue more positive research reports or ratings [about Sunrise securities] than were warranted by the financial data," and that these reports and ratings caused "Sunrise's common stock price [to be] artificially inflated or otherwise stabilized during the Relevant Period." However, allegations that "plaintiffs paid artificially inflated prices **[\*\*3]** for . . . securities and suffered damage[s]" are insufficient to state a claim for federal securities fraud. *Dura Pharm., 544 U.S. at 347* (internal quotation marks omitted; alteration in original); *see also Lentell, 396 F.3d at 175* (holding that an allegation that "the market price of [the] securities was artificially inflated" is insufficient to state a claim under *10(b)).* Further, plaintiffs here never allege that the falsity of the defendants' opinions was ever revealed to the public. *See Lentell, 396 F.3d at 175* (holding that it is "fatal under Second Circuit precedent" if "[t]here is no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of [the defendants'] 'buy' and 'accumulate' recommendations").

209 Fed. Appx. 80, *; 2006 U.S. App. LEXIS 31487, **;
Fed. Sec. L. Rep. (CCH) P94,136

Plaintiffs also argue that the defendants misrepresented and concealed various risks associated with Sunrise securities and that the materialization of those risks caused their losses. [1] However, all of the facts which plaintiffs allege were concealed were, in fact, revealed in various public filings. *Cf. Basic Inc. v. Levinson, 485 U.S. 224, 246, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)* [**4] ("[T]he market price of shares traded on well-developed markets reflects all publicly available information."). [2] Thus, plaintiffs failed to allege that the [*82] defendants concealed from the market risks which later materialized to cause plaintiffs' loss. *See Lentell, 396 F.3d at 175; Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 198 (2d Cir. 2003).*

1  The defendants argue that this theory was not fairly plead in plaintiffs' TAC. We need not reach this issue, however, because we hold that this claim fails for other reasons.

2  Although we generally consider only the complaint on a motion to dismiss, a complaint "include[s] any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *See, e.g., Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)* (internal citations omitted).

[**5]  We have considered all of plaintiffs-appellants' other arguments and find them without merit. Accordingly, for the foregoing reasons, the judgment of the district court is hereby **AFFIRMED**.