# Tab D

LEXSEE 2007 U.S. DIST. LEXIS 65372

**In re MERRILL LYNCH & CO., INC. RESEARCH REPORTS SECURITIES LITIGATION; This Document Relates To: All of the Actions on Schedule 1**

**02 MDL 1484(JFK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 65372*

**September 5, 2007, Decided
September 5, 2007, Filed**

**SUBSEQUENT HISTORY:** Motion denied by, Claim dismissed by *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (In re Merrill Lynch & Co. Research Reports Sec. Litig.), 2007 U.S. Dist. LEXIS 69195 (S.D.N.Y., Sept. 18, 2007)*

**PRIOR HISTORY:** *In re Merrill Lynch & Co. Research Reports Sec. Litig., 2007 U.S. Dist. LEXIS 9450 (S.D.N.Y., Jan. 31, 2007)*

**COUNSEL:** [*1] For Class Plaintiffs: COHEN MILSTEIN HAUSFELD & TOLL, Washington, D.C., Of Counsel: Herbert Milstein, Esq., Joshua Devore, Esq.; KAPLAN FOX & KILSHEIMER, New York, New York, Of Counsel: Christine Fox, Esq., Frederic Fox, Esq.; MURRAY FRANK & SAILER, New York, New York, Of Counsel: Jacqueline Sailer, Esq.; SHAPIRO HABER & URMY, Boston, Massachusetts, Of Counsel: Edward Haber, Esq., Todd Heyman, Esq.

For Defendants: CLIFFORD CHANCE, LLP, New York, New York, Of Counsel: Mark Holland, Esq., Mary K. Dulka, Esq.; FOLEY & LARDNER, New York, New York, Of Counsel: Marc Dorfman, Esq.; SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, New York, New York, Of Counsel: Jay Kasner, Esq., Scott Musoff, Esq., Edward Yodowitz, Esq., Joanne Gaboriault, Esq.

For Objector New York State Teachers' Retirement System: NEW YORK STATE TEACHERS' RETIREMENT SYSTEM, Albany, New York, Of Counsel: Joseph Indelicato, Jr., Esq.

**JUDGES:** JOHN F. KEENAN, United States District Judge.

**OPINION BY:** JOHN F. KEENAN

**OPINION**

**OPINION AND ORDER**

**JOHN F. KEENAN, United States District Judge:**

This Opinion considers the petition of the lead plaintiffs for class certification and final approval of a proposed settlement and plan of allocation in twenty putative securities [*2] class actions brought on behalf of direct purchasers of securities that were the subject of allegedly false or misleading Merrill Lynch research reports. The Court also considers Lead Counsels' application for an award of attorneys' fees and reimbursement of litigation expenses. For the reasons that follow, the Court (i) grants class certification to the settling plaintiffs, (ii) approves the settlement and plan of allocation, (iii) awards attorneys' fees in the amount of 24% of the settlement fund, and (iv) awards reimbursement of litigation expenses to counsel.

**BACKGROUND**

These twenty securities class actions (collectively, the "Actions") were among numerous securities class actions brought against Merrill Lynch on behalf of classes of direct purchasers of stock in Internet-based companies that were the subject of allegedly misleading research reports written and disseminated by the defendants. The cases originally were assigned to the late Honorable Milton J. Pollack for pre-trial purposes, in In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 02 MDL 1484, pursuant to an order of the Judicial Panel on Multidistrict Litigation ("MDL") which consolidated before Judge Pollack [*3] numerous claims, alleging securities fraud against Merrill Lynch and other defendants. The cases were reassigned to me upon Judge Pollack's death. This is the second global settlement of the cases con-

solidated under this MDL. The first global settlement involved three consolidated cases, relating to claims brought on behalf of shareholders of three different Merrill Lynch proprietary mutual funds (the "Mutual Fund Cases") and was approved by this Court on February 1, 2007. See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 02 MDL 1484 (JFK), *2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Feb. 1, 2007)* (the "MF Decision").

Plaintiffs in these Actions are shareholders who held stock, during the relevant class periods, in twenty different internet-based companies that were the subject of allegedly false and/or misleading Merrill Lynch research reports. [1] Defendants are Merrill Lynch & Co., Inc.; Merrill Lynch's broker-dealer affiliate, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"); and various Merrill Lynch research analysts, including Henry Blodget, a Merrill Lynch vice president and the primary analyst for companies in the Internet sector. [2] Plaintiffs alleged that [*4] the favorable ratings given by Merrill Lynch's analysts to the Internet-based stocks at issue were materially misleading and the result of a conflict of interest between Merrill Lynch's research and investment banking operations. Plaintiffs claimed that the defendants' conduct violated *Sections 10(b)* and *20(a)* and *Rule 10b-5* of the Securities Exchange Act of 1934. The factual background of the Actions and the plaintiffs' claims are set forth in previous decisions and orders of Judge Pollack, including *In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243 (S.D.N.Y. 2003)* and *In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 429 (S.D.N.Y. 2003)*; in Judge Pollack's decision and order in a related class action case, *In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351 (S.D.N.Y. 2003)*; and in the MF Decision. Familiarity with those decisions is assumed.

[1] The twenty Actions, each of which relates to a different security, are: All Aboard the Training Junction v. Merrill Lynch & Co., No. 03 Civ. 2927; In re Merrill Lynch & Co. Aether Systems Inc. Research Reports Sec. Litig., No. 02 Civ. 3429; In re Merrill Lynch & Co. CMGI [*5] Inc. Research Reports Sec. Litig., No. 02 Civ. 7218; In re Merrill Lynch & Co. Etoys Inc. Research Reports Sec. Litig., No. 02 Civ. 6645; In re Merrill Lynch & Co. Excite@Home Research Reports Sec. Litig., No. 02 Civ. 3042; In re Merrill Lynch & Co. Exodus Communs., Inc. Research Reports Sec. Litig., No. 02 Civ. 6914; In re Merrill Lynch & Co. GoTo.com Research Reports Sec. Litig., No. 02 Civ. 3835; In re Merrill Lynch & Co. Homestore.com Research Reports Sec. Litig., No. 02 Civ. 9931; In re Merrill Lynch & Co. InfoSpace Analyst Reports Sec. Litig., No. 01 Civ. 6881; In re Merrill Lynch & Co. Internet Capital Group,

Inc. Researech Reports Sec. Litig., No. 02 Civ. 3050; In re Merrill Lynch & Co. iVillage Inc. Research Reports Sec. Litig., No. 02 Civ. 6637; In re Merrill Lynch & Co. Lifeminders Research Reports Sec. Litig., No. 02 Civ. 9852; In re Merrill Lynch & Co. LookSmart, Ltd. Research Reports Sec. Litig., No. 02 Civ. 7739; In re Merrill Lynch & Co. Openwave Systems, Inc. Research Reports Sec. Litig., No. 02 Civ. 3252; In re Merrill Lynch & Co. Pets.com, Inc. Research Reports Sec. Litig., No. 02 Civ. 3634; In re Merrill Lynch & [*6] Co. Quokka Sports, Inc. Research Reports Sec. Litig. No. 02 Civ. 7585; In re Merrill Lynch & Co. B2B HOLDRs Sec. Litig., No. 02 Civ. 5002; In re Merrill Lynch & Co. Internet Architecture HOLDRs Sec. Litig., No. 02 Civ. 3606; In re Merrill Lynch & Co. Internet HOLDRs Sec. Litig., No. 02 Civ.5961; In re Merrill Lynch & Co. Internet Infrastructure HOLDRs Sec. Litig., No. 02 Civ. 4242.

[2] The defendants, as defined in the Stipulation of Settlement, are Merrill Lynch & Co., Inc., MLPF&S, B2B HOLDRs/SM Trust, Internet Architecture HOLDRs/SM Trust, Internet HOLDRs/SM Trust, Internet Infrastructure HOLDRs/SM Trust, Henry M. Blodget, Virginia Syer Genereux, John L. Steffens, E. Stanley O'Neal, George A. Schieren, Ahmass L. Kakahany, Thomas A. Patrick, Dominic A. Carone, and Michael J. Castellano.

*Procedural History*

The first of these Actions commenced on July 26, 2001, with the filing of a complaint on behalf of shareholders of the stock InfoSpace (the "InfoSpace Complaint"). The InfoSpace Complaint alleged that the defendants had recommended the purchase of InfoSpace stock despite being in possession of negative material information regarding an impending merger of InfoSpace and Go2Net, another [*7] internet company. On April 8, 2002, while the defendants' motion to dismiss the InfoSpace Complaint was pending, the Office of the New York Attorney General (the "NYAG") submitted an affidavit in New York Supreme Court, in support of the NYAG's attempt to compel the defendants' to produce certain records (the "Dinallo Affidavit"). The Dinallo Affidavit alleged in detail the defendants' practice of regularly publishing misleading and/or false recommendations on Internet-based stocks in order to generate investment banking business for Merrill Lynch. The NYAG's investigation into Merrill Lynch's conduct received a great deal of publicity and led to the filing of over one hundred class action complaints, in courts throughout the country, on behalf of purchasers of approximately two

dozen Internet-based securities that had been the subject of allegedly false Merrill Lynch research reports. In October 2002, the Judicial Panel on Multidistrict Litigation transferred all the cases to Judge Pollack for pre-trial proceedings, under the caption In re Merrill Lynch Research Reports Securities Litigation, No. 02 MDL 1484.

On December 9, 2002, Judge Pollack issued Case Management Order # 1, directing [*8] that the cases be consolidated according to the security that was the subject of each complaint. On February 5, 2003, March 31, 2003, and July 22, 2003, Judge Pollack issued Orders that, among other things, appointed Lead Plaintiffs in each of the twenty Actions; appointed firms to act as Lead Counsel in these Actions [3]; appointed the Co-Chairs of a Plaintiffs' Executive Committee (the "Co-Chairs") [4]; and appointed Liaison Counsel [5].

> 3  The law firms designated as Lead Counsel are: Kaplan Fox & Kilsheimer LLP; Shapiro Haber & Urmy LLP; Murray Frank & Sailer LLP, Cohen Milstein Hausfeld & Toll, P.L.L.C.; Finkelstein Thompson LLP; Pomerantz Haudek Block Grossman & Gross LLP; Weiss & Lurie; and Much Shelist Freed Denenberg Ament & Rubinstein, P.C.

> 4  The Co-Chairs of the Executive Committee are: Shapiro Haber & Urmy LLP; Murray Frank & Sailer LLP; and Cohen Milstein Hausfeld & Toll, P.L.L.C.

> 5  Liaison Counsel is Kaplan Fox & Kilsheimer LLP.

On March 13, 2003, Lead Plaintiffs filed consolidated amended complaints in each of the Actions. On April 30, 2003, the defendants filed motions to dismiss the complaints in two cases designated as "test cases" by Judge Pollack, In re Merrill Lynch 24/7 [*9] Real Media Inc. Research Reports Sec. Litig. No. 02 Civ. 3210 (MP), and In re Merrill Lynch Interliant Inc. Research Reports Sec. Litig., No. 02 Civ. 3221 (MP) (the "Test Cases"). On June 30, 2003, Judge Pollack dismissed the complaints in the Test Cases with prejudice, on the grounds, inter alia, that the plaintiffs had failed adequately to plead loss causation; that the plaintiffs had failed to plead fraud with sufficient particularity; and that the complaints were untimely, because the plaintiffs had been put on inquiry notice more than one year before the commencement of the actions. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351 (S.D.N.Y. 2003). Lead Plaintiffs in the Test Cases filed a motion for reconsideration of the statute of limitations ruling and for leave to amend the complaints. Judge Pollack denied those motions, and the plaintiffs timely appealed.

The defendants then filed motions to dismiss nine of the Actions (the "Phase I Cases"). On October 29, 2003 and November 17, 2003, Judge Pollack dismissed the Phase I Cases with prejudice, and Lead Plaintiffs in those cases timely filed notices of appeals. Those appeals were pending at the time [*10] the parties agreed upon the instant settlement.

On December 8, 2003, the defendants moved to dismiss the complaints in seven additional Actions (the "Phase II Cases"). Those motions to dismiss were pending at the time the parties agreed upon a settlement.

Four of the instant Actions, brought on behalf of purchasers of Merrill Lynch-created "baskets" of Internet-based securities (the "HOLDRs Cases"), were not subjected to motions to dismiss.

On October 6, 2004, following Judge Pollack's death, the Judicial Panel for Multidistrict Litigation reassigned the cases consolidated in In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 02 MDL 1484, including these Actions, to this Court.

On January 20, 2005, the Second Circuit issued its decision in the appeal of Judge Pollack's dismissal-with-prejudice of the Test Cases. In Lentell v. Merrill Lynch, 396 F.3d 161 (2d Cir. 2005), cert. denied, 546 U.S. 935, 126 S. Ct. 421, 163 L. Ed. 2d 321 (2005), the Circuit affirmed Judge Pollack's dismissal on the ground of loss causation. Id. at 178. The Second Circuit, however, reversed Judge Pollack's ruling that the claims were time-barred.

Appeal of the dismissals of the Phase I cases had been stayed pending the Circuit's ruling [*11] in the appeal of the dismissals of the Test Cases. On June 21, 2005, the Circuit lifted the stay of the appeal in the Phase I cases.

*Settlement*

The parties began conducting settlement discussions prior to the Second Circuit's ruling in Lentell. The first settlement discussion occurred on October 1 ,2003. Counsel for the defendants and the Co-Chairs continued settlement discussions throughout 2004 and 2005. On February 16, 2006, the Co-Chairs and the defendants came to a preliminary agreement regarding settlement of the Actions, and the terms of that preliminary agreement were set forth in a letter of understanding. The preliminary agreement called for a cash payment of $125 million, with interest to begin accruing at rate equal to the three-month London Offered Interbank Rate ("LIBOR") rate as of March 30, 2006. On January 11, 2007, the parties executed a Stipulation and Agreement of Settlement ("Stipulation"). The parties submitted the Stipulation to the Court, along with a Proposed Preliminary Order Approving the Settlement ("Preliminary Order"), to which were attached as exhibits a "Notice of Pendency and

Proposed Settlement of Class Actions ("Notice"), a Proof of Claim and Release [*12] Form ("Proof of Claim"), and a Summary Notice of Proposed Class Action Settlement and Hearing Thereon ("Summary Notice").

The Stipulation provides for the cash payment of $125 million plus accruing interest [6] (the "Settlement Fund"). The Stipulation defines the classes in each of the Actions as consisting of persons who purchased one or more of the securities that are the subject of the instant Actions during the relevant class period for each security and who do not exclude themselves from the Settlement (collectively, the "Class Members").

> 6     Interest was calculated at the three-month LIBOR rate as of March 30, 2006 and accrued from March 30, 2006 to February 23, 2007. On February 23, 2007, the Settlement Fund was deposited into escrow accounts, pursuant to the Stipulation, and will continue to accrue interest until the Settlement Fund is distributed to the classes. As of June 15, 2007, the Settlement Fund's value was $ 133,310,871.08.

Pursuant to the Stipulation, the Settlement Fund will be used to pay taxes and tax expenses; administrative costs of the Actions, including the costs of providing notice; and attorneys' fees and litigation expenses. The remaining amount of the Settlement [*13] Fund ("Net Settlement Fund") then will be distributed to valid claimants pursuant to the Plan of Allocation. The Stipulation also contains a release and waiver, barring any participating Class Members from bringing against any defendant or former defendant in these Actions any future claims, known or unknown, that arise out of or relate to the Actions.

Plaintiffs moved for preliminary approval of the Settlement on January 17, 2007. On January 24, 2007, the Court entered the Preliminary Order. The Preliminary Order granted preliminary class certification to the Actions for settlement purposes and certified the Lead Plaintiffs in the Actions as class representatives. The Preliminary Order also approved the form of the proposed Notice, the Proof of Claim, and the Summary Notice, and scheduled a Fairness Hearing for July 18, 2007, 2006. [7] The Preliminary Order directed counsel to send the Notice and Proof of Claim via first class mail, no later than March 20, 2007, to all identifiable potential Class Members and further directed counsel to publish the Publication Notice in The Wall Street Journal, USA Today, and on the PR Newswire within two weeks after mailing of the Notice. The Preliminary [*14] Order required any Class Member who wished to be excluded from the Settlement to mail notice of the request for exclusion by May 4, 2007. The Preliminary Order further required any objection to the Settlement to be filed with the Court and served on the

parties no later than May 4, 2007. The Order also stated that the deadline for submission of claims was August 31, 2007. [8]

> 7     The date of the Fairness Hearing was subsequently adjourned to July 25, 2007.

> 8     By Order dated March 13, 2007, the Court extended the deadline for the mailing of Notice to April 3, 2007 and the deadline for the filing of exclusions and objections by Class Members to May 18, 2007. By further Order dated August 31, 2007, 2007, the Court extended the deadline for the filing of claims to October 31, 2007, for a group of approximately 11,000 potential claimants whose names were not received by Analytics until July 31, 2007.

*Notice to Class*

On April 3, 2007, pursuant to the Preliminary Order, counsel, through the Court-approved claims administrator, Analytics, Inc. ("Analytics"), began the process of identifying potential Class Members and mailing claim packets to identifiable class members. Each claim packet contained [*15] the Notice and the Proof of Claim. As of June 27, 2007, Analytics mailed 1,818,781 claim packets to potential Class Members. On April 16, 2007, Analytics published the Summary Notice in the national editions of The Wall Street Journal and USA Today, and on the PR Newswire. Analytics also posted downloadable copies of the Notice and Proof of Claim on Analytics' website and on a website created for purposes of the Settlement(http://www.merrilllynchsettlement.com) (last visited August 22, 2007).

The Notice provided a background of the Actions, described the circumstances leading up to the Settlement, supplied the details of the Settlement, gave notice of the Fairness Hearing, and provided instructions for Class Members regarding submissions of claims, exclusion from the Settlement, objection to the terms of Settlement and/or the application for attorneys' fees and reimbursement of expenses, and attendance at the Fairness Hearing. The Notice also stated that Lead Counsel would apply for attorneys' fees not to exceed 30% of the Settlement Fund, and reimbursement of attorneys' costs and expenses incurred in connection with the litigation of the Actions not to exceed $ 1,750,000.

*Plan of* [*16] *Allocation*

The Notice included the proposed Plan of Allocation. The Notice explains that, under the Plan of Allocation, the Net Settlement Fund will be distributed to those Class Members who submit timely, valid Proof of Claim forms that demonstrate net losses on transactions of the stocks at issue in the Actions during the relevant class periods.

Under the Plan of Allocation, a percentage, ranging from 0.6% to 20.4%, of the Net Settlement Fund was allocated to each Action. The allocation of the Net Settlement Fund among the Actions was based on the recommendations of Judge Layn Phillips, a retired United States District Judge, whom Lead Counsel retained to assist in formulating the Plan of Allocation. Pursuant to a stipulation among Lead Counsel, counsel in each of the Actions submitted to Judge Phillips an opening and reply brief in which counsel asserted the relative strengths of plaintiffs' positions in each Action and argued in support of as large a percentage of the allocation as possible. In addition, counsel appeared before Judge Phillips for oral argument. After hearing oral argument, Judge Phillips issued a final recommendation regarding the allocation of the settlement proceeds [*17] among the Actions. The allocation was based on an assessment of the relative likelihood, in each Action, that plaintiffs would be able to prove liability and the amount of damages that could have been recovered for the relevant class periods in each Action. Lead Counsel stipulated to be bound by Judge Phillips' final allocation recommendations, subject to this Court's final approval.

The Notice sets forth in detail the percentage of the Net Settlement Fund that will be allocated to each Action and the Recognized Loss amount that Class Members in each Action will be entitled to claim. The Recognized Loss for each Class Member is based on when the Class Member purchased the shares at issue; when the shares were sold; the amount of loss incurred; and the number of shares, if any, held by the Class Member at the end of the relevant class period.

*Reaction of Class to the Notice of Proposed Settlement*

The response of the classes to the proposed settlement has been extremely positive. After mailing over 1.8 million claim packets to potential Class Members, as of June 27, 2007, Analytics received only 299 requests for exclusion. As of July 25, 2007, the date of the Fairness Hearing, only twelve [*18] individual investors and one institutional investor had filed objections to either the settlement or the request for an award of attorneys' fees and reimbursement of expenses. [9] As discussed below, those objections are either overruled as meritless or have been rendered moot.

    9 Two individual investors, Susan Lockshine and Gary Bauer, withdrew their joint objection after filing it. One institutional investor, the Commonwealth of Pennsylvania Public School Employees' Retirement System, also withdrew its objection subsequent to filing.

*Fairness Hearing*

On July 25, 2007, the Court held the Fairness Hearing. Lead Counsel spoke in favor of the settlement and in support of the application for an award of attorneys' fees of 24%, and reimbursement of litigation expenses. Counsel for defendants appeared but did not argue in favor of the settlement or the application for attorneys' fees. Counsel for the sole institutional objector, the New York State Teachers' Retirement System, appeared and stated an objection to the Settlement. No other objectors attended the hearing.

## DISCUSSION

### (i) Certification of the Settlement Class

The Stipulation contemplates certification of the settlement class. "Before [*19] certification is proper for any purpose-settlement, litigation, or otherwise -- a court must ensure that the requirements of *Rule 23(a)* and *(b)* have been met." *Denny v. Deutsche Bank, A.G., 443 F.3d 253, 270 (2d Cir. 2006)*. *Rule 23(a)* imposes four threshold requirements on putative class actions: numerosity, commonality, typicality, and adequacy of representation. *Id. at 267.* In addition, *Rule 23(b)(3)* imposes the following two requirements: "Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" Id. (quoting *Fed. R. Civ. P. 23(b)(3)*). The Court considers each requirement in turn.

*Numerosity*

*Rule 23(a)(1)* requires that the putative class be "so numerous that joinder of all class members is impracticable." *Fed. R. Civ. P. 23(a)(1).* While no minimum number of plaintiffs is required for a suit to be maintained as a class action, "[g]enerally, courts will find a class sufficiently numerous when it comprises 40 or more members." *DeMarco v. Nat'l Collector's Mint, Inc., 229 F.R.D. 73, 80 (S.D.N.Y. 2005)* (citation and internal quotations [*20] omitted). Here, Analytics identified more than 1.8 million potential Class Members. At the Fairness Hearing, Lead Counsel informed the Court that, as of the week ending July 20, 2007, more than 80,000 claims had been filed. The settlement classes in these Actions clearly are so large that individual actions by all potential plaintiffs would not be possible. The numerosity requirement therefore is satisfied.

*Commonality*

Under *Rule 23(a)(2)*, class certification is appropriate where "there are questions of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2).* The commonality requirement of *Rule 23(a)(2)* is satisfied if "all class members are in a substantially identical factual situation and the questions of law raised by the plaintiff[s] are applicable to each class member." *In re Playmobil Antitrust*

*Litig.*, 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998). The rule does not require that every question of law or fact be common to each class member. Id. "The commonality requirement has been applied permissively in the context of securities fraud litigation." *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006). Here, the Actions raise questions of law and fact that [*21] are common to each class member. Plaintiffs are suing under the same federal securities laws, alleging the same misrepresentations and/or omissions of material statements in the Merrill Lynch research reports, and alleging that the misrepresentations artificially inflated the prices of the stocks at issue, thereby resulting in the plaintiffs' financial losses. Thus, "the success of each plaintiff's claim turns on establishing the existence, nature and significance of the same alleged misrepresentations and omissions." Id. The commonality requirement is satisfied.

*Typicality*

*Rule 23(a)(3)* is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Fed. R. Civ. P. 23(a)(3)*. The "typicality" requirement is met where "the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1104 (E.D.N.Y. 2006) (internal quotations and citation omitted). Here, there is no indication that the claims of the lead plaintiffs differ in any respect from the claims of the rest of the putative Class Members. [*22] Thus, the typicality requirement is satisfied.

*Adequacy of Representation*

*Rule 23(a)(4)* requires that "the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. This necessitates a two-part inquiry: (1) whether the lead plaintiffs' interests are antagonistic to the interests of other members of the class, and (2) whether plaintiffs' attorneys are qualified, experienced and able to conduct the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Regarding the first prong, there is no indication that the lead plaintiffs' claims conflict in any way with the claims of other Class Members. As stated above, the claims of the named plaintiffs appear to be typical of the claims of the remainder of the class. The second prong also is satisfied. As the resumes submitted by Lead Counsel clearly show, counsel have wide experience in the field of securities class litigation. Further, as discussed below and as is clear from the record of this litigation, counsels' skillful and zealous representation over a six-year period enabled the settling classes to obtain a favorable and certain cash recovery. [*23] Thus, the final requirement of *Rule 23(a)* has been met.

*Rule 23(b)(3): Predomination and Superiority*

*Rule 23(b)(3)* requires "[1] that common questions of law or fact predominate over individual questions and [2] that a class action is superior to other methods of adjudication." *In re Veeco Instruments, Inc.*, 235 F.R.D. at 240. "In determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999). Common questions also predominate where "even if each Class member were to bring an individual action, each would be required to prove the existence of the alleged activities of the defendants in order to prove liability." Id. Here, only the issue of damages will be different for each Class Member in each Action, depending upon the number of shares owned by a given Class Member and the dates on which those shares were purchased, sold, and/or held. Further, as discussed above, the Class Members' claims involve the same questions of fact and law. Thus, even if each Class Member in each Action were to bring suit individually, each [*24] plaintiff would have to allege and prove virtually identical facts. Therefore, common questions predominate.

*Rule 23(b)(3)* sets forth the following factors to be considered in making a determination of superiority: "(A) The interest of members of the class in individually controlling the prosecution . . . of separate actions; (B) The extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) The desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) The difficulties likely to be encountered in the management of a class action." *Fed. R. Civ. P. 23(b)(3)*. As the court observed in In re Blech Sec. Litig.,

> In general, securities suits . . . easily satisfy the superiority requirement of *Rule 23*. Most violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible. Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor an adjudication of their [*25] claims. Moreover, although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf.

187 F.R.D. at 107.

The reasoning of the court in *Blech* applies in these Actions, where there are potentially hundreds of thousands of Class Members and the expected recovery per share is low. Because of the large number of potential claimants and the relatively small damage suffered by potential individual claimants, it is unlikely that individual plaintiffs would endure the expense of litigation in order to bring their claims. There is no indication that counsel are likely to encounter any difficulties in administering the settlement of the actions. Therefore, because class action treatment is superior to any other method for the fair and efficient adjudication of these Actions, the requirements of *Rule 23(b)(3)* are satisfied.

Because the factors for class certification set forth in *Rule 23(a)* and *Rule 23(b)(3)* have been met, the application to certify the classes for settlement is granted.

### (ii) Approval of Final Settlement

Federal *Rule 23(e)* governs the settlement of class actions and **[*26]** requires court approval before a settlement is executed. Adequate notice of the proposed settlement must be provided and the proposed settlement must be the subject of a fairness hearing. *Fed. R. Civ. P. 23(e)(1)*. In addition, a court may approve a settlement that is binding on the class only if it determines that the settlement is "fair, adequate, and reasonable" and not a "product of collusion." *Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000)*. This evaluation requires the court to consider both "the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005)*. The determination of the fairness of a settlement is a matter addressed to the Court's discretion. *Joel A., 218 F.3d at 139*.

### Adequacy of Notice

While there are no rigid rules to determine the adequacy of notice in a class action, the standard is generally that of reasonableness. *Wal-Mart, 396 F.3d at 113-14*. Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely **[*27]** to inform potential class members. *Weigner v. City of New York, 852 F.2d 646, 649 (2d Cir. 1988)*. Notice is generally deemed reasonable if the average person understands the terms of the proposed settlement and the options provided to class members thereunder. *Wal-Mart, 396 F.3d at 114*.

In these Actions, counsel provided potential Class Members with adequate notice of the Settlement. Counsel, through a Court-approved claims administrator, disseminated the Notice to more than 1.8 million potential claimants. In plain language that is easily understood by the average person, the Notice set forth essential information, including the background of the Actions, the terms of the Settlement, the Plan of Allocation, and the various rights of Class Members under the Settlement (including the right to opt out, file objections, and attend the Fairness Hearing). Appended to each Notice was a form for Proof of Claim, which contained detailed instructions for filing claims under the Settlement, including a "Reminder Checklist" that summarized the steps that a Class Member needed to take in order to submit a claim. Counsel also complied with the publication requirement, causing the Summary Notice **[*28]** to be published in appropriate national print and online publications. The Summary Notice contained the required information regarding the Settlement terms and process and provided clear instructions on how potential claimants could obtain a copy of the Notice and Proof of Claim. The Court finds that Notice of the proposed settlement of the Actions was reasonable.

### Procedural Fairness

"A 'presumption of fairness, adequacy, and reasonableness' may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Wal-Mart, 396 F.3d at 116* (quoting Manual for Complex Litigation, Third, 30.42 (1995)). "'The experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves' shed light on the fairness of the negotiating process." Hicks v. Morgan Stanley & Co., No. 01 Civ. 10071, *2005 U.S. Dist. LEXIS 24890, at *13 (S.D.N.Y. Oct. 24, 2005)* (quoting *Malchman v. Davis, 706 F.2d 426, 433 (2d Cir. 1983))*.

It is clear from the record of this case that the negotiations leading to the Settlement were procedurally fair. The parties first discussed the **[*29]** potential for settlement in October 2003 and continued negotiations in 2004 and 2005, pausing only to re-evaluate their positions after the Second Circuit issued its crucial ruling in Lentell in 2005. After agreeing on key settlement terms in February 2006, the parties spent nearly one year conducting further negotiations before executing the Stipulation, in January 2007. In sum, counsel with wide experience and demonstrated skill in the field of class action securities litigation represented both sides in reaching the Stipulation after protracted negotiations. There is nothing in the record of this litigation to rebut the presumption of procedural fairness that attaches to the negotiation process. The Court thus finds that the process by which the parties negotiated the proposed settlement was fair and reasonable.

### Substantive Fairness

Courts of the Second Circuit examine the well-established "Grinnell factors" to determine whether a

settlement is substantively fair and reasonable as required by *Rule 23(e)*. The factors that a district court considers are:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage [\*30] of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund in light of a possible recovery in light of all the attendant risks of litigation[.]

*D'Amato v. Deutsche Bank, 236 F.3d 78, 86 (2d Cir. 2001)* (citing *City of Detroit v. Grinnell Corp., 495 F.2d 448, 463*, abrogated on other grounds by *Goldberger v. Integrated Reserves, Inc., 209 F.3d 43 (2d Cir. 2000))*. A court need not find that every factor militates in favor of a finding of fairness; rather, a court "consider[s] the totality of these factors in light of the particular circumstances." *In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 456 (S.D.N.Y. 2004)*.

Application of the *Grinnell* factors in these Actions leads ineluctably to the same conclusion that this Court reached in the MF Decision: namely, that given the dire procedural posture of this case, "[t]here is little question [\*31] that the settlement agreements . . . are fair and adequate to the class because they would provide what further litigation could not -- any recovery for class members." *In re Stock Exchs. Options Trading Antitrust Litig., No. 99 Civ. 0962, 2006 U.S. Dist. LEXIS 87825, at *26 (S.D.N.Y. Dec. 4, 2006)* (internal quotations and citation omitted)). The proposed settlement in this case provides Class Members with the immediate and certain benefit of a substantial cash settlement. Had the plaintiffs not settled and pursued the litigation of these Actions, the almost certain result would have been complete non-recovery. As discussed above, the Second Circuit, in Lentell, affirmed Judge Pollack's dismissal-with-prejudice of the complaints in the Test Cases on loss causation grounds. Similarly, Judge Pollack dismissed with prejudice the complaints in the Phase I cases on the ground, inter alia, that the plaintiffs had failed adequately to plead loss causation. Given the Circuit's ruling in Lentell, the dismissals of the Phase I cases were highly likely to be upheld by the Second Circuit on appeal. The Phase II cases probably would have suffered the same

fate: that is, dismissal with prejudice [\*32] in this Court on the ground, inter alia, of failure to plead loss causation, followed by affirmance of the dismissal in the Second Circuit. Similarly, the HOLDRs cases, when subjected to motions to dismiss, were also highly likely to have suffered dismissals-with-prejudice and affirmance of those dismissals on appeal. In light of the high likelihood of non-recovery faced by the plaintiffs at the time the Stipulation was executed, the Settlement represents a fair recovery for the plaintiffs.

The size of the Settlement Fund, in light of the risk faced by the plaintiffs were they to proceed with these Actions, militates in favor of approval. Here, the Settlement Fund will amount to over $ 133 million. The alternative, as noted above, is an extremely high risk, if not a certainty, of complete non-recovery. According to the plaintiffs' damages experts (Financial Market Analysis LLC ("FMA")), the total claimed damages in these actions were estimated at a high of $ 4,134,800,000, and a low of $ 1,735,800,000. Thus, the Settlement Fund represents between approximately 3% and 7% of the claimed damages. A recovery of between approximately 3% and 7% of estimated damages is within the range of [\*33] reasonableness for recovery in the settlement of large securities class actions. See *Hicks, 2005 U.S. Dist. LEXIS 24890, at *19* (finding a settlement representing 3.8% of plaintiffs' estimated damages to be within range of reasonableness); see also Ellen M. Ryan & Laura E. Simmons, Cornerstone Research, Securities Class Action Settlements: 2006 Review and Analysis, at 6, available at http://securities.cornerstone.com/pdfs/settlements_2006. pdf (last visited August 23, 2007) (reporting that, in 2006, the median settlement as a percentage of estimated damages was 0.7% in securities class actions where estimated damages ranged between $1.001 and $5 billion). Thus, the substantial recovery of $125 million, plus accrued interest, weighs in favor of approval.

The overwhelmingly positive reaction of the class also weighs heavily in favor of approval of the Settlement. After over 1.8 million Notices were mailed to potential Class Members, only eleven objections to the fairness of the Settlement were submitted, and only 299 investors requested to be excluded from the Settlement. "If only a [\*34] small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart, 396 F.3d at 118*. Here, the relatively small number of objections and requests for exclusion militate in favor of approving the settlement as be fair, adequate, and reasonable. See, e.g., *D'Amato, 236 F.3d at 86* (approving settlement where 18 objections were filed after notice was sent to 27,883 class members); *McBean v. City of New York, 233 F.R.D. 377, 386 (S.D.N.Y. 2006)* (approving settlement where, after notice was sent to 40,352 class members, only four objected and 36 opted

out of settlement); *Hicks*, 2005 U.S. Dist. LEXIS 24890, at *16 (finding that reaction of class supported approval, where 123 class members out of approximately 100,000 requested exclusion and only three filed objections).

In sum, after considering the relevant Grinnell factors, the Court finds that the Settlement is substantively fair and reasonable.

*Objections to Settlement*

The eleven objections to the fairness of the proposed Settlement have been rendered moot or are without merit and do not weigh against approval of the Settlement. All of the objections to the fairness of the Settlement **[*35]** were filed by individuals, none of whom attended the Fairness Hearing. Although several of the objections were improperly filed (for example, served on counsel but not filed with the Court, filed with the Court but not served on counsel, or filed untimely), the Court will ignore any procedural defects and address each on its merits.

*Manning Warren* Mr. Warren simply objects to the Settlement on the ground that the amount of the Settlement Fund is less than the fines paid by Merrill Lynch to settle the NYAG's action. This is factually incorrect: Merrill Lynch paid $100 million in settlement, see NYAG Press Release, Spitzer, Merrill Lynch Reach Unprecedented Agreement to Reform Investment Practices: Merrill Lynch to Pay $100 Million Penalty, May 21, 2002, available                         at http://www.oag.state.ny.us/press/2002/may/may21a_02.h tml (last visited August 23, 2007). The Settlement Fund, without interest, amounted to $125 million. Mr. Warren further states that the settlement is "unreasonably low and is not in the investors class' best interests." (Objection of Manning Warren.) These conclusory statements are not sufficient to weigh against approval of the Settlement as fair and reasonable.

*David Race* **[*36]** Mr. Race objects on the ground that the settlement classes should include acquirers of shares in the stock, Openwave, through a merger. As plaintiffs point out, Mr. Race is simply mistaken. Even though Mr. Race acquired his shares through a merger, he is nevertheless deemed a member of the class under the provisions of the Settlement. Lead Counsel have represented to the Court and have informed Mr. Race and his attorney that Mr. Race will be included in the Settlement. Accordingly, I consider Mr. Race's objection to be dismissed as moot.

*Frank Cordingley* Mr. Cordingley states that a recovery equivalent to "10% return on initial investment would be considered good faith for believing that no criminal activities would occur during this American institution called our stock exchange . . . ." (Objection of Frank Cordingley.) Mr. Cordingley does not otherwise

explain why the terms of settlement are unfair. Mr. Cordingley's statement does not constitute a valid ground for objection.

*Frank Arcuri* Mr. Arcuri objects to the Plan of Allocation for shareholders of CMGI stock. Mr. Arcuri states that his losses in the stock exceeded $20,000 and that the one cent/share recovery provided for shareholders **[*37]** of CMGI during the relevant class period by the Plan of Allocation is "without merit, and frivolous, and should be dismissed." (Objection of Frank Arcuri.) Mr. Arcuri proposes that a larger recovery for each CMGI shareholder can be obtained by proportionately reducing attorneys' fees. Plaintiffs assert that the recovery for CMGI shareholders is appropriately low because it "reflects the weakness of plaintiffs' allegations" during the relevant class period. As counsel note, Judge Phillips classified the CMGI case as a "low-tier liability/zero damage case." (Pl. Mem. in Support of Settlement at 25.)

As discussed below, Judge Phillips' analysis of the relative strength of each Action and the resulting Plan of Allocation were reasonable and fair. Mr. Arcuri has not shown why Judge Phillips' assessment of the weakness of the CMGI Action, during the relevant class period, is erroneous, in light of the fact that claimants in Mr. Arcuri's position simply would be unable to prove loss causation. Thus, Mr. Arcuri's objection does not weigh against approval of the Settlement.

*Cliff Bamford* Mr. Bamford simply requests that the Court exclude him from the settlement, mainly on the ground that the **[*38]** proposed settlement enriches class counsel while providing little justice or relief to injured investors such as himself. As plaintiffs point out, Mr. Bamford's application does not comply with the requirements set forth in the Notice, namely because Mr. Bamford has failed to state the type and number of shares he owned of a particular security that is the subject of these Actions, nor when he bought or sold the security. To the extent that Mr. Bamford's submission is deemed an objection, it has no merit.

*Ernest Michaud* Mr. Michaud reports that, as a result of his purchase of Exodus stock, he ended up losing "12 to 15 thousand dollars. Money I had earmarked to help pay for my children's college expenses." (Objection of Ernest Michaud.) He describes the proposed settlement, from which he stands to recover only five dollars, as a "joke" and regrets that the notice has reminded him of "this bad memory" that he had almost succeeded in forgetting. (Id.) Although Mr. Michaud clearly has expressed his displeasure with the outcome of his investment and this Settlement, his objection does not state any valid reason why the Court should not approve the settlement.

*Bryan Fitzpatrick* Mr. Fitzpatrick **[*39]** states that he bought and sold 200 shares of CGMI and 100 shares of

ICGE during the relevant class periods. Mr. Fitzpatrick primarily objects that he stands to recover nothing because he did not sell his securities at a net loss. He cites to *Dura Pharmaceuticals v. Broudo,* 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005), for the proposition that a shareholder may recover on a claim for securities fraud when a shareholder, despite having incurred no out-of-pocket loss, nevertheless realizes a gain that was less than it would have been but for the fraud. Mr. Fitzpatrick protests that it is unfair to extinguish the claims of shareholders who did not incur net losses; he states that the proper course would have been to "exclude such persons from the definition of the class and permit them to pursue their claims in another action if they so choose." (Objection of Fitzpatrick.) He also states that the Settlement, which treats shareholders of CMGI and ICGE stock differently depending upon when the shares were bought and sold, constitutes a conflict of interest that is violative of constitutional due process.

As plaintiffs note, it is well-settled in the Second Circuit that it is not inequitable for a plan of allocation [*40] to provide for distribution of the proceeds of a settlement fund only to claimants who suffered out-of-pocket losses as a result of the defendants' alleged fraudulent conduct. See *Official Comm. Of Unsecured Creditors of WorldCom, Inc. v. SEC,* 467 F.3d 73 (2d Cir. 2006). Thus, the Settlement does not violate Mr. Fitzpatrick's right to due process of law. As plaintiffs further note, had Mr. Fitzpatrick wished to preserve his claims and commence his own action against the defendants, he could have opted out of the Settlement. The Court finds that Mr. Fitzpatrick's objections to the fairness of the Settlement have no merit.

*Bonita Bates* Ms. Bates purchased and sold ICGE shares prior to November 8, 2000, the date on which previously undisclosed risks relating to ICGE were revealed. Ms. Bates objects to the Plan of Allocation's failure to distribute settlement proceeds to investors who purchased and sold ICGE stock prior to November 8, 2000. As plaintiffs note, shareholders who sold their ICGE stock prior to the disclosure of previously undisclosed risks would be unable to prove loss causation. Therefore, the Plan of Allocation reasonably provides no recovery for claimants who, like Ms. [*41] Bates, sold their ICGE stock prior to the date of disclosure. Accordingly, Ms. Bates' objection has no merit.

*Thomas & Catherine Quaranta* The Quarantas appear to object to the fact that the class period during which they purchased and sold shares of CMGI stock allows them to obtain no recovery under the Plan of Allocation. The objection has no merit, however, because the Quarantas sold their shares of CMGI before Merrill Lynch disclosed the existence of previously undisclosed risks. Thus, like Ms. Bates, the Quarantas are unable to prove

loss causation, and accordingly, it is fair and reasonable that the Plan of Allocation recognizes no loss for the period at issue and provides the Quarantas with no recovery.

*Susan Borstein* Like the Quarantas, Ms. Borstein purchased and sold her CMGI shares prior to the defendants' revelation of previously undisclosed risks; thus, she would be unable to prove loss causation, her recognized loss is zero, and her objection to the Settlement has no merit.

*Slayden Yarbrough* Mr. Yarbrough also objects to the absence of recognized loss, under the Plan of Allocation, for his purchase of CMGI shares. Mr. Yarbrough purchased his CMGI shares after the defendants [*42] revealed previously concealed negative facts regarding CMGI. Thus, Mr. Yarbrough would be unable to prove loss causation and his recognized loss is, appropriately, zero.

In sum, the eleven individual investors' objections to the fairness of the Settlement do not weigh against approval of the Settlement as fair and reasonable.

*Plan of Allocation*

"In approving an allocation plan, the Court must ensure that the distribution of funds is fair and reasonable." *Hicks,* 2005 U.S. Dist. LEXIS 24890, at *19-20 (citations omitted). A plan of allocation that is devised by competent and experienced class counsel "need have only a reasonable, rational basis." Id. (internal quotations and citation omitted).

The Plan of Allocation was developed by Lead Counsel with the significant participation of a retained neutral arbiter, former United States District Court Judge Phillips. As noted above, the Plan of Allocation is the result of extensive proceedings conducted before the former Judge Phillips and his subsequent assessment of counsels' arguments and the relative factual strengths and weaknesses of each Action. The Plan of Allocation calls for the Settlement Fund to be distributed to Class Members in [*43] each Action on the basis of each Class Member's pro rata loss of value in shares for each Action during relevant class periods for which there existed a recognized loss. A plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is reasonable. See *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 2007 U.S. Dist. LEXIS 9450, at *39-40; *Hicks,* 2005 U.S. Dist. LEXIS 24890, at *21 (citing *In re Global Crossing,* 225 F.R.D. at 462). Further, the Court notes that the Plan of Allocation was described in detail in the Notice that was sent to each potential class member, and as discussed above, the few objections to the Plan have no merit. Accordingly, the

Court approves the Plan of Allocation as fair and reasonable.

### (iii) Attorneys' Fees

Lead Counsel request an award of attorneys' fees in the amount of 24% of the Settlement Fund, or approximately $31,994,609, as of June 15, 2007. The requested award translates to a multiple of 1.985 of counsels' total lodestar and an hourly rate of $912.80 for all the legal and paraprofessional work expended on these Actions. Lead Counsels' request comports with the terms of the Notice provided to [*44] potential class members, which stated that counsel would not request fees in excess of 30% of the Settlement Fund.

"[W]here an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class . . . the attorneys whose efforts created the fund are entitled to a reasonable fee -- set by the court -- to be taken from the fund." *Goldberger, 209 F.3d at 47.* A district court has broad discretion to award attorneys' fees, and an award of fees will be overturned only for abuse of that discretion. Id. In the Second Circuit, a district court may calculate attorneys' fees in one of two ways. Under the "lodestar" method, "an attorney fee award is derived by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *A.R. v. N.Y. City Dep't of Educ., 407 F.3d 65, 79 (2d Cir. 2005)*(internal quotations and citations omitted). The court then may apply a multiplier to the lodestar figure to account for other factors, such as the risk of the litigation, the performance of counsel, or the success achieved. See In re Twinlab corp. *Sec. Litig., 187 F. Supp. 2d 80, 84-85 (E.D.N.Y. 2003).* The percentage [*45] of the fund method is a simpler calculation where the award is based on "some percentage of the fund created for the benefit of the class." *Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999)* (citing *Blum v. Stenson, 465 U.S. 886, 900 n.16, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)).*

Both the lodestar and percentage methods are permissible methods of calculating reasonable attorneys' fees. *Goldberger, 209 F.3d at 50.* The trend in the Second Circuit, however, has been to express attorneys' fees as a percentage of the total settlement, rather than to use the lodestar method to arrive at a reasonable fee. *Wal-Mart, 396 F.3d at 121; In re Elan Sec. Litig., 385 F. Supp. 2d 363, 373 (S.D.N.Y. 2005).* The Second Circuit disfavors application of the lodestar method because the "lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart, 396 F.3d at 122* (internal quotations and citation omitted); see also In re AOL Time Warner, Inc. Sec. & "ERISA" *Litig., No. 02 Civ. 5575,*

*2006 U.S. Dist. LEXIS 78101, at *24 (S.D.N.Y. Sept. 28, 2006),* report and recommendation adopted by *2006 U.S. Dist. LEXIS 77926 (S.D.N.Y. Oct. 25, 2006)* [*46] (noting that "every significant Southern District opinion facing the issue since Goldberger has embraced the percentage approach"). The percentage method usually is deemed to be preferable "because it reduces the incentive for counsel to drag the case out to increase the number of hours billed; also, fewer judicial resources will be spent in evaluating the fairness of the fee petition." *Hicks, 2005 U.S. Dist. LEXIS 24890, at *23* (citation omitted). Use of the percentage method also comports with the statutory language of the Private Securities Litigation Reform Act of 1995 ("PSLRA") which specifies that "total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class . . . ." *15 U.S.C.    78u-4(a)(6)* (emphasis added); *Maley v. Del Global Tech., 186 F. Supp. 358, 370 (S.D.N.Y. 2002)* (noting that in amending the PSLRA, Congress "indicated a preference for the use of the percentage method").

Whether the fee is calculated using the lodestar or percentage method, courts consider the following Goldberger factors in determining a reasonable [*47] award of fees: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy." *Goldberger, 209 F.3d at 50.* "Even when the percentage method is used, however, the Second Circuit 'encourages the practice of requiring documentation of hours as a 'cross-check' on the reasonableness of the requested percentage.'" *In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 520-21 (E.D.N.Y. 2003),* aff'd *Wal-Mart, 396 F.3d at 96 (2d Cir. 2005)* (quoting *Goldberger, 209 F.3d at 50*). In evaluating the lodestar value for "cross-check" purposes, the hours submitted by the attorneys are reviewed but not exhaustively scrutinized. *Goldberger, 209 F.3d at 50.* In determining a reasonable award of attorneys' fees, the Court seeks to balance the "overarching concern for moderation with the concern for avoiding disincentives to early settlements." *In re Elan Sec. Litig., 385 F. Supp. 2d at 376* (citations and internal quotations omitted). A fee award "should be assessed based on scrutiny of the unique circumstances of [*48] each case, and 'a jealous regard to the rights of those who are interested in the fund.'" *Goldberger, 209 F.3d at 53* (quoting *Grinnell, 495 F.2d at 469*).

Counsel argue that an award of 24% in these Actions is fair and reasonable in light of this Court's award of a fee of 22.5% in the Mutual Fund Cases. Counsel contend that the Mutual Fund Cases, which were part of the same MDL

as the instant Actions and were based on similar allegations of wrongful conduct engaged in by largely the same defendants, provide a useful benchmark for the Court's analysis of the Goldberger factors. Counsel also assert that an award of 24%, which marks a slight, 1.5% increase over the award granted in the Mutual Fund Cases, is justified in light of the differences between this litigation and the Mutual Fund Cases. Specifically, counsel point to the greater risk of non-recovery encountered by the plaintiffs at the outset of this litigation and the more difficult discovery undertaken in this case as justifying the award of a larger percentage than that awarded in the MF Decision.

The Court agrees that the MF Decision, and the award of fees in that litigation, provide a useful benchmark in determining an appropriate [*49] award of attorneys' fees in the instant case. Thus, in analyzing the relevant factors, the Court will remain mindful of its application of those factors in the MF Decision. Here, as in MF Decision, the Court will determine attorneys' fees using the percentage method. Each of the *Goldberger* factors will be considered, and the Court then will evaluate the lodestar figure as a "cross-check" on the reasonableness of the percentage requested.

### (1) Time and Labor Expended

Plaintiffs' counsel expended a total of 35,051.26 hours of legal and paraprofessional work over the course of approximately six years on this litigation. By contrast, [10] counsel in the Mutual Fund Cases expended a total of 9,462 hours, over four years of litigation. Lead Counsel argue that the work expended in this case was more far more extensive than that expended in the Mutual Fund Cases, because of "both the number of actions that were prosecuted and the additional proceedings handled by counsel . . . ." (Pl. Mem. Attny Fees at 9.) Counsel state that the work included: preparation of pleadings for each separate action and the subsequent filing of consolidated amended complaints; filing opposition briefs to defendants' [*50] motions to dismiss in sixteen of the twenty actions; extensive and successful efforts in the face of considerable initial resistance by the NYAG to obtain documents possessed by the NYAG; review of the NYAG documents; filing a motion for reconsideration after Judge Pollack dismissed the Test Cases; preparing and filing briefs in appeal of Judge Pollack's dismissals of both the Test Cases and Phase I cases; preparing and filing a motion for reconsideration of the Second Circuit's affirmance of Judge Pollack's dismissal of the Test Cases; preparing and filing a writ of certiorari to the Supreme Court after the Second Circuit's affirmance of the dismissal of the Test Cases; conducting extensive settlement negotiations both before and after the Circuit's decision in Lentell; drafting the Stipulation and Preliminary Order; and participating in the allocation proceedings before Judge Phillips, which included preparation of "allocation briefs"

for each security and oral argument following submission of the briefs.

> 10  Originally, counsel claimed to have expended 36,847.26 hours. Lead Counsel subsequently submitted a letter, and accompanying corrected declarations and memoranda, in which they [*51] candidly stated that, due to a clerical error, one of the attorneys in the case had misstated his billable time as 1800 hours, when he actually expended only four hours.

The number of hours expended in the litigation of these actions is justified. Collectively, these Actions constitute a more massive litigation than did the Mutual Fund Cases. In contrast to the work performed in the Mutual Fund Cases, the labor in this case involved the preparation of more pleadings, more extensive motion practice, more arduous discovery, lengthier settlement negotiations, and more work in devising a fair and reasonable Plan of Allocation. In sum, the work performed in these Actions supports counsels' request for an award that is higher than that granted in the MF Decision.

### (2) Magnitude and Complexity

Securities class litigation "'is notably difficult and notoriously uncertain.'" *In re Sumitomo Copper Litig., 189 F.R.D. 274, 281 (S.D.N.Y. 1999)* (quoting *In re Michael Milken and Assoc. Sec. Litig., 150 F.R.D. 46, 53 (S.D.N.Y. 1993))*. Counsel contend that these Actions presented greater complexity than that of the Mutual Fund Cases. In the MF Decision, I noted that the litigation did not involve particularly [*52] challenging issues, such as difficulties in obtaining discovery, and was not of unusual magnitude . Here, by contrast, counsel contend that they "undertook expansive and difficult efforts to obtain" the NYAG documents. (Joint Decl. P 21.) Specifically, in October 2002, counsel submitted a request under New York's Freedom of Information Law to obtain the NYAG documents. The request was denied, as was plaintiffs' appeal from the denial. Subsequently, counsel negotiated directly with the NYAG and initially received permission to review, but not copy, the documents at the NYAG's offices. It was only later that the NYAG documents became public, and therefore fully available to counsel in the Mutual Fund Cases. Thus, counsel assert that the "review of the critical documents in those [the Mutual Fund] cases (and these Actions) would not have been possible but for the extraordinary efforts of plaintiffs' counsel here." (Pl. Mem. Attny Fees at 11.).

Lead Counsel also state that the magnitude of these actions is much greater than that of the Mutual Fund Cases, primarily because this case involved the litigation of twenty separate actions, each involving divergent facts. Counsel point to the fact [*53] that the merits of each

complaint had to be litigated separately, for plaintiffs' oppositions to the motions to dismiss and for plaintiffs' separate briefs before former Judge Phillips in support of an award of allocation for each action. Counsel point to the intricate process which underlay the formulation of the Plan of Allocation as evidence of the overall complexity of the case.

The Court agrees here that "this Case is complex with difficult liability issues." *Levitt v. Bear Stearns & Co. (In re Sterling Foster & Co. Sec. Litig.), MDL No. 1208, 2006 U.S. Dist. LEXIS 80861, at *25 (E.D.N.Y. Oct. 31, 2006).* Although the issues involved in the litigation of these Actions were not particularly novel or complex when compared with some other securities class actions, see *In re Bristol-Myers Squibb Secs. Litig., 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005)* (evaluating the complexity of the class action relative to other securities actions), the magnitude and complexity of these Actions are certainly greater than were present in the Mutual Fund Cases. The greater number of Actions, each implicating different material facts, and the more arduous discovery undertaken in the course of this litigation [*54] militate in favor of an award higher than that granted in the Mutual Fund Cases. Accordingly, I find that this factor supports the requested award of 24%.

*(3) Risk of Litigation*

Courts of the Second Circuit have recognized the risk of litigation to be "perhaps the foremost factor to be considered in determining" the award of appropriate attorneys' fees. *In re Elan Sec. Litig., 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005)* (internal quotations and citation omitted). There is generally only a very small risk of non-recovery in a securities class action. See *Dreyfus Aggressive Growth Mutual Fund Litigation, No. 98 CV4318, 2001 U.S. Dist. LEXIS 8418, 2001 WL 709262, at *4 (S.D.N.Y. June 22, 2001)* ("What empirical data does exist indicates that all but a small percentage of class actions settle, thereby guaranteeing counsel payment of fees and minimizing the risks associated with contingency fee litigation.") (citing S. Rep. No. 104-98, at 9 (1995) (estimating that about 300 securities lawsuits are filed each year and that 93% of these cases reach settlements). In the MF Decision, I noted that "'where claims were precipitated by public events,' the risk undertaken by class counsel is especially [*55] slight." *In re Merrill Lynch & Co. Research Reports Sec. Litig., 2007 U.S. Dist. LEXIS 9450, at *54 (quoting In re Bristol-Myers Squibb Secs. Litig., 361 F. Supp. 2d at 234).* I found that the risk of non-recovery faced by the plaintiffs in the Mutual Fund Cases was minimal, given the NYAG's highly publicized investigation into Merrill Lynch's misconduct and the resulting settlement between Merrill Lynch and the NYAG, even though plaintiffs in the Mutual Fund Cases were faced with the daunting prospect of proving loss causation.

Here, counsel contend that the risk of litigation was significantly higher than that faced in the Mutual Fund Cases because the InfoSpace Action, which was the first action to be brought in these consolidated cases, was filed in July 2001, approximately eight months before the NYAG's investigation became public. "[L]itigation risk must be measured as of when the cases is filed." *Goldberger, 209 F.3d at 55.* At the time the InfoSpace Action was filed, plaintiffs did not have the benefit of the NYAG's work "and there was no reason to believe a settlement was likely. On the contrary, the InfoSpace Action was a virtually unprecedented attempt to hold an analyst responsible [*56] for issuing conflicted reports." (Pl. Mem. Attny Fees at 13.)

The Court agrees that the risk of litigation faced by plaintiffs in the InfoSpace Action at the time that case commenced was significantly higher than the risk faced in the Mutual Fund Cases and the other nineteen Actions that are the subject of the instant settlement. Although the InfoSpace Action is only one of twenty actions at issue, the Plan of Allocation calls for 20.4% of the Settlement Fund to be distributed to the InfoSpace plaintiffs. This is the largest distribution of the settlement proceeds among the Actions, and as a sheerly mathematical matter the allocation indeed renders the InfoSpace action the "most valuable". (Pl. Mem. Attny Fees at 14.) Given the relative importance of the InfoSpace Action, and the clearly heightened risk faced by the plaintiffs in that case, there was a greater overall risk faced in these Actions than was faced at the outset of the Mutual Fund Cases. Thus, this factor supports a fee that is greater than the fee awarded in the Mutual Fund Cases.

*(4) Quality of Representation*

To evaluate the "quality of the representation," courts review the recovery obtained and the backgrounds of the lawyers [*57] involved in the lawsuit. See *In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. at 467.* "The quality of opposing counsel is also important in evaluating the quality of Class Counsels' work." *In re KeySpan Corp. Sec. Litig., 2005 U.S. Dist. LEXIS 29068, at *35 (citing Warner Communications Sec. Litig., 618 F. Supp. 735, 749 (S.D.N.Y. 1985)).*

Here, as noted above, counsel obtained a reasonable recovery for the Class Members of between approximately 3% and 7% of total claimed damages. Given the moribund procedural posture of these actions and the likelihood of complete non-recovery in the event that the litigation continued, the settlement obtained constitutes a favorable result for the Class Members.

Counsel assert that they have great experience in class securities litigation. The high quality of representation provided by Lead Counsel is evident from the extensive record of this case, as well as from firm resumes

that counsel have submitted to the Court. Similarly, the defendants were represented by law firms of national repute, and defense counsel provided skilled and zealous representation. Accordingly, the Court finds that the quality of representation does not weigh against an [*58] award of the fee requested by Lead Counsel.

### (5) Requested Fee in Relation to Settlement

Although a number of cases could be cited to support or oppose the argument that a 24% fee in a securities class action of this size is reasonable, "reference to awards in other cases is of limited usefulness." *In re KeySpan Corp. Sec. Litig., 2005 U.S. Dist. LEXIS 29068, at *40* (citing *Goldberger, 209 F.3d at 53*). This is because "fee awards should be assessed based on the unique circumstances of each case." *In re Bristol-Myers Squibb Secs. Litig., 361 F. Supp. 2d at 236* (citing *Goldberger, 209 F.3d at 52*). Nevertheless, this Court's award of fees of 22.5% of the Settlement Fund in the Mutual Fund Cases, which are very closely related to the instant Actions, provides a highly useful benchmark from which to assess the reasonableness of Lead Counsel's request of a 24% fee in these Actions.

The award of 22.5% in the Mutual Fund Cases was based on a painstaking application of the Goldberger factors to the facts of those cases. The reasonableness of an award of 24% in these Actions, constituting a modest increase of 1.5% of the award granted in the Mutual Fund Cases, is born out by two crucial differences [*59] between the litigations. First, the discovery undertaken in these Actions was somewhat more difficult: plaintiffs in these actions encountered significant resistance to their efforts to obtain and review the necessary documents. Second, the overall risk encountered by the plaintiffs in these Actions was greater. As noted above, the InfoSpace Action represents a significant portion of the recovery in this settlement and was commenced eight months before the NYAG's investigation into the defendants' allegedly misconduct became public knowledge, well before the onslaught of nationwide litigation that followed. Thus, in terms of the plaintiffs' expectations of recovery, the InfoSpace Action is readily distinguishable from the Mutual Fund Cases, which were commenced "with the expectation of a promising resolution, given the publicity generated by the NYAG's investigation and settlement, and the pressure brought to bear upon the defendants as a result of those events." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 2007 U.S. Dist. LEXIS 9450, at *57.*

In light of the more difficult discovery and the overall higher degree of risk faced by the plaintiffs in these Actions, an award [*60] slightly higher than that granted in the Mutual Funds Cases is reasonable.

### (6) Public Policy

Public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation. See *In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005)* ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives."). As Judge Holwell explained in *Hicks, 2005 U.S. Dist. LEXIS 24890,*

> Private actions to redress real injuries further the objectives of the federal securities laws by protecting investors and consumers against fraud and other deceptive practices. Such actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class. Due to the dispersed, and relatively small, losses among a large pool of investors, the class action mechanism and its associated percentage-of-recovery fee award solve the collective action problem otherwise encountered by which it would not be worthwhile for individual investors to take the time [*61] and effort to initiate the action. To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding. The concept of a private attorney acting as a private attorney general is vital to the continued enforcement and effectiveness of the Securities Acts.

*2005 U.S. Dist. LEXIS 24890 at *26-27* (citation and internal quotations omitted).

Here, where many if not most Class Members are individual investors, public policy supports an award sufficient to encourage counsel to act on behalf of such investors. See *In re Bristol-Myers Squibb, 361 F. Supp. 2d at 236*; *In re VisaCheck/Mastermoney, 297 F. Supp. 2d at 524* ("The fees awarded must be reasonable, but they must also serve as an inducement for lawyers to make similar efforts in the future."). An award of fees in excess of that required to encourage class litigation, however, does not necessarily serve public policy.

Here, the requested fee of 24% translates to an aggregate rate of $912.80 for every hour of legal and paraprofessional work expended during this litigation. This rate, though substantial, is less than the hourly rate of $959 that resulted from the award of 22.5% in the Mutual Fund [*62] Cases. Thus, I find that the fee requested by

counsel is certainly sufficient to provide proper incentive to class counsel to undertake securities class actions but is not exorbitant. Accordingly, public policy concerns do not weigh against an award of fees of the percentage that counsel has requested.

*Lodestar Cross-Check*

Even in cases where the court applies the percentage method of fee calculation, documentation of hours remains a useful "cross-check" on the reasonableness of the requested percentage. *Goldberger, 209 F.3d at 50.* Nevertheless, "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case . . . ." Id. Under the lodestar method of fee computation, a multiplier is typically applied to the lodestar. *In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. at 467-68.* The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors. Id.

Counsel have provided an account of the hours worked during this litigation [*63] by the partners, associates, and paraprofessionals from the firms of Lead Counsel. A total of 35,051.26 hours were expended during the litigation, for total billed charges, or a "lodestar", of $ 16,116,234.75. Counsel's requested fee of 24% of the Settlement Fund represents a multiple of approximately 1.985 of the aggregate loadstar.

Counsel's lodestar represents an aggregate hourly rate of approximately $460. The rates charged by the Lead Counsel firms, though high, are not inordinate for top-caliber New York law firms. See *Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth., No. 76 Civ. 2125, 2005 U.S. Dist. LEXIS 5200, at *35 (S.D.N.Y. Mar. 31, 2005)* (observing that "a recent billing survey made by the National Law Journal shows that senior partners in New York City charge as much as $750 per hour and junior partners charge as much as $490 per hour") (citing In Focus: Billing; A Firm-by-Firm Sampling of Billing Rates Nationwide, Nat'l Law Journal, December 6, 2004, at 22)).

As in the Mutual Fund Cases, the time records submitted by Lead Counsel reveal that senior personnel performed a sizeable percentage of the work in this litigation. Approximately 45% of the total hours billed [*64] [11] in this case were billed by partners or senior associates, at a rate of $ 500 or more per hour. Although significant, the percentage of hours expended by senior personnel in these Actions is less than that expended in the Mutual Fund Cases, where approximately 59% of the total hours were billed at a rate of $500 or more per hour. In addition,

here, as in the Mutual Fund Cases, the time sheets submitted by counsel show that the relatively heavy participation of senior personnel was justified, because the large majority of the hours worked were spent on complicated tasks, such as the drafting of pleadings and motions, and conducting extensive settlement negotiations. There is no indication that counsel failed to delegate work, where appropriate, to more junior personnel. Compare *FTR Consulting Group, Inc. v. Advantage Fund II, Ltd., 2005 U.S. Dist. LEXIS 20013, at *17-18* ("It would appear that a substantial amount of this work could have been performed by associates or paralegals at significantly lower rates"); *Klein ex rel. SICOR Inc. v. Salvi, No. 02 Civ. 1862, 2004 U.S. Dist. LEXIS 4844, at *30 (S.D.N.Y. Mar. 26, 2004)* (lowering counsel's lodestar because of, inter alia, "inadequate [*65] delegation of work to younger lawyers of tasks commonly performed by younger lawyers at lower rates, and too much work being performed at relatively higher hourly rates than should have been the case" where "senior lawyers . . . performed the great bulk of the work . . . at $ 550 and $ 525 per hour respectively"). There is also no indication that counsel performed unnecessary work. The Court credits counsels' representation that they took elaborate pains to ensure that no duplicative work was performed during the course of the litigation.

> 11    Pursuant to the Court's Case Management Order # 3, during 11 the course of this litigation Lead Counsel firms have provided quarterly accountings of their work, including detailed time sheets that list the tasks engaged in by each attorney. In addition, Lead Counsel have submitted a compendium of final time reports, reflecting work performed through June 15, 2007, in which the hours worked are broken down by personnel for each firm, and by category of the tasks performed.

In cross-checking the requested percentage against the lodestar, the Court must "confirm that the percentage amount does not award counsel an exorbitant hourly rate." *In re Bristol-Myers Squibb Secs. Litig., 361 F. Supp. 2d at 233* [*66] (citing *In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 486, 489 n.24 (S.D.N.Y. 1998)* (internal citations omitted)). Here, as noted above, the requested percentage of 24% of the Settlement Fund translates to a multiple of counsel's lodestar of 1.985 and to an aggregate hourly rate of $912.80. In the Mutual Fund Cases, the Court reduced the requested fee percentage so that the award resulted in an aggregate hourly compensation of $959, which was deemed to be a "princely rate of pay, by any standard" but ultimately reasonable. *In re Merrill Lynch Research Reports Sec. Litig., 2007 U.S. Dist. LEXIS 9450, at *78.* The [*67] hourly rate of $912.80 is generous but reasonable, when contrasted with the higher rate of compensation obtained

by counsel in the Mutual Fund Cases, in light of the greater risk faced by plaintiffs at the outset of this litigation, the greater difficulty encountered in undertaking discovery, and the larger size and complexity of the overall litigation. Similarly, a multiple of 1.985 of counsels' lodestar, which is slightly higher than the 1.95 multiple that resulted in the Mutual Fund Cases, is justified, in light of the factors that distinguish the two litigations.

*Objections to Requested Fees*

Two individual investors and one institutional investor have objected to counsels' request for attorneys' fees. Each objection is examined in turn.

*Brian Fitzpatrick* Mr. Fitzpatrick, who also objected to the fairness of the Settlement, states that the Court should award no more than 15% of the settlement fund. He cites to an article in the Journal of Empirical Legal Studies for the proposition that the median percentage of a settlement in class action suits, where the settlement range is $ 79 to $ 190 million, is 15%. Mr. Fitzpatrick notes that the settlement has occurred relatively early in litigation [*68] and that the requested percentage award would result in a windfall to counsel.

Mr. Fitzpatrick's objection is without merit. The legal scholarship cited by Mr. Fitzpatrick appears to review class action settlements as a whole and does not reflect the "median" range of settlement for securities class actions. In any event, reference to settlement statistics in other cases is of limited usefulness. See *Goldberger, 209 F.3d at 53.* As discussed at length above, application of the Goldberg factors in this case supports an award of 24%.

*Tor Jernudd* Mr. Jernudd objects that a fee in the amount of 30% of the Settlement Fund, which was the maximum amount counsel was permitted to request as stated in the Notice, is an "unreasonable sum that is disproportionate both to the labor involved and to any harm suffered by us as 'class members.'" (Objection of Tor Jernudd.) Mr. Jernudd suggests that non-profit entities or governmental entities are better suited to bring class actions on behalf of injured shareholders. He makes no substantive arguments beyond these remarks. Mr. Jernudd's objection does not address counsels' actual request for 24% of the Settlement Fund and is insufficient to weigh against [*69] approval of the request as fair and reasonable.

*New York State Teachers' Retirement System* The New York State Teachers' Retirement System (the "NYSTRS"), whose counsel addressed the Court at the Fairness Hearing, objects that the percentage of the Settlement Fund awarded as attorneys' fees in these Actions should be no greater than the percentage awarded in the Mutual Fund Cases and, based on Second Circuit precedent, should in fact be significantly less. The NYSTRS

cites to numerous cases in the Second Circuit in which courts have awarded substantially less than 30% of settlement funds. The NYSTRS also states that counsels' lodestar is suspect and "may be inflated by unnecessary and duplicative work by numerous counsel battling over what is essentially the same turf." (Objection of New York State Teachers' Retirement System at 5.)

The NYSTRS' arguments have no merit. As discussed above, the mere fact that courts have awarded lower fees in several other cases does not weigh against an award of a 24% fee in this case. The NYSTRS has not engaged in any analysis of the Goldberger factors, as applied to the facts of this case. Further, as explained at length in this Order, a fee of 24% in [*70] these Actions, which represents a modest increase of the percentage awarded in the Mutual Fund Cases, is justified based on material differences between the two litigations. Finally, there is no support for the suggestion that counsels' time records may reflect duplicative or unnecessary labor. It is clear, both from the Lead Counsels' Joint Declaration and the individual attorney affidavits submitted by each of the eight Lead Counsel firms, that Lead Counsel took pains to avoid unnecessary work in this case, for example, by creating a master set of allegations that were used in each complaint in the twenty Actions. In sum, the NYSTRS' objection does not weigh against an award of 24% of the Settlement Fund.

*Reasonable Fee Award*

After applying the *Goldberger* factors and considering counsels' lodestar, the Court finds that an award of 24% of the Settlement Fund constitutes a reasonable fee. This award will result in a fee of approximately $31,994,609, as of June 15, 2007, which equates to a reasonable lodestar multiplier of approximately 1.985 and a high but not exorbitant hourly rate of pay of $912.80.

**(iv) Reimbursement of Litigation Expenses**

Counsel request reimbursement of $ 1,376,255.97 [*71] in litigation costs and expenses. Counsel is entitled to reimbursement from the common fund for reasonable litigation expenses. *Miltland Raleigh-Durham v. Myers, 840 F. Supp. 235, 239 (S.D.N.Y. 1993)* (quoting *Reichman v. Bonsignore, Brignati & Mazzotta, P.C., 818 F.2d 278, 283 (2d Cir. 1987)).*

Counsels' application is for an amount less than that stated in the Notice, which provided that the request for reimbursement of expenses would not exceed $1,750,000. Expenses incurred in litigating these actions, included "appeal costs, travel, experts, the costs of retaining a respected neutral for the adversarial allocations proceedings, reproduction/duplication, phone/fax/postage, messenger/overnight delivery, and filing fees." (Mem. Attny Fees at 17.) Each of the Lead Counsel firms has submitted a

line-item accounting of expenses incurred during the litigation. No Class Members have objected to the expenses claimed. The expenses submitted by counsel are reasonable and should be reimbursed in full out of the Settlement Fund.

## CONCLUSION

For the foregoing reasons, the Court grants certification to the settlement classes and approves the Settlement and Plan of Allocation as fair and reasonable. [*72] Plaintiffs' remaining claims are dismissed with prejudice. Counsel are awarded attorneys' fees in the amount of 24% of the Settlement Fund and reimbursement of costs and expenses in the amount of $1,376,255.97.

The Court will enter an Order and Final Judgment, to be submitted by counsel, confirming and finalizing its approval of the Settlement and its award of fees and expenses consistent with all of the proceedings in this case and this Opinion and Order. Attorneys' fees and expenses are to be administered pursuant to the terms of the Order and Final Judgment.

**SO ORDERED.**

**Dated: New York, New York**

September 5, 2007

JOHN F. KEENAN

United States District Judge

# Tab E

LEXSEE 2006 U.S. DIST LEXIS 5781

**YELENA SEROVA, individually and derivatively on behalf of Allarus Technology Management, Inc., Plaintiff, - against- PHILIP H. TEPLEN, MICHAEL EDEN AND BARBARA EDEN, Defendants.**

**No. 05 CIV. 6748 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 5781*

**February 16, 2006, Decided**
**February 16, 2006, Filed**

**COUNSEL:** [*1] For Yelena Serova, individually, Yelena Serova, derivatively on behalf of Allarus Technology Management Inc., Plaintiffs: Theodore Seth Steingut, Law Office of Theodore Seth Steingut, NYC, NY.

For Philip H. Teplen, Defendant: Steven Mark Cordero, Sr, Kavanugh, Maloney & Osnato, LLP, New York, NY.

For Michael Eden, Barbra Eden, Defendants: Robert S. Getman, New York, NY.

**JUDGES:** Hon. HAROLD BAER, JR., U.S.D.J.

**OPINION BY:** HAROLD BAER, JR.

**OPINION**

*OPINION & ORDER*

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiff Yelena Serova ("Serova") brought this action against defendants Philip H. Teplen ("Teplen"), and Michael and Barbara Eden ("the Edens") alleging: (i) legal malpractice (against Teplen only); (ii) breach of fiduciary duty (against Teplen only); (iii) violation of *New York Judiciary Law* 487 (against Teplen only); (iv) disgorgement of legal fees (against Teplen only); (v) securities fraud under the Securities Exchange Act of 1934 Section 10(b), *15 U.S.C. Section 78j(b)*, and Rule 10b-5, *17 C.F.R. Section 240.10b-5*; (vi) common law fraud; (vii) negligent misrepresentation; (viii) corporate waste and [*2] mismanagement; and (ix) violation of the Business Corporation Law of the State of New York and Shareholders Agreement (against the Edens only). This Court has jurisdiction over this action pursuant to *15 U.S.C. Section 78aa* and *28 U.S.C. Section 1332(a)(2)*.

Serova's claims arise from actions taken by Teplen as Serova's attorney, and by the Edens as members of the Board of Directors of a company in which Serova invested. All defendants now move to dismiss all but the first claim pursuant to *15 U.S.C. Section 78u-4(b)* and *Rules 12(b)(6), 9(b)*, and *23.1* of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion to dismiss is GRANTED.

**I. BACKGROUND**

The following facts are taken from the allegations of the amended complaint unless otherwise stated.

**A. *The Parties***

Serova is a citizen and resident of the country of Russia. 09/29/2005 Amended Complaint ("Am. Compl.") P12. While a student at Touro College, New York, Serova sought to obtain permanent residency in the United States. *Id.* P16. Serova is a 30% shareholder in a [*3] company now known as Allarus Technology Management, Inc. ("Allarus"). *Id.* P13.

Teplen is a resident of the State of New York and an attorney practicing in New York who holds himself out as an expert in immigration matters. *Id.* P14, 16. While generally his conduct is less than exemplary, some of the alleged conflicts of interest are blatant and reprehensible. Nonetheless and without adequate knowledge of the facts, Serova not only retained Teplen to assist her in obtaining permanent resident status in the United States but to provide other legal services as well. *Id.* P16.

Michael Eden is the founder and chief executive officer of Allarus, a New York corporation formerly known as Rupert Technologies Group, Inc. ("Rupert"). *Id.* Prior to the events at issue, Barbara Eden, Michael Eden's wife, wholly owned the corporation's common stock. *Id.* The

Edens are both members of the Board of Directors of Allarus. *Id.* P15.

**B.** *Events Leading to the Litigation*

In September 2001, Serova, a student at Touro College, contacted Teplen about obtaining permanent residency in the United States. *Id.* P16. Teplen advised Serova to apply for an EB-5 immigrant investor [*4] visa, which requires the petitioner to invest at least $ 500,000 in a United States business. *Id.* P17. Teplen advised Serova that the then United States Immigration and Naturalization Service ("INS") looked unfavorably on investments that merely met the minimum requirement and recommended that Serova invest over $ 1 million. *Id.* P18. Pursuant to a retainer agreement dated October 2, 2001, Serova retained Teplen to "assist in development for acquisition or establishment of business, negotiate transaction, draft[] purchase agreements and shareholder agreements" as well as to facilitate the visa application. *Id.* P19. Although the retainer agreement stated that Teplen did not guarantee any particular outcome, Teplen told Serova at the time the agreement was concluded and at all times thereafter until the visa application was denied that if she invested over $ 1 million, she was virtually certain to obtain an EB-5 visa. *Id.* PP20, 29. Teplen also told Serova that he would find a suitable investment opportunity for her. Id. P21.

By early 2002, Teplen had introduced Serova to Michael Eden, Teplen's client and long-time friend, for the purpose of developing an investment [*5] opportunity. *Id.* P22. At that time and at all times thereafter, Teplen and Mr. Eden only disclosed that Mr. Eden was Teplen's "friend" and neither disclosed that Teplen had in the past represented the Edens or their company, Rupert. *Id.* Mr. Eden was then running Rupert, a small computer services business, which was renamed Allarus once the Serova investment was made. *Id.* Teplen discouraged Serova from investing in any ventures other than Rupert/Allarus. *Id.* P 23.

Serova attended three or four meetings with Michael Eden regarding a possible investment in Allarus. *Id.* P24. At those meetings, Allarus was not represented by an attorney and Mr. Eden acted as an agent for his wife, Barbara Eden. *Id.* Teplen was present at each of those meetings as Serova's attorney but he failed to negotiate any of the terms of the investment on her behalf and, indeed, had private discussions with Mr. Eden regarding the investment. *Id.* PP24, 25. Thereafter, Teplen acted as the sole attorney in the transaction and drafted all the closing papers. *Id.* P26. Serova was informed on numerous occasions that Teplen had no involvement with Allarus. *Id.*

Pursuant to an agreement dated [*6] June 28, 2002 among Serova, Allarus, and Barbara Eden (the "Invest-

ment Agreement"), Serova invested $ 1,162,000 in Allarus and received 30% of its stock. Id. P27. At all relevant times Mr. Eden acted as the representative officer of Allarus and agent for his wife. *Id.* Under the Investment Agreement, Allarus used $ 240,000 of Serova's funds to redeem thirty of the existing hundred shares from Mrs. Eden. *Id.* P27. The purchase price paid for the redemption of Mrs. Eden's stock was deposited in an account jointly owned by the Edens. *Id.* There was also a separate Shareholders Agreement dated June 28, 2002 between Serova and Mrs. Eden. *Id.* P28; Shareholders Agreement, Ex. D to 10/14/2005 Affidavit of Defendant Philip H. Teplen ("Teplen Aff."). Serova alleges that the Shareholders Agreement was one-sided in favor of the Edens/Allarus and that the terms were never the subject of a negotiation. Am. Compl. P40. The Shareholders Agreement identifies Teplen as an officer of the company. Shareholders Agreement, Ex. D to Teplen Aff., at 3.

On August 10, 2003, Serova's EB-5 visa application was denied. Am. Compl. P30; Department of Homeland Security Notice of Decision ("Notice of [*7] Decision"), Ex. C to Teplen Aff. After Serova's visa was denied, Teplen advised Serova to refile her application. Am. Compl. P31. Serova declined to do so because she had consulted another attorney and learned that less than 15% of EB-5 visas are actually granted. *Id.*; *see* 10/14/2005 Mem. of Law of Defendant Philip H. Teplen in Supp. of Mot. to Dismiss ("Teplen Mem.") at 4, n. 3. Had Serova known that fact from the outset, she would not have invested in Allarus. Am. Compl. P31. Teplen did not advise Serova about many of the requirements for obtaining an EB-5 visa until after she had invested in Allarus. *Id.* P32. One example was the requirement that Serova file tax returns from the previous five years. *Id.* P35. Teplen knew that Serova's parents would fund the investment, however, and that as they are Russian citizens, they would be unlikely to have the required tax documentation. *Id.* Had Serova known about the tax return requirement, she would not have invested in Allarus. Id. P32.

Neither Teplen nor the Edens disclosed to Serova that Teplen became an executive vice president of Allarus at about the time Teplen submitted Serova's EB-5 visa application to the INS. [*8] *Id.* P37. Nor did Teplen or the Edens disclose the fact that within days after her investment, Teplen and Allarus jointly leased space in the Empire State Building. Id. P38. Serova alleges that Teplen and the Edens had to have negotiated the lease prior to her investment but that they did not disclose this fact to her. *Id.* P39. Pursuant to the lease, the annual rent for the space was $ 195,300 for the first two years, which was approximately half Allarus' gross annual sales in the preceding year. *Id.*

Teplen represented Michael Eden, Barbara Eden, or their business before, during, and after Teplen represented

Serova. *Id.* P41. Serova maintains that Teplen's independence in representing her interests was compromised as a result of his relationship with the Edens and, consequently, Serova's investment was made on "legal terms that were decidedly one-sided in favor of Allarus." *Id.* PP41-43. She alleges that Teplen had a motive to commit fraud and other misdeeds alleged in the complaint for "enhanced legal fees from a complicated visa application" and representation in the subject transaction, and for "unwarranted and excessive compensation" from the investment. *Id* [*9] . PP51, 53. She further alleges that the Edens had a motive to commit fraud for "immediate financial gain from the sale of Mrs. Edenl's [sic] stock, the capitalization of the company which had no operating capital and minimal profits from operations," and for excessive compensation from the investment. *Id.* PP51, 53.

Serova claims that the defendants squandered her investment within eighteen months. *Id.* P56. The unaudited financial statements of Allarus show that as of December 31, 2002, a mere six months after Serova's investment, Allarus had shareholders' equity of only $ 517,443. *Id.* P54. This diminution in shareholder equity resulted from Allarus's net loss of $ 406,283 for the period from June 28 through December 31, 2002. *Id.* P54. For the year ended December 31, 2003, Allarus lost $ 426,584 and had only $ 36,223 on hand. *Id.* P55. Serova alleges that her losses were proximately and substantially caused by: (i) the unwarranted and excessive compensation given to the defendants after her investment was made; (ii) Allarus' financial obligation under the undisclosed joint lease; and (iii) the reckless financial projections made or endorsed by the defendants that [*10] were not achievable in light of all the circumstances, including the undisclosed lease and planned excessive compensation. *Id.* P53.

Although Serova was on the Board of Directors and only the Board could set executive compensation, no board meetings were convened despite her repeated demands and, therefore, no board action was taken to set the compensation received by the Edens or Teplen. *Id.* P57. Serova alleges that she has suffered and will continue to suffer substantial monetary damages including, but not limited to, the loss of her investment in Allarus. *Id.* P77.

## II. STANDARD OF REVIEW

When ruling on a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, the court must construe all factual allegations in the complaint in favor of the non-moving party. *See Krimstock v. Kelly, 306 F.3d 40, 47-48 (2d Cir. 2002).* The court may consider the following materials in deciding a *Rule 12(b)(6)* motion: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2)

documents 'integral' to the complaint and relied upon in it, even if not attached [*11] or incorporated by reference, [1] (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under *Rule 201 of the Federal Rules of Evidence.*" [2] *In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003).* A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).*

1

A document is "integral" to the complaint when the complaint relies heavily upon its terms and effects. *See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).*

2 Serova objects that the defendants' *Rule 12(b)(6)* motion directs the court to documents and facts that fall outside this enumerated list when there has been little discovery in the case and no depositions taken. These facts and documents include sublease agreements between the defendants and other entities, and a pre-investment meeting between the defendants, Serova's father, and his investment adviser from Credit Suisse. *See* Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss ("Pl.'s Mem.") at 2-5. I have not considered these materials in reaching my decision.

## [*12] III. DISCUSSION

### A. *Duplicative Claims*

Teplen argues that the claims for breach of fiduciary duty, disgorgement of fees, securities fraud, common law fraud, and negligent misrepresentation should be dismissed as duplicative of the claim for legal malpractice.

In New York, a claim for breach of fiduciary duty that is "premised on the same facts and seeks the identical relief" sought in a malpractice cause of action is "redundant" and should be dismissed. *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc., 10 A.D.3d 267, 780 N.Y.S.2d 593, 596 (N.Y. App. Div. 2004).* Similarly, a claim for disgorgement of legal fees that is predicated on the same facts as a malpractice claim and seeks the same damages must be dismissed as duplicative. *See Mecca v. Shang, 258 A.D.2d 569, 685 N.Y.S.2d 458, 460 (N.Y. App. Div. 1999).* Claims for common law fraud

and negligent misrepresentation that are based on the same factual allegations as a legal malpractice claim and do not allege distinct damages are also duplicative of that cause of action. *See id.*

Here, Serova's claims for breach of fiduciary duty, disgorgement of fees, common [*13] law fraud, and negligent misrepresentation against Teplen are all based on the same operative facts as her malpractice claim: namely, that by omitting to disclose his prior representation of the Edens and ongoing business relationship with them, Teplen materially misrepresented his interest in Serova's investment and failed to exercise the standard of care expected of attorneys engaged to provide similar services. ³ Moreover, the damages Serova seeks for these causes of action--at least $ 1.25 million consisting of legal fees paid to Teplen and the loss of her investment in Al-larus, as well as punitive damages--are the same as for the malpractice claim. *See* Am. Compl. Prayer for Relief. Accordingly, the claims for breach of fiduciary duty, disgorgement of fees, common law fraud, and negligent misrepresentation are dismissed as duplicative of the legal malpractice claim.

> 3   Serova contends that these claims are not du-
> plicative of the malpractice claim because she has
> alleged that Teplen conspired with the Edens and
> benefited from the fraud all three perpetrated. *See*
> Pl.'s Mem. at 7. Serova fails to cite any authority
> that is on point. Moreover, because Serova alleges
> that the Edens failed to disclose the same infor-
> mation as Teplen--that Teplen had previously
> represented the Edens and continued to have a
> business relationship with them--imputing the
> Edens' alleged misrepresentations to Teplen
> would not change the fact that the breach of fidu-
> ciary duty, disgorgement, common law fraud, and
> negligent misrepresentation claims arise from the
> same factual allegations as the malpractice claim.

[*14]   Teplen admits, however, that there are no prior decisions that hold that a securities fraud claim may be dismissed as duplicative of a malpractice claim. *See* Teplen Mem. at 9. Given the dearth of authority, and that the securities fraud claim is dismissed on other grounds, this Court declines to be the first to do so. *See* Section III.C *infra.*

### B. *Judiciary Law Section 487*

Teplen asserts that Serova's claim pursuant to *New York Judiciary Law Section 487* should be dismissed as inapplicable to this action. That statute provides, in per-tinent part, that an attorney who "is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party" is guilty of a misdemeanor and is liable to the injured party for treble

damages in a civil action. *N.Y. Judiciary Law   487* (McKinney 2005). The alleged deceit, if not directed at a court, "must occur during the course of a 'pending judicial proceeding.'" *Costalas v. Amalfitano*, 305 A.D.2d 202, 760 N.Y.S.2d 422, 424 (N.Y. App. Div. 2003). Teplen argues that because he did not represent Serova in any litigation [*15] or before any court, Serova has no cause of action against him under *Section 487.*

Serova responds that *Section 487* is not limited to misconduct during court proceedings, but applies to any deceitful conduct engaged in by an attorney in his or her role as an attorney. In support of this contention, Serova cites to *N. Trust Bank of Florida/Sarasota, N.A. v. Coleman*, 632 F. Supp. 648 (S.D.N.Y. 1986). While the court stated that "*Section 487* is aimed at actions by an attorney in his or her role *as an attorney*," read in context it would appear that the court was simply emphasizing that a wrongdoer may not be held liable under *Section 487* simply because he is an attorney. *Id.* at 650. There is no indication that the court intended to extend the reach of *Section 487* to action taken outside of judicial proceedings. Indeed, there, the misconduct at issue involved the de-fendant's delay in bringing suit. *See id.* Serova also cites to *Hyams v. Mehlman*, 148 A.D.2d 586, 540 N.Y.S.2d 191 (N.Y. App. Div. 1989), in which the court allowed the defendant to assert a counterclaim under *Section 487* for actions the plaintiff attorney took when he [*16] negoti-ated an escrow arrangement. *Id.* at 191. The escrow ar-rangement at issue, however, was related to an action to enforce a money judgment. *See id.* Further, the same court in a later case affirmed that *Section 487* "only applies to wrongful conduct by an attorney in a suit actually pend-ing." *Henry v. Brenner*, 271 A.D.2d 647, 706 N.Y.S.2d 465, 466 (N.Y. App. Div. 2000).

Here, Teplen's alleged deceit occurred in connection with Serova's visa application ⁴ and investment transac-tion, neither of which qualifies as a pending judicial proceeding. Consequently, Serova may not rely on *Sec-tion 487* to assert a cause of action against Teplen for treble damages.

> 4   Serova asserts that Teplen's miscon-
> duct--presumably in relation to the visa applica-
> tion--occurred in connection with a quasi-judicial
> proceeding before the "BCIS." *See* Pl.'s Mem. at
> 12. Serova has not, however, alleged this fact in
> the Amended Complaint. Further, Serova admits
> that she has found no case construing whether a
> quasi-judicial proceeding qualifies under *Section
> 487.*

### [*17] C. *Securities Fraud*

All defendants contend that Serova's claim of securi-ties fraud under *Rule 10b-5* of the Securities Exchange

Act of 1934 should be dismissed pursuant to *Rules 12(b)(6)* and *9(b)* of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. Section 78u-4(b)*, because Serova has failed to state a claim upon which relief may be granted and has failed to plead fraud with particularity. In addition, the Edens assert that the securities fraud claim against them is time-barred.

To state a cause of action under *Section 10(b)* of the Securities Exchange Act of 1934 and *Rule 10b-5*, "a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that [the] plaintiff's reliance on the defendant's action caused [the plaintiff] injury." *Stevelman v. Alias Research Inc., 174 F.3d 79, 83 (2d Cir. 1999). Federal Rule of Civil Procedure 9(b)* requires [*18] that allegations of fraud be pleaded with particularity. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 187 (2d Cir. 2004).* This requirement means that the complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent. *Id.* (quoting *Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)).* The PSLRA codified the heightened pleading requirements of *Rule 9(b)* insofar as it "requires particularity in the pleading of the requisite mental state." *Dresner v. Utility.com, Inc., 371 F. Supp. 2d 476, 489 (S.D.N.Y. 2005)* (citing *Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir. 2000)).*

The amended complaint alleges the following misrepresentations and omissions by the defendants in relation to Serova's purchase of a 30% share of Allarus: (i) Teplen misrepresented to Serova her chances of obtaining an EB-5 visa if she invested in Allarus; (ii) Teplen and the Edens failed to inform Serova that they [*19] were planning to jointly lease space after she made her investment; (iii) Teplen and the Edens failed to disclose their past and ongoing business relationship; and (iv) Teplen and the Edens failed to disclose that they planned to derive "excessive" compensation from Allarus.

As to the first alleged misrepresentation, Serova admits in the amended complaint that the retainer agreement disclaims any guarantee of a successful outcome, and this Court gives greater credence to that document than to Serova's contrary allegations. *See In re Aegon N.V. Sec. Litig., 2004 U.S. Dist. LEXIS 11466, No. 03 Civ. 0603, 2004 WL 1415973, at *5 (S.D.N.Y. June 23, 2004)* ("The truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted."). Further, Teplen's assurances as to the visa are at best an expression of opinion, and to state a

claim for misrepresentation of an opinion under the securities laws, the plaintiff must "allege with particularity that defendants did not sincerely believe the opinion they purported to hold." *Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004).* It is insufficient to allege [*20] that defendants could have reached a different opinion based on available information, or that the defendant's opinion was unreasonable. *See id.* Here, Serova fails to allege--let alone allege with particularity--that Teplen did not sincerely believe that she was virtually certain to obtain an EB-5 visa if she invested over $ 1 million in a United States enterprise. Therefore, Serova's securities fraud claim cannot rest on Teplen's alleged misrepresentations to Serova about her chances of obtaining a visa.

Serova's securities fraud claim also fails for lack of particularity in alleging why the defendants' failures to disclose information were fraudulent. For instance, Serova does not explain how the defendants' failure to disclose their plans to enter a joint lease agreement was materially misleading in connection with her investment in Allarus. At most, the allegations demonstrate that Teplen and the Edens had a close relationship such that they agreed to lease office space together. Serova already knew, however, that Teplen and the Edens were friends, and the Shareholders Agreement disclosed that Teplen was to be an officer of Allarus. Similarly, Serova fails to explain how the [*21] defendants' failure to disclose that Teplen had previously represented the Edens or Rupert constituted a false material misrepresentation or omission. Serova alleges no facts that indicate that Teplen's prior representation of the Edens or Rupert gave rise to a conflict of interest in his representation of Serova in the investment transaction. *See Kaufman v. Tudor Realty Servs. Corp., 4 A.D.3d 212, 772 N.Y.S.2d 265, 266 (N.Y. App. Div. 2004)* (holding that mere fact of a prior representation without allegation that it was adverse to later representation does not give rise to conflict of interest). Finally, Serova fails to explain why the compensation that Teplen and the Edens were to derive from Allarus was "excessive."

Moreover, Serova fails to allege scienter with particularity as to the alleged failures to disclose. In this Circuit, a plaintiff may show that a defendant acted with the required state of mind in one of two ways: (i) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," or (ii) "by alleging facts to show that defendants had both motive and opportunity to commit fraud." *Stevelman, 174 F.3d at 84.* [*22] Serova conclusorily alleges that the defendants acted "knowingly" or "recklessly" in omitting to inform her of the joint lease, prior representation, or excessive compensation. She fails to allege facts, however, that would give rise to a strong inference that Teplen or

the Edens acted consciously or recklessly. For instance, Serova fails to explain why Teplen would reveal that the Edens were his friends, yet intentionally fail to tell her that he had previously represented them or that they had arranged to lease space together.

As to motive and opportunity, Serova alleges that Teplen stood to gain enhanced legal fees from a complicated visa application and representation of Serova in the investment transaction, and that the Edens would gain from the sale of Barbara Eden's stock in Rupert and capitalization of a company that had no operating capital and minimal profits from operations. Serova further alleges that all the defendants would gain by their joint lease of space and ability to derive or increase their executive compensation from Allarus. Serova fails to explain why Teplen's legal fees were "enhanced." In any event, this Court will not assume that a professional will intentionally [*23] commit fraud and risk his or her reputation simply to earn a fee. *See Whalen v. Hibernia Foods PLC, 2005 U.S. Dist. LEXIS 15489, No. 04 Civ. 3182, 2005 WL 1799370, at \*2 (S.D.N.Y. Aug. 1, 2005)* (Baer, J.). As to the Edens' alleged prospective gains, Serova fails to allege that the stock she bought from Barbara Eden was worth less than the amount she paid for it. Serova alleges only that Rupert had "virtually no working capital or profit" at the time she made her investment, but fails to specify what that minimal capital or profit was. Likewise, Serova fails to allege what benefits Teplen and the Edens would gain from the joint lease that Teplen could not have achieved by leasing an alternative space on his own, or that would not also benefit Allarus. Finally, Serova fails to allege why the prospect of deriving or increasing executive compensation from Allarus would have motivated the defendants to defraud her. This Circuit has declined to predicate allegations of fraud on incentive compensation alone because doing so would subject virtually all corporate executives to charges of fraud. *See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994).*

Lastly, Serova fails [*24] to allege with particularity that the defendants' acts and omissions caused her injury. To satisfy the causation requirement in a securities fraud claim, the plaintiff must allege both that "the fraud caused the plaintiff to engage in the transaction and that it also caused the harm actually suffered." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 96 (2d Cir. 2001).* The first concept of causation, transaction causation, refers to the plaintiff's reliance on the defendant's misrepresentations or omissions; "that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment." *Id.* The second concept of causation, loss causation, requires the plaintiff to prove that "the damages it suffered were a foreseeable consequence of the misrepresentation." *Id.* To establish loss causation,

the plaintiff must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 173 (2d Cir. 2005).* In other words, the loss must be "caused by the materialization of the concealed [*25] risk." *Id.*

Here, the amended complaint fails to allege loss causation. Serova nowhere alleges how the concealment of the defendants' compensation and joint lease, or misrepresentation of Allarus' financial projections caused her loss. She maintains merely that the annual rent under the lease was about 20% of Allarus' capital after her investment and that Teplen's concealed conflict of interest removed safeguards that could have been placed in the Investment Agreement. *See* Pl.'s Mem. at 27. Leaving aside the fact that these assertions were not made in the amended complaint, they fail to establish how the concealed information, when disclosed, had a detrimental effect on the value of Serova's investment.

Serova's securities fraud claim is dismissed for failure to adequately allege scienter, loss causation, and how the misrepresentations and omissions at issue were fraudulent. [5]

> 5 Because I dismiss the claim against the Edens on these grounds, I do not reach their argument that the claim is time barred.

[*26] **D. *Common Law Fraud***

The elements of fraud under New York law are "essentially the same as those for a claim of securities fraud under *Section 10(b)* and *Rule 10b-5*." *Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co., 2004 U.S. Dist. LEXIS 9100, No. 02 Civ. 1230, 2004 WL 1124660, at \*2 (S.D.N.Y. May 20, 2004).* Further, a plaintiff must meet the heightened pleading requirements of *Rule 9(b) of the Federal Rules of Civil Procedure* when pleading common law fraud. *See id.* This Circuit applies the same standard to pleading fraudulent intent under common law fraud as to pleading scienter in securities fraud. *See id.* (stating standard for alleging fraudulent intent that mirrors PSLRA standard for pleading scienter). Accordingly, my conclusion that Serova has failed to meet the heightened pleading requirements of *Rule 9(b)* in pleading securities fraud is equally fatal to her claim of common law fraud. The defendants' motion to dismiss this claim is granted. [6]

> 6 I have also dismissed the claim of common law fraud against Teplen on the ground that it is duplicative of Serova's legal malpractice claim against him. *See* Section III.A *supra.*

[*27] **E. *Negligent Misrepresentation***

I have already dismissed the claim of negligent misrepresentation against Teplen as being duplicative of Serova's legal malpractice claim. The Edens argue that this claim should also be dismissed against them because, among other reasons, the Edens did not owe a duty to Serova that arose from a special relationship between them.

To make out a claim for negligent misrepresentation under New York law, a plaintiff must establish that "the defendant had a duty to use reasonable care to convey correct information due to the existence of a 'special relationship,' that the information provided was incorrect or false, and that the plaintiff reasonably relied upon the information." *Citibank, N.A. v. Itochu Int'l Inc.*, 2003 U.S. Dist. LEXIS 5519, No. 01 Civ. 6007, 2003 WL 1797848, at *5 (S.D.N.Y. Apr. 4, 2003). Liability for negligent misrepresentation is generally "imposed only on those persons who possess unique or specialized expertise," such as professionals like lawyers and engineers. *Kimmell v. Schaefer*, 89 N.Y.2d 257, 675 N.E.2d 450, 454, 652 N.Y.S.2d 715 (N.Y. 1996). When the person making representations is not a professional, the following factors [*28] should be weighed in determining whether a special relationship exists: (i) "whether the person making the representation held or appeared to hold unique or special expertise;" (ii) "whether a special relationship of trust or confidence existed between the parties;" and (iii) "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.*

In *Kimmel*, the court affirmed the finding of a special relationship because the defendant possessed expertise in his business by virtue of his position as chairman of the board and chief financial officer. *See id. at 454*. Moreover, the defendant had sought to induce the plaintiffs to invest in his project, had represented that his financial projections were updated and well-researched, and expected the plaintiffs to rely on his projections in making their investment decisions. *See id. at 454-55*. Here, while it is arguable that the Edens held special expertise in the operations of their business and that they were aware that information they gave to Serova would factor in her decision whether to invest in Rupert/Allarus, there is no basis to conclude that a relationship of trust [*29] or confidence existed between Serova and the Edens. The amended complaint does not allege that the Edens sought to induce Serova to invest in their company, but rather that Teplen recommended the investment to her. Moreover, there is no allegation that the Edens represented their financial projections for Allarus as being sound and reliable. Indeed, Serova does not allege that the Edens made any representations about their financial projections to her at all.

Serova argues that a special relationship nonetheless existed here because "the relationship of the parties . . . [is] such that in morals and good conscience the one has the right to rely upon the other for information." *Id. at 454*. She contends that the morals of the market imposed a duty of full disclosure on the Edens because she was an unsophisticated college student and they were introduced to her as her attorney's friends. The Second Circuit in *Dallas Aerospace, Inc. v. CIS Air Corp.*, however, rejected the argument that New York had adopted a new "morals of the marketplace" test for finding a special relationship. *See id.*, 352 F.3d 775, 788 (2d Cir. 2003).

Because I find that no special relationship [*30] existed between Serova and the Edens, the negligent misrepresentation claim against them must be dismissed.

### F. *Derivative Claims*

The defendants contend that Serova's claims for corporate waste and mismanagement and for violations of the New York Business Corporation Law and the Shareholders Agreement must be dismissed because they can only be brought derivatively and Serova has failed to join Allarus as a party. [7]

> 7   The Edens also assert that the claim for corporate waste and mismanagement is brought both individually and derivatively and that under New York law, the mingling of derivative and individual claims requires dismissal of the causes of action so affected. I can find no allegation in the amended complaint, however, that purports to bring this claim both individually and derivatively.

Allegations of corporate waste and mismanagement "plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually." *Abrams v. Donati*, 66 N.Y.2d 951, 489 N.E.2d 751, 752, 498 N.Y.S.2d 782 (N.Y. 1985). [*31] "[A] shareholder derivative action brought pursuant to *Federal Rule of Civil Procedure 23.1* cannot proceed in the absence of the corporation[] whose rights are being asserted." *Tuscano v. Tuscano*, 403 F. Supp. 2d 214, 225 (E.D.N.Y. 2005) (citing *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970) and collecting cases). Here, Allarus has not been joined in the action. Therefore, the derivative claims are dismissed under *Federal Rule of Civil Procedure 12(b)(7)* for failure to join a necessary party.

### G. *Punitive Damages*

Serova seeks punitive damages with respect to her claims for legal malpractice, breach of fiduciary duty, securities fraud, common law fraud, and negligent misrepresentation. The punitive damage issue is moot as to all claims I have dismissed. It is premature to dismiss Se-

2006 U.S. Dist. LEXIS 5781, *

rova's demand for punitive damages in relation to the malpractice claim as the parties have not discussed the merits of that claim in the papers submitted for consideration on this motion.

## IV. CONCLUSION

The defendants' motion to dismiss Serova's claims [*32] for breach of fiduciary duty, violation of Judiciary Law *Section 487*, disgorgement of fees, securities fraud, common law fraud, negligent misrepresentation, corporate waster and mismanagement, violation of New York Business Corporation Law and violation of the Shareholders Agreement is granted. Accordingly, all claims against the Edens are dismissed and only the malpractice claim against Teplen survives. This discussion is sufficiently detailed not only to express the applicable law but to provide a basis for the plaintiff, if she chooses, to re-plead. This must be done within 20 days from the date hereof and in no event will it delay the October 2006 trial of the malpractice claim against Teplen. Fully briefed dispositive motions, if any, are due on or before June 15, 2006. The Clerk of the Court is instructed to close this motion and remove it from my docket.

**IT IS SO ORDERED.**

**New York, New York**

**February *16*, 2005**

/s/ Harold Baer, Jr.

**U.S.D.J.**

# Tab F

LEXSEE 2003 U.S. DIST. LEXIS 15070

**YURMAN DESIGN INC., Plaintiff, -against- CHAINDOM ENTERPRISES, INC., and SHIELER TRADING CORPORATION, Defendant.**

**99 Civ. 9307 (JFK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 15070*

**August 28, 2003, Decided
August 29, 2003, Filed**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Motion granted by, Application denied by *Yurman Design, Inc. v. Chaindom Enters., Inc., 2003 U.S. Dist. LEXIS 15058 (S.D.N.Y., Aug. 29, 2003)*

**PRIOR HISTORY:** *Yurman Design, Inc. v. Chaindom Enters., 2002 U.S. Dist. LEXIS 18329 (S.D.N.Y., Sept. 27, 2002)*

**DISPOSITION:**  [*1] Defendant's motion for reconsideration denied.

**COUNSEL:** For Plaintiff: Maxim H. Waldbaum, Lori D. Greendorfer, Of Counsel, SALANS, New York, New York.

For Chaindom Enterprises, Inc., Defendant: Robert D. Katz, Robert T. Maldonado, Of Counsel, COOPER & DUNHAM LLP, New York, New York.

For Shieler Trading Corporation, Defendant: Dennis M. Wade, Suzanne O'Keefe, Of Counsel, WADE, CLARK, MULCAHY, New York, New York.

**JUDGES:** JOHN F. KEENAN, United States District Judge.

**OPINION BY:** JOHN F. KEENAN

**OPINION**

*MEMORANDUM OPINION AND ORDER*

**JOHN F. KEENAN, United States District Judge:**

Defendant Chaindom Enterprises, Inc. ("Chaindom") moves pursuant to Local *Rule 6.3* for reconsideration of this Court's September 27, 2002 Opinion and Order dismissing Chaindom's second, sixth and eighth affirmative defenses, and dismissing Chaindom's first and second counterclaims. For the reasons outlined below, Chaindom's motion is denied. The Court made no impermissible factual findings and overlooked no controlling precedent.

*Standards* [*2]  *Under Local Rule 6.3*

The standards controlling a motion for reconsideration are set forth in *Local Civil Rule 6.3* and Fed. R. Civ. P.*59(e)*. *See Fulani v. Brady, 149 F.R.D. 501, 503 (S.D.N.Y. 1993), aff'd 35 F.3d 49 (2d Cir. 1994); Morser v. AT&T Info. Sys., 715 F. Supp. 516, 517 (S.D.N.Y. 1989)*. Reargument is appropriate only where the Court has "overlooked controlling decisions or factual matters that were put before it on the underlying motion," *Davis v. The Gap, Inc., 186 F.R.D. 322, 323 (S.D.N.Y. 1999)*, and which, had they been considered, "might reasonably have altered the result before the court." *Consol. Gold Fields v. Anglo Am. Corp., 713 F. Supp. 1457, 1476 (S.D.N.Y. 1989)*. A *Rule 6.3* motion "is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved." *Houbigant, Inc. v. ACB Mercantile (In re Houbigant, Inc.), 914 F. Supp. 997, 1001 (S.D.N.Y. 1996)*. Rather, *Rule 6.3* is intended to "ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional [*3] matters." *Carolco Pictures, Inc. v. Sirota, 700 F. Supp. 169, 170 (S.D.N.Y. 1988)*. Thus, *Rule 6.3* "precludes a party from advancing new facts, issues or arguments not previously presented to the court." *Bank Leumi Trust Co. of New York v. Istim, Inc., 902 F. Supp. 46, 48 (S.D.N.Y. 1995); Davis, 186 F.R.D. at 323*. The motion should be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been fully con-

sidered by the court." *Anglo Am. Ins. Group v. Calfed Inc.,
XCF, 940 F. Supp. 554, 557 (S.D.N.Y. 1996).*

A party is not to use a motion for reconsideration as a
"substitute for appealing from a final judgment." *Fulani,
149 F.R.D. at 503. Rule 6.3* is not meant as a substitute for
a direct appeal or as an opportunity to reargue the original
motion. *Cohen v. Koenig, 932 F. Supp. 505, 506 (S.D.N.Y.
1996).* Motions to reconsider are not granted where the
moving party is simply looking to relitigate an issue al-
ready decided.

Chaindom now moves on the basis that the Court
"improperly dismissed Chaindom's second, sixth and
eighth affirmative defenses, [*4] and its first and second
counterclaims, because it made factual findings against
Chaindom and in favor of Yurman, and it overlooked
controlling precedent." Not. of Mot. at 1. The Court has
now carefully reviewed the papers on this motion to re-
consider as well as those submitted on the underlying
motion. For the reasons detailed below the motion is
denied.

### 1. *Affirmative Defenses*

In the original motion, plaintiff moved to strike the
sixth and eighth affirmative defenses under *Rule 9(b)* for
failure to state a fraud claim with the requisite particular-
ity and alternatively under *Fed. R. Civ. P. 12(f)* on the
basis of legal insufficiency because there are no legal or
factual issues to be resolved. Chaindom contends that the
Court overlooked the fact that the defenses incorporate
the factual allegations set forth in the counterclaims and
therefore the Court incorrectly concluded that such de-
fenses failed to meet the particularity requirements of
*Rule 9(b)*. Chaindom also argues that the Court incor-
rectly dismissed the second affirmative defense under
*Rule 9(b)* as it did not allege a claim of fraud.

As to the affirmative defenses, the Court finds that
Chaindom raises no new arguments [*5] or facts over-
looked, but rehashes arguments made and issues decided
on the original motion. While the Court may not have
specifically addressed each argument advanced by
Chaindom, it considered and rejected them in dismissing
the affirmative defenses. It did not overlook any control-
ling decisions or factual matters put before it. The motion
to reconsider striking the affirmative defenses is denied.

### 2. *Counterclaims*

The first counterclaim asserted the invalidity and
unenforceability of the B4027 copyright registration.
Chaindom argues that the court overlooked controlling
law that would have resulted in a decision in its favor.
Chaindom contends that the Court made a factual finding
in Yurman's favor when dismissing the first counterclaim.
The Court is required to credit "well-pleaded factual al-
legations" and can reject conclusory allegations or legal
conclusions masquerading as factual conclusions. *De
Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69-70 (2d Cir.
1996).* Chaindom improperly pled its fraud claim upon
information and belief. Chaindom did not allege any facts
supporting a claim of misrepresentation by Yurman to the
Copyright Office. The motion to reconsider [*6] dis-
missal of the first counterclaim is denied.

The Court dismissed the second counterclaim be-
cause Chaindom's arguments regarding the derivative
nature of the designs failed. Chaindom now argues that
the Additional Designs are not original because the dif-
ferences between the B4027 bracelet and the designs are
*de minimis* and therefore lack the requisite originality.
Chaindom draws a distinction between the "issues of
invalidity based upon fraud in not identifying a work as a
derivative work, and invalidity based upon lack of origi-
nality where the difference between the copyrighted work
and a prior design are *de minimus* (sic)." Def.'s Reply
Mem. at 6. Chaindom contends that the Court dismissed
this counterclaim on the argument based on derivative
nature, and not that premised on the *de minimis* originality
argument. Chaindom's attempt to raise a new argument
regarding the originality of the Additional Designs is
improper on a motion to reconsider. Chaindom's motion
to reconsider dismissal of the second counterclaim is
denied.

### CONCLUSION

Chaindom's motion for reconsideration of this Court's
September 27, 2002 Opinion and Order dismissing
Chaindom's second, sixth and [*7] eighth affirmative
defenses, and dismissing Chaindom's first and second
counterclaims is denied.

**SO ORDERED.**

**Dated: August 28, 2003**

**JOHN F. KEENAN**

**United States District Judge**