# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

IN RE MERRILL LYNCH & CO., INC.  :  02 MDL 1484
RESEARCH REPORTS SECURITIES  :
LITIGATION  :

-----------------------------------------------------X

This document relates to:  :  02 Civ. 3210 (MP)

IN RE 24/7 REAL MEDIA, INC. RESEARCH  :
REPORTS SECURITIES LITIGATION  :  **JURY TRIAL DEMANDED**

-----------------------------------------------------X

## FIRST CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

  Lead Plaintiff John Kilgour Lentell ("Lentell" or "Plaintiff") alleges the following based

upon the investigation of counsel, which included a review of United States Securities and

Exchange Commission ("SEC") filings by 24/7 Media, Inc., ("24/7 Media" or the "Company"),

as well as regulatory filings and reports, securities analysts' reports and advisories about 24/7

Media issued by Defendants (as defined in ¶ 9 infra), press releases and other public statements

issued by Merrill Lynch (as defined in ¶ 7 infra), media reports about 24/7 Media, filings by the

Attorney General of the State of New York (the "Attorney General"), and certain internal Merrill

Lynch documents released by the Attorney General.  Lead Plaintiff Lentell believes that

substantial additional evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

### NATURE OF THE CLAIM

  1.  This is a federal securities class action brought by Plaintiff against Defendants on

behalf of a class consisting of all persons or entities who purchased or otherwise acquired 24/7

Media securities (the "Class") from May 12, 1999 through November 9, 2000, inclusive, (the

"Class Period"). Plaintiff seeks to recover damages caused to the Class by Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331. This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

3. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District and Merrill Lynch maintains its headquarters in this District.

4. In connection with the facts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5. Lead Plaintiff Lentell acquired 24/7 Media securities, as set forth in the attached certification, and was damaged thereby.

6. Defendant Merrill Lynch & Co., Inc. ("ML & Co.") describes itself as one of the world's premier investment banks. ML & Co., a Delaware corporation, has its headquarters in this District at 4 World Financial Center, New York, New York. ML & Co. is a holding

company, which operates through its wholly owned subsidiaries, and claims to be one of the world's leading financial management and advisory companies, with offices in 36 countries and total client assets of about $1.3 trillion. As an investment bank, ML & Co. claims to be a leading global underwriter of debt and equity securities and a leading strategic advisor to corporations, governments, institutions, and individuals worldwide. ML & Co. also claims to be one of the world's largest asset managers, with $462 billion in assets under management. Through its Global Securities Research & Economics Group, ML & Co. claims to rank among the leading research providers in the industry, with analysts and other professionals in 19 countries that cover approximately 3,200 companies. ML & Co.'s Global Securities Research and Economics Group, under its own name and ML & Co.'s name, issued analyst reports on over 25 internet companies, including iVillage, during the Class Period (the "Analyst Reports").

7.      Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPF&S" and, with ML & Co., "Merrill Lynch") is a wholly owned subsidiary of ML & Co. MLPF&S is a licensed broker/dealer in the United States and operates as the brokerage unit of ML & Co. MLPF&S, a Delaware corporation, has its principal office in this District. MLPF&S provides investment-banking services to businesses, and engages in retail and institutional sales to its customers. MLPF&S prepared and issued the Analyst Reports itself or through one of its affiliates, and claims the copyright in the Analyst Reports issued by Merrill Lynch.

8.      Defendant Henry Blodget ("Blodget") was, at all relevant times, a First Vice President of Merrill Lynch and was Merrill Lynch's primary analyst for companies in the Internet sector. As discussed below, Blodget was retained by Merrill Lynch to bring investment banking business to Merrill Lynch, and earned many millions of dollars as Merrill Lynch's premier analyst of Internet stocks, the majority of which was based on the amount of investment

3

banking business that he generated. Merrill Lynch reportedly paid him in excess of $5 million in 2000 and approximately $12 million in 2001 -- with some estimates as high as $20 million per year -- in addition to a $2 million buy-out when Blodget left Merrill Lynch in November 2001. Blodget was the primary or secondary author of all of the 24/7 Media Analyst Reports (as defined in ¶ 142 infra).

9.     Defendants ML & Co., MLPF&S, and Blodget are collectively referred to herein as the "Defendants."

### INTRODUCTION

10.     This action arises from, and as an integral part of, a massive scheme to defraud the investing public in connection with the purchase and sale of the publicly-traded securities of numerous Internet-related companies. The scheme was orchestrated by Merrill Lynch's Internet Group, aimed at fraudulently driving up the market prices of Internet companies covered and recommended to public investors by Merrill Lynch's Internet stock research analysts, and motivated by the desire to obtain and maintain lucrative investment banking business for Merrill Lynch. The scheme relied, in part, upon the "star-quality" public reputation of chief Merrill Lynch Internet research analyst Defendant Henry Blodget. The centerpiece of the scheme was the public issuance and maintenance of knowingly or recklessly false, bullish research reports (the "Analyst Reports"), BUY or ACCUMULATE recommendations, and profoundly unrealistic price targets for the Internet stocks. In many cases, there is even direct evidence, in the form of admissions in internal Merrill Lynch communications, that the Merrill Lynch analysts themselves did not believe in their own recommendations. Even in those cases where no direct admission of disbelief has yet been discovered, there is strong circumstantial evidence leading to a strong inference that the analysts either did not believe in the recommendation or were highly

4

reckless in making a recommendation that had no reasonable basis in fact. Indeed, Merrill

Lynch's entire stock rating system was grossly misleading. Whereas Merrill Lynch publicly

claimed that it had a five tier rating system (ranging from "BUY" to "SELL"), in actual practice

it virtually never issued a rating below the top two tiers of "BUY" or "ACCUMULATE" for an

Internet company.

11.    The fraudulent scheme was characterized by undisclosed material conflicts of

interest, the disclosure of which would have made the scheme impossible to carry out by

revealing the lack of independence, objectivity and reliability of Merrill Lynch's Internet

analysts and their reports: (1) secret agreements between Merrill Lynch and the Internet

companies to "trade" favorable, bullish Analyst Reports for investment banking business

directed to Merrill Lynch, (2) the secret sharing of investment banking fees among Merrill Lynch

and its Internet analysts, and (3) the fact that if Merrill Lynch were successful in propping up the

stock prices of the Internet companies, Merrill Lynch stood to reap (a) additional investment

banking fees in merger and acquisition transactions based on the inflated market prices of the

companies' securities, and (b) securities brokerage commissions from the sale of securities by

Internet company insiders at the inflated prices.

12.    The result of the scheme was to manipulate, inflate and maintain the market prices

of the securities of the Internet companies at artificially high levels that would not have prevailed

in the absence of the scheme. When the market prices of the Internet companies fell, public

investors lost hundreds of millions of dollars.

**THE NEW YORK ATTORNEY GENERAL ACTION**

13.    On April 8, 2002, the Office of the Attorney General in an Application for an

Order Pursuant to [New York] General Business Law Sec. 354 (the "Application") which it filed

in the Supreme Court of the State of New York, County of New York revealed its findings

regarding Merrill Lynch's conflicts of interest and misleading stock rating system.. The

Application named as Respondents Merrill Lynch & Co., Blodget and other past or present

officers or employees of Merrill Lynch. In support of the Application, the Attorney General

filed an Affidavit in Support thereof sworn to by Eric Dinallo, Chief of the Investment Protection

Bureau of the New York State Department of Law (the "Dinallo Affidavit" or "Dinallo Aff."). A

copy of the Dinallo Affidavit and Exhibits is attached to the Exhibits Incorporated by Reference

to Certain Consolidated Amended Complaints, and it is incorporated herein in full by reference

thereto.[1]

14.    As described in the Dinallo Affidavit, the Office of the Attorney General

conducted an investigation of "...all stocks covered by Internet research analysts at Merrill

Lynch..." including, to date, examination of close to twenty witnesses under oath, including

Blodget, and review of "...over 30,000 documents, comprising over 100,000 pages, including

thousands of e-mails." (Dinallo Aff. at 2).[2]

15.    As alleged by the Attorney General and as attested to in the Dinallo Affidavit,

Merrill Lynch's Analysts Reports and recommendations of all Internet companies covered by the

Internet Group were the product of a compromised and misleading "research" system that

routinely violated its own rating criteria in order for Merrill Lynch to obtain lucrative investment

banking business and for its analysts to achieve inflated bonuses which were directly linked to

---

[1] All citations in the Dinallo Affidavit to documents with the prefix "ML" are documents produced by Merrill Lynch to the Attorney General. Similarly, transcript references in the Dinallo Affidavit are to transcripts of depositions conducted by the Attorney General. All of those documents and transcript references have been reviewed by Lead Counsel for Plaintiff and the Class in this action.

[2] As of the date of filing of this Consolidated Amended Complaint, Plaintiff has not yet had an opportunity to review these documents in full. The Attorney General has stated publicly, however, that the documents will be made available as soon as possible.

Merrill Lynch's investment banking success. Indeed, the Dinallo Affidavit highlights specific examples of individual Internet company stocks that Defendants recommended to investors even though, internally, Merrill Lynch and its analysts actually had negative opinions of those stocks.

16.    The Dinallo Affidavit contains many such references to individual stocks in which the Internet Group issued buy recommendations despite holding negative and contrary opinions about the same stock. The examples provide a window within which Defendants' scheme can be viewed. Specifically, the examples of misleading Analysts Reports contained in the Dinallo Affidavit reveal Defendants' complete disregard of Merrill's own five-tier rating system in favor of a scheme that put Merrill Lynch's desire to obtain investment banking fees over its duty and obligation to issue truthful and honest Analyst Reports.

17.    Using testimony and documentary evidence, the Attorney General laid out the scheme Defendants employed to attract and maintain investment banking clients. The Dinallo Affidavit established that: (1) the Defendants carried out a scheme to win investment banking business from Internet companies through the use of favorable Analyst Reports; (2) the Analyst Reports that Merrill Lynch issued on Internet companies were false and misleading because the opinions set forth in those reports were not necessarily the true opinions that Merrill Lynch, Blodget and other Merrill Lynch analysts held when they issued the Analyst Reports, but rather simply a means to win investment banking business; (3) the rating system publicly represented by Defendants to be based on a five-tier system was rather a *de facto* three-point system as Defendants never used the "REDUCE" or "SELL" ratings even when they believed a company's stock was going to drop; and (4) that the Defendants acted with scienter when they issued the false and misleading Analyst Reports.

7

18.    Based on its investigation, the Attorney General concluded that because of

Defendants' scheme to attract and keep investment banking clients, investors were deprived of

Merrill Lynch's analysts' honest opinions:

> The foregoing summary ... demonstrates that profoundly troubling
> questions pervade Merrill Lynch's research and rating system, as
> that system has been employed by the company's Internet group.
> Contrary to the image of objectivity that Merrill Lynch has sought
> to cultivate for its research arm, **the evidence shows that analysts
> knowingly compromised their honestly held beliefs regarding
> the merits of particular stocks and skewed the ratings they
> issued in order to promote the interests of Merrill Lynch's
> investment banking business**, and that the analysts' involvement
> in that business netted them substantial monetary rewards. **The
> investing public**, of course, knew nothing of the inherent conflict
> of interest underlying the Merrill Lynch rating system, and **was
> deprived of the analysts' honest opinions**.   *(Id.* at 35-36,
> emphasis added.)

19.    In short, Defendants issued Analyst Reports that contained positive investment

recommendations for all of the companies Merrill Lynch's Internet Group covered between

February 1999 and April 8, 2002 to (1) obtain lucrative investment banking business for Merrill

Lynch and (2) reap financial windfalls for Merrill Lynch, Defendant Blodget and other Merrill

Lynch research analysts in the Internet Group.

20.    After the Attorney General's probe of Merrill Lynch's scheme became public in

an April 26, 2002 Associated Press article, David Komansky, Merrill Lynch & Co., Inc.'s Chief

Executive Officer, apologized for Merrill Lynch's betrayal of trust to investors:

> Merrill Lynch & Co. Chief Executive Officer David Komansky on
> Friday apologized for the firm's role in a Wall Street probe of
> conflicts of interest that the state attorney general called a betrayal
> of trust to millions of investors.
>
> "We have failed to live up to the high standards that are our
> tradition," Komansky said in a statement to shareholders. "I want

8

<u>to take this opportunity to publicly apologize to our clients, our shareholders and our employees.</u> [Emphasis added.]

"I want to do more than just apologize. I commit to you today that we are addressing this problem squarely," he said. "We will take meaningful and significant actions to restore investor confidence."

New York Attorney General Eliot Spitzer welcomed the statement, <u>but said it doesn't necessar[il]y fulfill his requirement in negotiations for the firm to admit wrongdoing.</u> . . .   [Emphasis added.]

"I think it's a step forward," Spitzer said. "One necessary aspect of resolution has always been contrition ... (the statement) is a beginning."

21.    As demonstrated below, Defendants' massive scheme to defraud the investing public in connection with the purchase and sale of the publicly-traded securities of numerous Internet-related companies by issuing false and misleading positive Analyst Reports and recommendations had the effect of inflating the price of 24/7 Media common stock above the price that would have otherwise prevailed in a fair and open market during the Class Period.

22.    Moreover, Defendants carried out a plan, scheme and course of conduct which was intended to and did manipulate, artificially inflate and maintain the market price and trading volume of 24/7 Media common stock and induced Lead Plaintiff Lentell, and the members of the class, to purchase 24/7 Media common stock at artificially inflated prices.

## MERRILL LYNCH HIRES BLODGET TO MARKET ITS INTERNET GROUP IN AN EFFORT TO OBTAIN LUCRATIVE INVESTMENT BANKING BUSINESS

23.    Prior to and throughout the Class Period, Blodget was repeatedly recognized in the financial and regular media as the preeminent analyst of Internet companies. Blodget was regularly the subject of newspaper, magazine and Internet news service articles and references, and he appeared repeatedly on business-oriented television programs. Indeed, before starting at

9

Merrill Lynch, Blodget acquired virtual "celebrity status." Merrill Lynch decided to hire Blodget to increase the influence and impact of Merrill Lynch's claimed research power and analyst coverage of Internet companies.

24.     Blodget's fame and extraordinary influence as an Internet analyst began on December 16, 1998, while he was an analyst at CIBC Oppenheimer.  Towards the end of his employment at CIBC, Blodget set what he even described at the time to be an "outlandish" price target for Amazon.com of $400 per share.  The market reacted swiftly to Blodget's price target, and in three short weeks investors had bid Amazon.com stock to over $400 per share.

25.     While Blodget was setting an extraordinary price target for Amazon.com, Jonathan Cohen, Merrill Lynch's then head Internet analyst, publicly disagreed with Blodget and countered with a target price of $50 for Amazon.com stock.

26.     Merrill Lynch concluded that Cohen's conservative opinions of Internet companies were hindering Merrill in obtaining investment banking business from Internet companies.  To remedy this problem, Merrill Lynch hired Blodget as the key element of a fraudulent scheme to increase its investment banking business.  With Blodget as the leader of the Internet Group and as Merrill Lynch's Internet cheerleader, Merrill Lynch set out to promote investment banking to Internet companies by offering those companies positive analyst recommendations.

27.     In January 1999, Cohen left and Merrill Lynch replaced him with Blodget a month later.

28.     Merrill Lynch hired Blodget because of his high-profile reputation to issue favorable opinions of Internet companies, and thereby to generate lucrative investment banking deals for Merrill Lynch.

10

29.    Blodget earned millions of dollars as Merrill Lynch's head Internet analyst. Merrill Lynch paid him more than $5 million in 2000 and approximately $12 million in 2001. Blodget's income was tied directly to the amount of Internet investment banking business generated for Merrill.

30.    According to a March 22, 1999 article in *Crain's New York Business*, Blodget's hiring had an immediate impact on Merrill Lynch:

> Mr. Blodget's value to Merrill Lynch is unmistakable. Internet initial public offerings have become huge moneymakers for investment banks, and firms frequently select their underwriters based upon the reputation of the analyst who covers their industry.

31.    Upon his arrival and at Blodget's direction, Merrill Lynch immediately set in place a structure in which the Internet Group's analysts would play an important role in investment banking matters by requiring that each analyst devote at least 50 percent of their time to investment banking.

32.    Under Blodget, Merrill Lynch "prioritize[d]" its research coverage for stocks according to whether the company had an investment banking relationship with Merrill Lynch. Within weeks of joining Merrill Lynch as head of the Internet Group, Blodget distributed to the Co-Heads of U.S. Equity Research and senior investment bankers a memorandum entitled, "Managing the Banking Calendar for Internet Research." The memorandum unapologetically described Blodget's expectation that at least 50 percent of his and his team's time would be allocated to investment banking matters. In addition to discussing "banking transactions [] in the pipeline" and "promising deals," the memorandum described Blodget's work schedule for one week as being divided "85% banking, 15% research." (Dinallo Aff. at 15).

33.    An example of Merrill Lynch using Blodget's reputation and his bullish reports to

11

obtain investment business and lucrative investment banking fees, was seen in Merrill Lynch's effort to be appointed lead underwriter for a stock issuance by a company called GoTo.com. Merrill Lynch admitted that its investment bankers used Blodget's past bullishness regarding GoTo.Com as a selling point when it tried to persuade GoTo.Com to retain Merrill Lynch as the lead underwriter for its stock offering.

34.    Defendants initiated coverage of GoTo.Com on January 11, 2001, because Merrill Lynch was competing to be appointed lead underwriter for a new stock offering to be made by GoTo.Com.  In support of its efforts to be appointment, Defendants issued another analyst report, dated April 25, 2001, in which they raised their rating of GoTo.Com to "ACCUMULATE" and "Long Term BUY."

35.    On June 6, 2001, GoTo.Com announced that it had appointed Credit Suisse First Boston, a competitor of Merrill Lynch, as the lead underwriter for its stock offering.  Incredibly only a few hours after the GoTo.com announcement, Blodget issued another GoTo.Com research report in which he downgraded GoTo.Com stock back to a "NEUTRAL."

36.    In e-mails and in his sworn testimony, Blodget admitted what Defendants kept from the public – that Defendants' Analyst Reports were false and misleading at the time they issued the reports:

> When, in January 2001, Merrill Lynch initiated coverage of GoTo, an institutional investor e-mailed Blodget asking, **"What's so interesting about GOTO except banking fees????"  Blodget responded, "nothin."**  (ML 03806).  Blodget's candid response was not included in the initiation report, nor did the report disclose that Merrill Lynch had promised research coverage in exchange for GoTo's investment banking business.

***

> **In his sworn testimony, Blodget conceded that Merrill Lynch investment bankers had veto power over his initiating coverage of GoTo with a 3 rating.** (Blodget, Tr. at 211-12).

(Dinallo Aff. at 25-26) (emphasis added).

37.    Once Defendants realized that their scheme was not going to yield results –

investment banking business – with respect to GoTo.com, they downgraded the stock:

> **Not only did Henry Blodget show leadership by initiating on the stock near its low point but he recently upgraded it and sponsored a set of investor and Merrill sales force meetings for management in New York, which dramatically moved the stock price.**

> ***

> Almost simultaneously, within the Internet group, McCabe e-mailed Blodget a draft downgrade of GoTo's stock from its then current 2- 1:

> H [Henry Blodget]

> I don't think I've downgraded a stock on valuation since the mid-90's. Anyway, I threw together these bullets in a note on my hard drive so that we are ready to pull the trigger quickly. Do you think we need more than bullets? I didn't think so since this downgrade would be based solely on valuation? Let me know.

> Thanks.

> Ed

> • <u>GoTo</u> has doubled since our upgrade about a month ago. We are downgrading the stock due to valuation.

> • We believe fundamentals are intact...

(ML 04097) (emphasis in original [deleted]).

13

> **Blodget's immediate three-word reaction was: "beautiful fuk em." Id.**

(Dinallo Aff. at 29-31) (emphasis added).

## BLODGET'S REPUTATION AS AN ANALYST OF INTERNET COMPANIES

38.    Blodget's ascension to the upper echelon of Internet analysts began when he was an analyst at CIBC Oppenheimer.  In October 1998, Blodget put a 12-month, $150 per share price target on Amazon.com stock.  But by mid-December, Amazon.com was trading at $242 per share.  So, on December 16, 1998, Blodget set an "outlandish" target price for Amazon.com stock of $400 per share.

39.    Once word of Blodget's target reached the market, Amazon.com stock immediately traded higher, closing up nearly 20% for the day.  Three weeks later, on January 6, 1999, the stock closed higher than Blodget's "outlandish" $400 per share target.  (One month later, Blodget replaced Jonathan Cohen as Merrill Lynch's head Internet analyst.)

40.    The circumstances of Blodget's rise to "household-name" status because of his Amazon.com price target were later described in an April 2, 2000 edition of *The Washington Post* in an article entitled "Analyst With a Knack for Shaking up Net Stocks; Henry Blodget Is Wall Street's Link Between Online Firms, Investors:"

> [I]t ... took [Blodget's] bold move with Amazon to make him a household name in the world of Internet stockholders.  The retailer was at its most controversial then, full of swaggering ambition and bleeding red ink.  It was also a hot stock, one that had doubled and redoubled.  Two months earlier Blodget had put a 12-month price target of $150 on it.  The stock quickly breezed by that to close on Dec. 15 at $242.
>
> So he set an "outlandish" new target-$400.  "I was trying to say, 'Stop asking me the price target.  There's plenty of upside,'" he says.  "But it was like I threw gasoline on a bonfire."

14

* * *

A Bloomberg News reporter got a tip on Blodget's aggressive forecast, and wrote a story about it. A couple of minutes later, CNBC picked up the story, noting Amazon stock was already up $10 in early-hours trading. A few minutes after that it hit the chatboards, provoking hundreds of messages during the course of the day.

At 9:30 a.m., the market opened with Amazon at $259, up $17. It continued rising all day, the commentary making the stock climb, which in turn provoked more commentary. It was as if Blodget had been understood to say Amazon was going to go to $400 that day.

The stock closed at $289, up nearly 20 percent, on quadruple its normal volume. Those who thought Amazon was worthless seemed personally insulted by the rise. Jonathan Cohen, at the time the Merrill Lynch Internet analyst, said the stock was worth less than a quarter of its current price.

On Jan. 6, 1999, Amazon closed at $138. Since it had split three-for-one in the meantime, that works out to be $414. The stock had done in three weeks what Blodget said would take a year. The next month, Blodget replaced Cohen at Merrill Lynch, for a salary that he declines to discuss but is reported to be $4 million.

The events still bemuse him. He quotes Jay McInerney, who explained how he abruptly became famous with his novel "Bright Lights, Big City" in 1984: "I plucked the chords of the Zeitgeist."

* * *:

"The reason stocks move is not because they're cheap or expensive," Blodget says. "It's because there's an imbalance of supply and demand. Stocks don't move on valuation."

* * *

"Our job is not to be stock pickers, but to be correct on trends, and help investors pick stocks," he said. "There's a significant difference."

41.    Blodget frequently appeared on television business news reports, where he would

15

set forth his bullish opinions and predictions regarding the stocks of various Internet companies.

Blodget's celebrity status also included regular appearances on television programs concerning

the financial markets.    In 1999 and 2000, Blodget appeared on television at least 77 and 46

times, respectively, often on CNBC and CNN.   These programs had great influence on the

financial markets in general, and on the prices of the stocks discussed on the programs.   This

influence was illustrated in a March 15, 1999 article in *The Wall Street Journal* entitled "Abreast

of the Market: What Moves Markets: New Forces Are Now Powering Surging Stocks: Ordinary

Joes Move Market Toward Dow 10,000 Mark With Aid From TV, Internet:"

> The pros keep an eye not just on their banks of quote machines, but
> also on television screens.  "In my fixed-income trading room and
> my stock trading room, CNBC is on all during the day," says
> Henry Herrmann, chief investment officer at Overland Park, Kan.,
> mutual-fund group Waddell & Reed.  He put in televisions two
> years ago, when he was upgrading the bond trading room.  "It is
> just another tool but it is a tool," he says.  When Prudential's Mr.
> Acampora turned bearish in August and CNBC relayed his
> warning of a sharp market drop, the prediction proved self-
> fulfilling and helped push stocks down.  The experience indicated
> that, at the right time, television appearances by any of a variety of
> market players can hit the market just as hard as a warning from
> the Fed's Mr. Greenspan.  And television can turn once-unknown
> analysts, such as Merrill's Mr. Blodget, into instant celebrities.

42.     Blodget's reputation as an Internet analyst was cemented by his selection as one

of three all stars in the Internet category of *The Wall Street Journal*'s "All-Star Analysts 1999

Survey," as reported in the publication's June 29, 1999 edition.

43.     In an October 4, 1999 article entitled "Digital 50 The Most Important People

Shaping Technology Today," *Time Magazine* confirmed Blodget's extraordinary power and

influence over the technology industry.  Although Blodget was a securities analyst covering

Internet companies, *Time* identified Blodget as one of the most important people shaping

16

technology.  Included with such technology luminaries as Bill Gates, the founder of Microsoft,

Steve Case, the founder of America On-Line, and Jeff Bezos, the founder of Amazon.com, *Time*

virtually gushed about Blodget:

> Henry M. Blodget The Forecaster Merrill Lynch Senior Internet
> and e-commerce analyst AGE: 32 WEB: www.ml.com
>
> It takes a certain cachet to make financial-market types swoon.
> Henry Blodget, arguably the most influential voice on Internet
> stocks in the world, is so hot right now that his late arrival to a
> recent bigwig luncheon prompted this announcement: "Elvis has
> entered the building." The 1989 Yale grad was a managing director
> and senior Internet analyst at CIBC Oppenheimer when he made
> the call that shot him into the spotlight and one of the most
> prestigious jobs on Wall Street. Amazon.com's share price was
> hovering around $200; pundits were proclaiming that the party was
> over. But Blodget remained bullish on the online bookseller and
> said the stock would hit $400 in 12 months--and then it hit the
> stratosphere. By March, he was at Merrill--and **he's been getting**
> **the kind of attention shown in those old E.F. Hutton ads ever**
> **since.**
> [Emphasis Added.]

44.     Blodget also had a strong reputation as an Internet stock analyst with the

institutional investment community.  In its October 1999 issue, *Institutional Investor* placed

Blodget on its Third Team for its 1999 All-America Research Team.  In its October 2000 issue,

*Institutional Investor* named Blodget to the "First Team" of its 2000 All-America Research Team

in two categories, E-Commerce and New Media.

45.     Merrill Lynch actively promoted Blodget's reputation and used his recognition to

enhance Merrill Lynch's status in the industry.  For example, Merrill Lynch placed the following

advertisement in the June 27, 2000 issue of *The Wall Street Journal*, the *San Jose Mercury News*

and on it's website:

**TechTalk.**

\* \* \*

**Limited-Time Offer:**
**Tune in to see Henry Blodget and David Peterschmidt**

TechTalk is exclusively for our clients – except for **this special**
**opportunity to catch a recent edition featuring Henry Blodget,**
**the most-read Internet analyst\*\* anywhere** [emphasis added]....

Now you can sample TechTalk at www.ml.com

\*\*    *First Call Thompson Financial*, May, 2000

Merrill Lynch Technology Group

be bullish                                                    Merrill Lynch

46.    Merrill Lynch also used Blodget's celebrity status to enhance the reputation of its

technology group in general.  In the spring of 2001, Merrill Lynch placed a two-page

advertisement in a weekly trade publication headlined "Techtelligence."  In the advertisement,

Merrill Lynch touted the capability of its technology group, including the 100 analysts who

covered 500 companies and the awards its analysts had won, highlighting Merrill Lynch's

"Internet Guru," Henry Blodget.

**BLODGET'S RECOMMENDATIONS SUBSTANTIALLY IMPACTED THE PRICE OF**
**INTERNET STOCKS**

47.    Because of his reputation, power and influence, whatever Blodget said about

Internet stocks held great sway with the market and investors.  An August 19, 1999 *New York*

*Times* article entitled "Stocks Slump as Investors Take Profits" gave an example of Blodget's

influence:

> A surprisingly strong earnings report by Dell Computer and a
> recommendation of eight Internet stocks by Merrill Lynch's
> influential analyst, Henry Blodget, helped keep the Nasdaq average
> in positive territory most of the day before it, too, slipped and
> ended down 13.49 points, or five-tenths of 1 percent, to 2,657.73.

18

* * *

> Mr. Blodget, the Merrill Lynch analyst, recommended eight
> Internet stocks he saw as benefiting from this year's holiday
> shopping season, perhaps tripling revenue from on-line sales and
> advertising. He predicted the shares, which "offer a sound way to
> play the fundamental strength and renewed investor enthusiasm"
> expected in coming months, would surge 50 percent to 100 percent
> by year-end.
>
> All his picks rose. Amazon.com jumped 3 7/8, to 113 1/8;
> America Online 1 11/16, to 99 3/16, and Yahoo 6 3/16, to
> 145 1/16. His other picks were eToys, Excite@Home, Lycos,
> Inktomi and Barnesandnoble.com

48.    Blodget's influence was again on display when *The Wall Street Journal's* August

19, 1999 "Heard on the Street" column reported:

> ...electronic-commerce stocks got a sudden boost yesterday after
> Merrill Lynch analyst Henry Blodget told clients in a conference
> call that he believes sentiment is turning back toward those
> issues....
>
> "We are throwing our hat into the ring," Mr. Blodget said. He
> advised buying some down-and-out Internet retailers, including
> Amazon.com, Barnesandnoble.com and eToys, along with service
> providers such as America Online and Yahoo!, on the theory that
> they will benefit from a strong back-to-school and holiday season.
>
> "This has been a rocky summer for this sector. But if you are
> committed to holding until December and you buy them at this
> level, you'll probably make significant money," Mr. Blodget said.
> He even put together a "holiday basket" with eight Internet stocks
> he thinks will "benefit disproportionately from strength" in the
> sector later this year. His list included not only Yahoo,
> Amazon.com, America Online and Barnesandnoble.com, but also
> eToys, Lycos, Excite At Home and Inktomi.
>
> Mr. Blodget's picks got a lift yesterday amid an overall rally in
> Internet stocks. Yahoo closed at 145.0625, up 6.1875; Inktomi
> closed at 119, up 3; Amazon.com closed at 113.125, up 3.875.

49.    The effect of Blodget's price targets on the stocks he covered was described in a

January 12, 2000 article in *The Wall Street Journal* entitled "Huge Price-Target Boosts Lifted

Web Stocks; Now Analysts Try Same Move in Other Sectors:"

> There is nothing that jump-starts an Internet stock like a big price-target boost by a Wall Street analyst.
>
> * * *
>
> There is nothing too risky about sticking an eye-popping price target on a stock anymore either.  Everyone laughed last year when Merrill Lynch's Henry Blodget nearly doubled his price target for Amazon.com, then trading at 230 a share, to 400.  (The stock has since split.)  The move looked pretty smart, however, within just weeks, and Mr. Blodget is now one of the highest-paid Internet analysts on Wall Street.
>
> Says Mr. Blodget: "If you are looking at stocks with this kind of volatility, you need extreme returns to justify the risk."  Further, he says "a lot of analysts are just measuring reality and giving investors a sense of where a stock might go."

50.    In the same *The Wall Street Journal* article, Blodget recognized the power of his

"price targets:"

> "The quick reaction to price targets is being driven by thinly traded stocks and an incredible amount of retail money that, when they see a new price target, they drive the stock there and past it," [Blodget] says....

51.    Another example of Blodget's influence was reported in an article in the May 23,

2000 *The Wall Street Journal*:

> The biggest chunk of the recovery in the session took place in the beleaguered Internet camp.  Shares of eBay (Nasdaq), weakened in intraday trading, turned around, ending the session 18 points better at 136 3/16.  The reversal came after the online auction concern's chief executive, Meg Whitman, continuing to campaign for the company's stock, which has fallen sharply from its March highs, spoke with Merrill Lynch Internet analyst Henry Blodget on an investment program Merrill conducted on the Internet.

52.    On July 14, 2000, *The Wall Street Journal* published an article about the

investment bankers who underwrote initial public offerings for Internet companies. Among

other things, the article pointed out the role analyst price targets had in the ever-escalating rise

for a time in the price of those shares:

> The bankers got help in feeding the furnace from a new breed of mostly young securities analysts who presented themselves as pathfinders in the uncharted terrain of the Internet.

> The best-known is Henry Blodget, famous for forecasting in December 1998 that Amazon.com would hit $400 a share in within 12 months. At the time, Amazon.com was trading at $240; within four weeks it blew past $400 on its way to a high of more than $600. Mr. Blodget was celebrated as a seer and left his job at CIBC Oppenheimer for Merrill Lynch & Co. Amazon.com? It closed at a split-adjusted $35 yesterday, equivalent to $210 at the time of Mr. Blodget's big call.

> \* \* \*

> Still, to critics, Mr. Blodget epitomizes the change in the analyst's role during the overheated market in tech stocks: more cheerleader than detached observer. And the buzz – and the career opportunities – that Mr. Blodget did draw may have encouraged other analysts to make similarly adventurous forecasts, the critics add.

> Despite Mr. Blodget's 75% caveat, his recommendations on individual stocks, like those of many Internet analysts, got more bullish even as they led the Nasdaq Composite Index to ever-more-dizzying heights. Today, he rates 12 of the 27 stocks that he follows as "buy" (the rest are "accumulate"), compared with just one buy rating for the 10 stocks he followed a year ago, says Bob Kim, a former Merrill Lynch supervisory analyst whose Web site, Restex.com, monitors Merrill technology research.

**MERRILL LYNCH'S COMPENSATION STRUCTURE REWARDED BLODGET AND THE OTHER ANALYSTS IN ITS INTERNET GROUP FOR THE INVESTMENT BANKING FEES THEY GENERATED**

53. Blodget earned millions of dollars as Merrill Lynch's head Internet analyst.

Merrill Lynch paid him more than $5 million in 2000 and approximately $12 million in 2001.

54. Blodget's compensation as well as the compensation of the other Merrill Lynch

21

Internet analysts, was directly related to the investment-banking fees Merrill Lynch obtained because of the Internet Analyst Reports Blodget and his Internet Group issued.

55.    Merrill Lynch's stock analysts, including Blodget, participated in a bonus pool that was funded, in part, from investment-banking fees Merrill Lynch received. Merrill Lynch has publicly acknowledged that its analysts received a large portion of their compensation in the form of year-end bonuses, which were primarily funded from a pool of money derived from investment-banking fees. Merrill Lynch has also publicly acknowledged that an analyst's year-end bonus reflected the employee's contribution in obtaining its investment-banking fees.

56.    Blodget was highly paid by Merrill Lynch because his reputation in the investment community as one of the top Internet analysts enabled Merrill Lynch to obtain numerous investment banking engagements, along with the lucrative investment banking fees from those engagements.

57.    From 1997 through early 2001, Merrill Lynch earned more than $100 million in investment banking fees on the initial public offerings alone for taking 20 Internet companies public. Moreover, Merrill Lynch reaped tens of millions of dollars of revenue from other investment banking business from companies covered by the Internet Group.

58.    As of April 2001, two of those 20 companies had gone out of business and 15 were trading well below their offering prices. The price of 8 of those companies had fallen 90% or more from their IPO prices. Nevertheless, in an interview published in the April 16, 2001 edition of *Business Week Magazine*, Blodget defended Merrill Lynch's performance: "Investors wanted these stocks. It's tough to tell a CEO, 'We won't take you public' when investors are shouting, 'Bring It On!'"

59.    That the compensation of Blodget and the other Internet analysts in his group was

22

directly related to the investment banking fees they helped Merrill Lynch obtain is highlighted in the Dinallo Affidavit:

>    The research analysts' objectivity and independence was
>    further eroded by the fact that their compensation depended in
>    part on their efforts on behalf of investment banking, as
>    demonstrated by the following Fall 2000 request from
>    respondent Deepak Raj, then co-head of global equity research,
>    to all equity analysts:
>
>    > **We are once again surveying your contributions
>    > to investment banking during the year .... Please
>    > provide complete details on your involvement in the
>    > transaction, paying particular attention the
>    > degree that your research coverage played a role
>    > in origination, execution and follow-up. Please
>    > note, as well, your involvement in advisory work
>    > on mergers or acquisitions, <u>especially where
>    > your coverage played a role in securing the
>    > assignment</u> and your follow-up marketing to
>    > clients. Please indicate <u>where your research
>    > coverage was pivotal in securing participation in
>    > high yield offering.</u>**

(Dinallo Affidavit at 20 - 21, underline emphasis in original, bold emphasis added).

60.    Moreover, the Dinallo Affidavit highlights that Blodget and the other Merrill Lynch Internet research analysts fully understood that their compensation was tied to the investment banking dollars they helped generate for Merrill Lynch:

>    On November 2, 2000, **Blodget and the Internet
>    research group responded to the above request.** In a detailed
>    memorandum with schedules, entitled "IBK Contributions:
>    Internet Team." Blodget stated that: (a) his group had been
>    involved in over 52 completed or potential investment banking
>    transactions; (b) the completed transactions had earned $115
>    million for the firm; and (c) more transactions would have been
>    completed had not the "market window for most Internet
>    companies closed in June." **He also identified the services his
>    analysts typically performed for investment banking,
>    including pitching the client, marketing the offering and,
>    notably, initiation and follow-on research coverage.** (ML

> 09544-51; see also ML 33856). **Shortly after documenting
> these contributions, Blodget's salary contract -- which
> contained a guaranteed minimum -- was cancelled and
> replaced with a substantially larger compensation package.
> Overall, Blodget's agreed annual compensation, including
> "guaranteed" minimum cash bonus, increased from $3
> million for 1999 to $12 million for 2001.**

(Dinallo Aff. at 21) (emphasis added).

## MERRILL LYNCH'S RESEARCH ANALYST REPORTS VIOLATED INTERNAL POLICY AND NASD AND SEC RULES AND REGULATIONS

61.    During the Class Period, Merrill Lynch's stated policy on the objectivity of its

research analyst opinions was clear:

> **Objectivity of Opinions**
>
> Opinions expressed by Analysts must be objective.  Any indication
> that a Research opinion is less than totally objective, or that it may
> have been influenced by a business relationship of the Firm, could
> seriously damage the Firm's reputation and lead to potential legal
> liability.  Consequently, although IBK or other personnel may
> discuss the basis and rationale of a Research opinion with
> Analysts, attempts to directly or indirectly influence an opinion are
> prohibited and must be reported immediately to Compliance.

(Merrill Lynch's Policy and Procedures Manual, at page 20 (ML 02063)).

62.    Typically, to achieve the type of objectivity the Merrill Lynch promised,

securities firms establish Chinese Walls between the investment banking and research groups:

> Tension between the various departments in a single firm is
> nothing new. At a securities firm, this tension is usually
> addressed by the establishment of a "Chinese Wall" .... [One]
> form of "Chinese Wall" attempts to prevent investment bankers
> from influencing analysts' ratings for the stock of existing or
> potential investment banking clients.

(Dinallo Aff. 14).

63.    The Chinese Wall tends to break down when analysts' compensation is affected

by his or her impact upon investment banking:

24

> The compensation structure of a securities firm can exacerbate the potential for an analyst to be conflicted. Where analysts' compensation is affected, directly or indirectly, by the analysts' contribution to investment banking, analysts' objectivity and independence can be seriously eroded.

(Dinallo Aff. at 14). This is what happened at Merrill Lynch.

64.     Moreover, Merrill Lynch's internal policies and procedures failed to deal with the conflict caused by its compensation scheme:

> Merrill Lynch's Policies and Procedures Manual for the Research Department (ML 02039, 02049) does not address the conflict raised by the compensation issue. Indeed, research analysts at Merrill Lynch were actively involved in evaluating and effectuating investment banking transactions. Moreover, **analysts' compensation was tied to the success of their efforts in this regard.**

(Dinallo Aff. at 14) (emphasis added).

65.     One of the conflicts of interest of Merrill Lynch's analysts was in the choices the analysts made regarding which companies Merrill Lynch covered. In particular, of the 29 Internet companies that the Defendants covered during the majority of the various class periods, Merrill Lynch or its affiliates had been a manager of the most recent offering of securities of 18 of them: eToys; EarthWeb; Excite@Home; 24/7 Media; Buy.com; iVillage; Barnesandnoble.com; Pets.com; Quokka; Safeguard Scientifics; DoubleClick; Webvan; AOL; Homestore.com; Inktomi; Internet Capital Group; Multex; and Priceline.

66.     The conflict caused the analysts to do more than just make their coverage choices based on investment banking concerns. The conflict also affected the substance of the opinions and recommendations issued. Indeed, throughout the relevant time period, the Internet Group linked (favorable) coverage with investment banking business:

The analysts in the Internet group at Merrill Lynch knew very well that investment banking business translated into compensation for them personally and the firm generally, and that their research played a role in attracting and keeping that investment banking business. (ML29830, ML03806, ML09544-51). In one revealing e-mail exchange, an analyst and investment banker discussed how to attract investment banking business of a company from a competitor. The banker proposed a formula that had apparently worked in the past with another banking client: **"we should aggressively link coverage with banking - that is what we did with** Go2Net **(Henry [Blodget] was involved) .... [I]f you are very bullish (b/c they will love you), they are not happy with [Goldman Sachs] and are going to be active, we can probably get by on a 'handshake.'"** (ML 05229-30). This e-mail lays bare the understanding that Merrill Lynch intended the prospect of affirmative research to attract investment banking clients.

(Dinallo Aff. at 15) (emphasis added).

67.    Blodget furthered this linkage by prioritizing the Internet Group's coverage to those firms with which Merrill Lynch had an investment banking relationship:

One way Blodget "prioritize[d] " research coverage for stocks was whether the company had an investment banking relationship with Merrill Lynch. (Blodget, Tr. at 207-08). Consistent with this agenda, **Blodget, within weeks of joining Merrill Lynch as head of the Internet research group, distributed a memorandum** entitled, "Managing the Banking Calendar for Internet Research," which he sent to the Co-Heads of U.S. Equity Research, and senior investment bankers. **The memorandum unapologetically described Blodget's expectation that at least 50 percent of his and his team's time would be allocated to investment banking matters. In addition to discussing "banking transactions [ ] in the pipeline" and "promising deals," the memorandum described Blodget's work schedule for one week as being divided "85% banking, 15% research."** (ML 34660-61). **Blodget's own time allocation reveals that Merrill Lynch viewed research as a sales tool for investment banking.**

(Dinallo Aff. at 15) (emphasis added).

68.    The prioritization led to an erosion of objectivity when it came time for Blodget

or the Internet Group to issue reports:

> The evidence examined to date confirms that the analysts'
> decisions about whether a stock should get coverage and what
> type of coverage it should receive were made neither
> objectively nor independent of the investment banking group.
> In one instance, an analyst stated that "part of the reason we
> didn't highlight [a risk] is because we wanted to protect ICG's
> [Internet Capital Group's] banking business." (ML 60807). In
> another communication, an analyst worried about the impact of
> a particular rating on the relationship with investment banking
> or its venture capitalists. (ML 60725). So pervasive was the tie
> between investment banking and research coverage, that when
> a competitor unexpectedly initiated coverage on the stock of a
> potential investment banking client, it prompted one Merrill
> Lynch analyst to respond, "they are angling for the M&A
> business too!" (ML 09032).

(Dinallo Aff. at 16).

69.    Blodget and the Internet Group knew that Merrill Lynch's reports could be

beneficial to Merrill Lynch's investment banking business:

> **Analysts conveyed to one another that they would
> "win brownie points" from investment banking if the
> investment bankers could assure a company that the
> analysts would cover its stock.** (ML 99103). **Implicit in this
> was that "coverage" would always be favorable.** Bankers, in
> turn, attempted to use the analysts to move the price of a stock
> to a level where research could be initiated, and so fulfill the
> promise of research coverage in exchange for banking work.
> One banker, who was frustrated by a stock's failure to reach the
> requisite price level of $10 before coverage could commence,[3]
> implored the Internet group to let the company speak at the
> group's upcoming conference that would be attended by many
> institutional investors – to promote Merrill Lynch's "active
> banking agenda" with the company and alleviate the company's
> unhappiness with the "research tie up" at Merrill Lynch. (ML
> 29750).

---

[3]"Pursuant to a consent decree entered into with the Securities and Exchange Commission in the 1970's, Merrill Lynch is prohibited from initiating coverage on stocks trading below $ 10. (Abbott Tr. at 84-85; ML 09151.) See also ML 02053." [footnote in original]

(Dinallo Aff. at 16–17) (emphasis added).

70.    Blodget and the Internet Group even let investment bankers comment and edit

analysts reports before they were issued, further eroding the Chinese Wall:

> **Investment banking also was involved in criticizing and editing the Internet group's reports for client companies, opining on whether a particular rating would be acceptable** and, in at least one instance, apparently opposing a proposed rating because "[there is no] interest in seeing initiation [of research coverage] at a 3-2 [rating]." (ML 03799). **Analysts openly discussed the conflict in e-mails, stating "the whole idea that we are independent from banking is a big lie - without banking this would be [rated] a 3-2."** (ML 09045).

(Dinallo Aff. at 17) (emphasis added).

71.    Merrill Lynch never disclosed the breakdown of the Chinese Wall between the

Internet Group analysts and investment banking:

> Merrill Lynch did not disclose to the public that the Internet group shared -- and at times appeared even to negotiate -- proposed ratings with the bankers and companies at issue, in clear violation of **Merrill Lynch policy that analysts "may not disclose proposed investment conclusions" to company management.** (ML02054). Indeed, **Blodget claimed not to even know of this prohibition.** (KC013). The results are intensely problematic: in one instance, a company agreed to a particular rating under the condition that its main competitor's stock would be downgraded to that same rating. It clearly violates Merrill Lynch's internal policies and **illustrates that the subsequent ratings were biased when a company is given advance notice of its stock rating and a voice in a competitor's downgrade.** (ML 09061). In another e-mail, an analyst reported that management of a company "do[es] not feel comfortable with us launching coverage of their stock. . . until [we] ... [can] come out wi[th] a buy rating." (ML 63362). The Internet group even contemplated giving coverage to a stock simply as an "accommodation for an important client," but only for six months, after which coverage would be dropped. (ML 36662).

28

(Dinallo Aff. at 22) (emphasis added).

72.    Merrill Lynch's scheme, including its rewards to the Internet Group analysts for generating investment banking business, not only created a significant conflict of interest, but it also led to substantial revenues for Merrill Lynch:

> From December 1999 to November 2000, the Internet group was involved in investment banking deals that -- on its own estimate -- produced approximately $115 million of revenue to Merrill Lynch. The list of the group's activities for that year included participating in the bankers' sales pitch to potential clients; marketing transactions to institutional investors once the bankers had obtained the assignment; and then initiating and doing "follow-on" research coverage. This list is eight single-spaced pages long and contains scores of banking deals. (ML 09544-51, Campbell Tr. at 73-83).

(Dinallo Aff. at 16).

73.    In short, and as attested in detail in the Dinallo Affidavit, Blodget and the rest of the analysts in the Internet Group were far from independent of their investment banking colleagues, and their tortured relationship helped drive both the selection of covered stocks and the ratings ultimately assigned.

74.    As a result, the integrity, credibility and reliability of Merrill Lynch's Internet Group was compromised, a fact never disclosed to investors throughout the Class Period. Had investors known of the lack of integrity, credibility and reliability of Merrill Lynch's Internet Group, they would not have purchased stocks based on any of the Internet Group's opinions and recommendations.

75.    Defendants' failure to issue objective and independent research reports reflecting their true opinions and beliefs violated numerous industry regulations. For example, National Association of Securities Dealers ("NASD") Rule 2210 (Communications with the Public)

29

provides, in pertinent part, that:

(1)    General Standards

(A) All member communications with the public shall be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts in regard to any particular security or securities or type of security, industry discussed, or service offered. No material fact or qualification may be omitted if the omission, in the light of the context of the material presented, would cause the communication to be misleading.

(B) Exaggerated, unwarranted or misleading statements or claims are prohibited in all public communications of members. In preparing such communications, members must bear in mind that inherent in investment are the risks of fluctuating prices and the uncertainty of dividends, rates or return and yield, and no member shall, directly or indirectly, publish, circulate or distribute any public communication that the member knows or has reason to know contains any untrue statement of a material fact or is otherwise false or misleading.

76.    Similarly, NASD Rule 2120 (Use of Manipulative, Deceptive or Other Fraudulent Devices) provides that:

No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance.

77.    NASD Rule IM-2310-2 (Fair Dealing with customers) provides, in pertinent part, that "[i]mplict in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing."

**DEFENDANTS EMPLOYED A MANIPULATIVE, FALSE AND MISLEADING RATINGS SYSTEM**

78.    During the Class Period, Merrill Lynch had a published uniform, company-wide rating system to be used by its analysts, including Blodget. Each analyst report was to set forth the analyst's "Opinion of Potential for Intermediate-Term Appreciation (0-12 Months)" and the analyst's "Opinion of Potential for Long-Term Appreciation (More Than One Year)." The recommendations or ratings for each of those time periods purportedly was one of the following:

- 1 - BUY;
- 2 - ACCUMULATE;
- 3 - NEUTRAL;
- 4 - REDUCE;
- 5 - SELL; or
- 6 - NO RATING

79.    The Defendants often described their ratings of a company by stating the Intermediate-Term rating, followed by a slash, followed by their Long-Term rating. For example, the ratings of a company that the Defendants rated an Intermediate-Term ACCUMULATE and a Long-Term BUY, would be denoted "ACCUMULATE/BUY."

80.    The Defendants also described their ratings using the numerical values assigned to each rating, as set forth above, by stating the number for the Intermediate-Term rating, followed by a dash and then stating the number for their Long-Term Rating. For example, the ratings of a company that the Defendants rated an Intermediate-Term ACCUMULATE and a Long-Term BUY, would be denoted "(2-1)."

81.    Merrill Lynch and Blodget misleadingly represented that their Ratings Criteria for the combined Intermediate-Term and Long-Term ratings on all of the Internet stocks that they rated, including 24/7 Media, were as follows:

Buy/Buy (1-1):

31

- Dominant leader with a clean story in a sector with strong growth prospects.
- Profitable or on a clear path to profitability within 2-3 quarters (in the more mature sectors).
- Strong cash position: enough to reach profitability with plenty left over for discretionary investment.
- Valuation attractive, or at least justifiable, on a multiple of visible earnings (or cash flow ("expensive" is okay, if fundamentals remain strong).
- Stock that we believe has a high likelihood of appreciating more than 20% within a year.
- High level of conviction about sector, company, management, and stock.

Accumulate/Buy (2-1):

- Strong company with good growth prospects in a promising sector, or dominant sector leader with issues that we expect to be resolved.
- Profitable or on a clear path to profitability within the next 12-18 months (again, in the more mature sectors).
- Solid near-term cash position – enough to reach profitability.
- Valuation justifiable on a multiple of visible earnings or cash flow, or too expensive to be a 1-1.
- Stock that we believe has a high likelihood of appreciating more than 20% in 1-2 years.

Accumulate/Accumulate (2-2):

- Good growth prospects
- Improving financial performance
- Valuation justifiable
- Some uncertainties or reservations remain

Neutral/Buy (3-1):

- Significant issues relating to intermediate-term outlook
- A business model which we believe fundamentally "works"
- Long-term should be okay.

Neutral/Accumulate (3-2):

- Challenging sector, or growth rate less than sector growth rate
- Not yet clear when able to turn profit
- Needs additional cash to turn profitable
- Significant uncertainties or reservations remain

82.     Merrill Lynch's internal documents demonstrate that the Merrill Lynch failed to disclose to the investing public the scheme that its research analysts' ratings did not comport with its own definitions.  According to the Attorney General:

> Although perhaps comforting to investment banking clients (who could be assured their stocks would never get a reduce or sell rating because "we don't cover anything below a 3" (OV 00276)), the de facto three-point system not surprisingly wreaked havoc amongst the various constituencies called upon to interpret and utilize the ratings, especially the retail public. While sophisticated institutional investors and equities traders may have recognized the de facto three-point scale, see (ML 55256-58) ("3-1 is a major red flag - short"), or may have specifically been told by the Internet group that, despite a stock's 3-1 rating there was nothing "interesting" about a company "except the [investment] banking fees" (ML 03806), the public and retail investors did not have such insight.

(Dinallo Aff. at 10).

83.     Unbeknownst to investors, from the time that Blodget began his employment at Merrill Lynch in February 1999 through April 8, 2002, the Internet Group had the policy and pursued the practice of virtually never giving an Internet stock rating or recommendation other than "BUY/BUY" or "ACCUMULATE/BUY."  Throughout that entire period of time, even as a number of stocks he covered declined substantially, Blodget never issued a single report in which he gave the company a "REDUCE" or "SELL" recommendation or rating.

84.     Indeed, at his August 1, 2001 deposition held at the Office of Attorney General, Blodget stated under oath as follows:

> Q.     Do you ever recommend in any of your research reports that one of the companies you cover should be a sell rating in Merrill Lynch?
>
> A.     No.
>
> Q.     Did any of the companies you cover, did Merrill Lynch go down in price?

A.    Many.

Q.    Did they go down dramatic in price, some of them?

A.    Yes.

Q.    Did you ever make those sell recommendations?

A.    No.

(Blodget Tr., pages 116-17).

85.    The Defendants maintained and concealed from the investing public that policy and practice because Defendants believed that giving an Internet stock a rating or recommendation of less than "ACCUMULATE/BUY" would have jeopardized Merrill Lynch's efforts to obtain investment banking and underwriting engagements and fees from the Internet companies they covered.

86.    The lack of candor with which Defendants wrote and issued their reports on Internet companies, and particularly Defendants' undisclosed uniform practice before and during the Class Period, of never publishing a rating or recommendation for an Internet stock other than "BUY" or "ACCUMULATE," was seen by the manner in which Defendants ceased coverage of an Internet company.  Specifically, when Defendants made the decision to stop issuing Analyst Reports regarding a particular Internet company, which could have been because they no longer saw any potential to obtain investment banking or underwriting fees as a result of that coverage, Defendants did not advise the investing public of that decision.  Despite the fact that they had previously been recommending the purchase of a company's stock, Defendants provided no guidance as to what investors should do with their stock holdings.  Rather, without notice or explanation, Defendants no longer issued reports regarding that stock.

34

87.     Because Defendants avoided the bottom two tiers of its rating system – reduce
and sell – Merrill Lynch's five-point system was a de facto three-point system:

> Although Merrill Lynch's published rating system provided
> for 4s (reduce) and 5s (sell), the Internet group never used 4s or 5s.
> The list of covered Internet stocks for the second quarter of 2000,
> for instance, lists 24 stocks, none of which was rated less favorably
> than a 2. (ML 03747). From the spring of 1999 to the fall of 2001,
> Merrill Lynch never published a single reduce or sell rating on any
> stock covered by the Internet group. In their sworn testimony, both
> Blodget and his subordinate, respondent Kirsten Campbell,
> confirmed that the group never rated a stock 4 or 5. (Blodget Tr. at
> 115-19; Campbell Tr. at 36). **Thus, although represented to be a
> five-point system, internally it became a three-point system. In
> lieu of assigning reduce or sell recommendations to stocks they
> no longer favored, the Internet group instead merely quietly
> stopped covering the stock, without any announcement or
> meaningful explanation to the retail public.** (ML87610).

> **Thus, as previously covered stocks such as Pets.com,**
> Mypoints.com, Quokka Sports, Webvan, iVillage, Buy.com, 24/7
> Media, E-Toys, Internet Capital Group, and **InfoSpace
> plummeted, sometimes all the way to zero, retail customers
> and the investing public were never advised to sell.** (ML 51690,
> ML 51833, ML 51997, ML 52195, ML 52516, ML 53160, ML
> 53161, ML 53162, ML 53181, ML 53507, ML 53612 and ML
> 53760; see also ML 87610).

(Dinallo Aff. at 9, emphasis added.)

88.     One example of Defendants avoiding the bottom two tiers of Merrill Lynch's
stock rating system was their handling of ratings for Internet Capital Group:

> The electronic communications of the Internet group feature many
> such exchanges. For example, on August 30, 1999, the group
> initiated coverage on the stock of Internet Capital Group (ICGE),
> an investment banking client, with a 2-1 rating. The stock closed
> on October 4, 2000 at $15.69, down from a high of $212 on
> December 22, 1999. **On October 5, 2000 with the stock at
> $12.38,** in an e-mail exchange with another senior analyst, **Blodget
> predicted the stock was, "going to 5."** (ML 63900). **The next
> day he wrote in an e-mail: "No helpful news to relate
> [regarding ICGE], I'm afraid. This has been a disaster... there**

really is no floor to the stock." (ML 63901). But even with these prognostications, **the public rating remained 2-1 and, when eventually downgraded on November 9, 2000, was changed only to a 2-2. The result was a continued recommendation to the investing public to purchase a stock about which the head of the Internet group was obviously exceptionally and accurately pessimistic, and for which he anticipated a drop of an additional 60 percent.** (ML 63900-01; ML 64077; ML 53507). Despite this pessimistic outlook, ICGE was on Merrill Lynch's list of the top ten technology stocks ( "Top Ten Tech" list), as late as September 12, 2000. (ML 62490-01).

***

Under this regime, even a 1-1, Merrill Lynch's highest investment rating, could not be trusted. In one example, **while a company's stock price was $96.50, the analysts, while reviewing a research note reiterating the 1-1 rating, wrote of the stock's prospects: "could go very low," "could hit $50 or $60 I think."** (ML 63652).

(Dinallo Aff. at 11-12) (emphasis added).

89.     The effect of avoiding the bottom two tiers of their rating system, as evidenced by the treatment of Aether Systems, was that the Internet Group rarely issued Analyst Reports that reflected their true opinions and were issued as part of the overall scheme to attract investment banking business:

The Aether [Systems] situation culminated in **a general indictment by Blodget of the Internet group's ratings. At the end of 2000, Blodget threatened to start to rate the stocks honestly, no matter what the investment banking consequences were.** His ultimatum was prompted by a long-time broker who felt burned by late downgrades of covered stocks. (ML 68401-02), and an e-mail from research management regarding downgrades. Blodget wrote:

> **The more I read of these, the less willing I am to cut companies any slack, regardless of predictable temper-tantrums, threats, and/or relationship damage that are likely to follow.**

36

> If you believe that this stance is a bad business decision for Merrill Lynch, please raise this with [senior management]. We all had to spend (waste) an unbelievable amount of time on the latest situation....**If there are no new email forthcoming from Andy [Melnick] on how the instructions below should be applied to sensitive banking clients/relations, <u>we are going to just start calling the stocks (stocks, not companies), including AETH, like we see them, no matter what the ancillary business consequences are.</u>**

> (ML 68402-02) ([underline] emphasis added [by Dinallo Affidavit].)  **Thus, by Blodget's own admission, as late as the end of 2000, the Internet group was <u>not</u> calling stocks as they saw them, but was permitting ancillary business consequences to taint their coverage.**

(Dinallo Aff. at 19 - 20, underline emphasis in original; bold emphasis added).

90.    Instead of issuing objective Analyst Reports in accordance with Merrill Lynch's published rating system, the Internet Group invariably looked to investment banking interests when deciding what ratings to give stocks:

> The conflicts and pressures that the research group experienced became particularly acute at the end of 2000 with respect to the mobile Internet company, Aether Systems ("AETH"). As of September 27, 2000, Merrill Lynch was doing a secondary equity offering for the company, and the Internet group was involved. (ML 09546). During what was supposed to be a confidential telephone conversation about the mobile Internet sector, Merrill Lynch research analyst respondent Virginia Sayer discussed Aether, InfoSpace ("INSP") and Phone.com ("PHCM"), but chose Phone.com - on which Merrill Lynch then had no coverage and to which it then provided no banking services - as having the "the best real business opportunity." (ML 63333-35, ML 095445 1). When the comments were e-mailed to a large number of recipients, Blodget chastised Eric Welland of Merrill Lynch's London office for "blast[ing] the contents out to the whole sales force". (ML 63333-35). Sayer concurred, "it could impair our relations w/ those companies we do cover. We are marketing a big secondary for AETH[ ], and we were [banking] advisor in its sale to INSP. This is the sort of email that gets forwarded by a

37

salesperson, and could very well get[ ] sent directly to any of these
companies." The Internet group's desire that accurate assessments
be distributed to the public was clearly subservient to the desire to
maintain investment banking's relationship with Aether.

(Dinallo Aff. at 17-18).

91.    The Attorney General's office concluded that the reason for this failure to disclose

was, at least in part, "the substantial unrevealed conflict of interest" involving Merrill Lynch's

research analysts acting as investment bankers for the companies at issue, often initiating,

continuing, and/or manipulating research coverage for the purposes of attracting and keeping

investment banking clients, thereby producing misleading ratings that were neither objective,

independent credible or reliable, as they purported to be.  (Dinallo Aff. at 10.)

**DEFENDANTS' INTERNAL DOCUMENTS DEMONSTRATE THAT DEFENDANTS
BASED THEIR ANALYST REPORTS' RECOMMENDATIONS ON MERRILL
LYNCH'S ABILITY TO OBTAIN OR MAINTAIN UNDERWRITING AND
INVESTMENT BANKING BUSINESS**

92.    All of the Internet Group's Analyst Reports were deceptive and misleading

because the Defendants failed to disclose that they had based their decisions as to which

companies to cover and what to say about those companies on Merrill Lynch's efforts to obtain

and/or retain underwriting and investment banking engagements from those companies or others.

93.    The Internet Group's Analyst Reports, and particularly, the Defendants'

"ACCUMULATE/BUY" and "BUY/BUY" recommendations were materially misleading

because they failed to disclose that Merrill Lynch and Blodget had a policy and practice of

virtually never issuing an analyst report on an Internet company, including, for example, 24/7

Media, in which their rating or recommendation with respect to the stock of that company was

other than a "BUY/BUY" or "ACCUMULATE/BUY."  Defendants maintained that policy and

practice, regardless of whether there was any rational economic basis for those recommendations

that the applicable company's stock be acquired, because if the Defendants had assigned an Internet company a rating of less than "ACCUMULATE/BUY," it would have jeopardized Merrill Lynch's ability to obtain underwriting or investment advisory engagements from those companies or others.

94.    The Analyst Reports were materially misleading because the Defendants did not disclose in the Reports the massive scheme to defraud the investing public in connection with the purchase and sale of the publicly-traded securities of numerous Internet-related companies by issuing false and misleading positive Analyst Reports.

95.    The Internet Group's Analyst Reports were deceptive and materially misleading because they failed to disclose that Defendants' "ACCUMULATE/BUY" and "BUY/BUY" recommendations and the price targets lacked a reasonable basis in fact.

96.    The Dinallo Affidavit also sets forth testimonial and documentary evidence regarding the materially misleading nature of the Defendants' Analyst Reports on other Internet companies, and the Defendants' scienter in issuing those reports.  That evidence demonstrates that the Defendants, during the Class Period, engaged in a pattern and practice of and a scheme of issuing false and deceptive Analyst Reports on Internet companies.  That evidence provides further support for the claims herein that Defendants acted knowingly, purposely and with the intent to defraud when they issued the Analyst Reports.

97.    As Defendants continued to issue favorable Analyst Reports for Internet companies, its Internet Group analysts concealed from the public their true opinions of the covered companies:

> ...the public was unaware that while **the Internet group** was contemplating a 3 (neutral) rating on selected stocks, **internally they were saying amongst themselves that the stock was "going**

> a lot lower," (ML 09045), **that the company was "crap,"** (ML
> 51453, 37899), **or a "dog"** (ML 37700). Nor was the public told
> that while the Internet group was contemplating a 2 (accumulate)
> rating on a variety of stocks, internally -- and to selected
> institutional investors -- the analysts were saying that there was
> **"[no] reason to buy more of' the stock and its business was
> "falling apart,"** (ML 74038), **"[n]o reason to own"** the stock,
> (ML 09045), or that the group expected the stock to be "flat" over
> the next six months without "any real catalysts [for change]" (ML
> 37956). **The public also was not told that the group internally
> disparaged other stocks rated 2 as a "piece of shit,"**(ML 60903,
> 64372), **and "such a piece of crap."** (ML 51453).

(Dinallo Aff. at 10-11) (emphasis added).

98.     The Internet Group analysts also concealed the investment banking influences on

its opinions and published Analyst Reports:

> **Research management itself acknowledged that "we are off
> base on how we rate stocks and how much we bend backwards
> to accommodate banking etc."** (ML 64239). A host of e-mails
> demonstrate research management's knowledge and understanding
> of the conflicts, pressures, and confusion. <u>See, e.g.,</u> (ML 66935,
> ML 60847, ML 60865-66, ML 03607-08, ML 87610).

(Dinallo Aff. at 17) (emphasis added).

99.     Merrill Lynch not only failed to disclose the lack of independence of Blodget and

the other Merrill Lynch research analysts, and their conflicts of interest, but Merrill Lynch also

instructed Blodget to directly and overtly lie to the public on television, in order to maintain the

appearance that its research analysts, including Blodget, were independent of Merrill Lynch's

investment banking group.  For example, as attested in the Dinallo Affidavit:

> **[T]he public was specifically told that the Internet group
> analysts were independent, objective and unbiased.** (ML 85893;
> see also ML 02039,02063). Knowing that such conflicts existed,
> and that members of the research group routinely acted as quasi-
> investment bankers, Merrill Lynch pretended there was a clear
> division, thereby enhancing the analysts' credibility. Thus, prior to

the head of the Internet group [Blodget] appearing on television, he
was reminded,

> **CNN called and wanted to know if we are in the
> AOL deal as an advisor.** Head of media relations
> gave them a no comment. **<u>If you are asked on
> Moneyline interview about that say something to
> the effect that you are not in the loop on that as
> you are in research not banking.</u>**

(ML 41152) ([underline] emphasis added [by Dinallo Affidavit]).

(Dinallo Aff. at 20, bold emphasis added).

## SPECIFIC EXAMPLES OF DEFENDANTS' CONFLICT OF INTEREST IN ISSUING THE FALSE AND MISLEADING ANALYSTS REPORTS

100.    The Internet Group's contemporaneous internal analyses and opinions

demonstrate that their Analyst Reports were based on Defendants' desire to obtain or maintain

investment banking business, not on its publicly published rating system:

| Company | Date | Contemporaneous Analyst Comments | Published Rating |
|---------|------|----------------------------------|------------------|
| Aether System (AETH) | 03/15/01 | "might have announcement next week...which could pop stock...but fundamentals horrible" (ML 82578) | 3-1 |
| Excite@home (ATHM) | 12/27/99 12/29/99 | "we are neutral on the stock". Six month outlook is "Flat", without any "real catalysts" for improvement seen (ML 37899; ML 37956) | 2-1 |
| Excite@home (ATHM) | 06/03/00 | "such a piece of crap" (ML 51453) | 2-1 |
| GoTo.Com (GOTO) | 1/11/01 | Nothing interesting about company "except banking fees" (ML 03806) | 3-1 |
| InfoSpace | | "this stock is a powder keg, | |

| (INSP) | 7/13/00 | given how aggressive we were on it earlier this year and given the 'bad smell' comments that so many institutions are bringing up" (ML 06413) | 1-1 |
|---|---|---|---|
| InfoSpace (INSP) | 10/20/00 | "piece of junk" (ML 06578) | 1-1 |
| Internet Capital Group Inc. (ICGE) | 10/05/00 | "Going to 5" (closed at $12.38) (ML 63901) | 2-1 |
| Internet Capital Group Inc. (ICGE) | 10/06/00 | "No hopeful news to relate....We see nothing that will turn this around near-term. The company needs to restructure its operations and raise additional cash, and until it does that, there is nothing positive to say." (ML 64077) | 2-1 |
| Lifeminders (LFMN) | 12/04/00 | "POS" (piece of shit) (ML 60903) | 2-1 |
| 24/7 Media (TFSM) | 10/10/00 | "piece of shit" (ML 64372) | 2-2 |

(Dinallo Aff. at 12 - 13).

## BLODGET'S RESIGNATION AS A MERRILL LYNCH INTERNET ANALYST

101.    On November 14, 2001, it was announced that Blodget, who accepted Merrill

Lynch's offer to buy him out for approximately $2 million, was resigning from Merrill Lynch.

102.    Post mortems on Blodget's resignation recounted that Merrill Lynch hired

Blodget because his high profile, bullish reports on Internet stocks would help Merrill Lynch

obtain investment banking and underwriting business in the Internet sector:

> Jonathan Cohen, the man he replaced at Merrill Lynch, ended
> up being right.  Henry ended up being wrong.  Merrill had
> always been looking for real strength in technology banking
> especially, where they had a weakness to a certain extent.  They
> felt that by hiring Blodget, such a cheerleader for the Internet

42

> sector, they would position themselves well with many
> companies. They did get some underwriting business out of it.
> Unfortunately, many of those issues did not do much of
> anything.

(November 15, 2001, the CNBC television program "Squawk Box")

103.    Similarly, the November 16, 2001 issue of the *Financial Post*, in an article

entitled "' King Henry' Begins New Chapter: Merrill's Faded Dot-Com Guru Resigns to Write

Book," reported as follows:

> At the height of dot-com bonanza, Mr. Blodget - once dubbed
> "King Henry" in industry circles - had the ability to send stocks
> soaring or sinking by simply speculating about their prospects.
>
> * * *
>
> Those bullish days now seem like long ago. Many dot-coms
> Mr. Blodget touted have gone out of business or had most of
> their value wiped out. Mr. Blodget's credibility took a huge
> blow in August, 2000 when he lowered his recommendations
> on 11 of the 29 Internet stocks he covered. The problem was
> that by then, most of them, including Pets.com and Buy.com,
> had already tumbled 75%.

**MERRILL LYNCH'S SETTLEMENTS WITH THE NEW YORK STATE ATTORNEY GENERAL**

104.    On April 18, 2002, Merrill Lynch entered into a $100 million agreement with the

New York State Attorney General to settle claims concerning research analysts' conflict of

interest and the firm's publication of inflated stock ratings in Analyst Reports. As part of the

settlement Merrill Lynch agreed to increase its disclosures regarding its research reports as

follows:

> - By April 24, 2002, Merrill Lynch will implement a
>   website that will disclose, for companies covered in
>   research reports, those companies which have engaged in
>   publicly announced equity underwritings and merger and
>   acquisition transactions over the prior 12 months, for

43

which Merrill Lynch has received, or is entitled to
receive, compensation.  Language directing readers to the
website will be included in research reports.

- By June 3, 2002, Merrill Lynch will replace its website
disclosure by stating in equity research reports whether it
has received, or is entitled to receive from the covered
company, compensation from publicly announced equity
underwriting and merger and acquisition transactions
over the prior 12 months.

- By June 3, 2002, Merrill Lynch will include language on
the first page of equity research reports stating that
investors should assume that Merrill Lynch is seeking, or
will seek investment banking and other business from the
covered company.

- By June 3, 2002, Merrill Lynch will include in equity
research reports specific disclosure, on a percentage
basis, for the intermediate-term "strong buy," "buy,"
"neutral," and "reduce/sell" ratings for stocks in the
following categories:

    1.    All stocks in the sector or industry group
          applicable to the covered company.

    2.    All stocks in the applicable sector or industry
          group from which Merrill Lynch has received or
          is entitled to receive compensation for publicly
          announced equity underwriting and merger and
          acquisition transactions over the prior 12 months.

    3.    All stocks covered by Merrill Lynch Global
          Equity Research.

    4.    All stocks covered by Merrill Lynch Global
          Equity Research from which Merrill Lynch has
          received or is entitled to receive compensation for
          publicly announced equity underwriting and
          merger and acquisition transactions over the prior
          12 months.

(Merrill Lynch April 18, 2002 Press Release).

    105.    On April 26, 2002, David Komansky, Chairman and Chief Executive Officer of

Merrill Lynch, publicly "apologized" for the Defendants' conduct described herein. Komansky, on behalf of Merrill Lynch, acknowledged that the Defendants' conduct failed to meet professional standards. He said:

> The e-mails that have come to light are very distressing and disappointing to us,....They fall far short of our professional standards and some are inconsistent with our policies.

106.    In his April 26, 2002 statement Komansky also admitted that Merrill Lynch's purported policies had not been enforced by Merrill Lynch, stating that Merrill Lynch was "redoubling" its efforts to enforce its existing policies.

107.    On May 21, 2002, Merrill Lynch reached a final settlement with the New York State Attorney General in connection with the Attorney General's Section 354 proceedings against Merrill Lynch.

108.    Pursuant to that settlement, Merrill Lynch agreed to pay a fine of $100 million and agreed to the following changes in its research analyst operations:

- Sever the link between compensation for analysts and investment banking. The agreement requires Merrill Lynch to separate completely the evaluation and determination of compensation for equity research analysts from Merrill Lynch's investment banking business.

- Prohibit investment banking input into analysts' compensation. Merrill Lynch is forbidden from soliciting or considering any information concerning the amount of investment banking revenue received from clients covered by the research analysts and prohibiting the analysts from being evaluated by investment bankers.

- Create a new investment review committee responsible for approving all research recommendations with strict standards and independence from investment banking and the analysts themselves.

- Establish a monitor to ensure compliance with this agreement. The appointment of the monitor is subject to the approval of the Attorney General.

- Require that upon discontinuation of research coverage of a company, Merrill Lynch will issue a report disclosing the termination of coverage and the rationale for such termination, and will notify investors that the last rating should no longer be relied upon.

- Disclose in Merrill Lynch's research reports whether it has received or is entitled to receive any compensation from a covered company over the past 12 months.

- Issue a statement of contrition on the part of Merrill Lynch for failing to address conflicts of interest.

109.    Pursuant to the settlement, Merrill Lynch issued the following statement:

Merrill Lynch would like to take this opportunity, as part of the agreement reached with New York State Attorney General Eliot Spitzer and other states, to publicly apologize to our clients, shareholders and employees for the inappropriate communications brought to light by the New York State Attorney General's investigation. We sincerely regret that there were instances in which certain of our Internet sector research analysts expressed views that at certain points may have appeared inconsistent with Merrill Lynch's published recommendations.

We view this situation as a very serious matter and have informed our research department personnel that such communications, some of which violated internal policies, failed to meet the high standards that are our tradition and will not be tolerated.

As a result we have taken steps to guard against such instances in the future. In addition, we are taking steps to reinforce the firewalls that separate our research department from investment banking. The agreement we have reached with the State Attorney General is designed to accomplish these objections....

## DEFENDANTS' SCHEME AS IT RELATES TO 24/7 MEDIA AND DEFENDANTS' FALSE AND MISLEADING STATEMENTS CONCERNING 24/7 MEDIA

110.    24/7 Media provides marketing solutions to the digital advertising industry. The

Company's business is organized into two principal lines of business: Technology Solutions and Integrated Media Solutions. 24/7 Media connects advertisers to audiences through its Integrated Media Solutions, which include four products: the 24/7 Network of marquee branded Websites and niche Websites; permission-based e-mail databases; a comprehensive promotions suite; and a search engine results listings service.

111.    On August 13, 1998, 24/7 Media had its initial public offering. Defendant Merrill Lynch acted as 24/7 Media's lead underwriter of the offering and was obligated, as stated in 24/7 Media's August 14, 1998 Prospectus filed with the SEC on Form 424B1 to purchase 1.51 million shares of the total 3.25 million offered. The shares were offered at $14 per share with an underwriting discount of $.98 per share. Thus Merrill Lynch made at least $1,479,800 in disclosed underwriting fees, which does not include fees earned from "over-allotments" or "spinning."

112.    On September 8, 1998, following the mandatory quiet period, Merrill Lynch issued an Analyst Report initiating coverage of 24/7 Media with an ACCUMULATE/BUY rating.

113.    On April 27, 1999, 24/7 Media issued additional common stock through a Secondary Offering of 3.5 million shares priced at $46.00 per share. In this firm commitment offering, Defendant Merrill Lynch again acted as 24/7 Media's lead underwriter, and was obligated, as stated in 24/7 Media's April 28, 1999 Prospectus filed with the SEC on Form 424B1 to purchase 700,000 shares of the total 3.5 million offered. The shares were offered at $46 per share with an underwriting discount of $2.53 per share. Defendant Merrill Lynch thus earned approximately $1,771,000 in underwriting fees, which does not include fees earned from "over-allotments" or "spinning."

114.    The Class Period begins on May 12, 1999 when Defendant Blodget took over coverage for 24/7 Media and Defendants issued an Analyst Report reiterating the previous

ACCUMULATE/BUY rating and setting a 12-month target price of $75.  At the time the report

was issued, 24/7 Media was trading at $45.125 per share.

115.    The issuance of the May 12, 1999 Analyst Report came within weeks after 24/7

Media' Secondary Offering, which earned Defendant Merrill Lynch more than $1.7 Million in

investment banking fees,

116.    At the close of trading on August 11, 1999, 24/7 Media common stock had dropped

to $26.75.  The next day, August 12, 1999, Defendants issued another Analyst Report upgrading

24/7 Media stock to a BUY/BUY rating.  At the close of trading on August 12, 1999, 24/7 Media

shares had surged ahead and closed at $29 per share.

117.    On September 9, 1999, Defendants issued another Analyst Report reiterating the

BUY/BUY rating and setting a 12-month target price of $40.  At the time the report was issued,

24/7 Media was trading at $35.25 per share.  In the Analyst Report, Defendants raised their 1999

revenue estimates from $72 to $84 million and 2000 revenue estimates from $130 to $155 million.

They further wrote:

> We believe TFSM remains significantly undervalued relative to
> comparable stocks based on a discounted P/E, revenue multiplier, or
> sum-of-the-parts valuation basis.  We believe the valuation is
> depressed, in part, because over the last few quarters we have had to
> successively revise EPS downwards.  We believe the multiplier will
> expand once the company demonstrates that this revised model is
> solid.
>
> Management firmly believes that this model is solid, with substantial
> topline and bottomline upside.  Based on this assurance, we reaffirm
> our Buy rating and a $40 dollar price objective.

118.    Less than one week later, on September 15, 1999, Defendants issued another

Analyst Report, reiterating the BUY/BUY rating and the 12-month target price of $40.  At the time

the report was issued, 24/7 Media was trading at $28 per share.

48

119.    On September 30, 1999, Defendants issued another Analyst Report reiterating the

BUY/BUY rating but dropping the 12-month target price. At the time the report was issued, 24/7

Media was trading at $34.375 per share.

120.    On November 3, 1999, Defendants issued another Analyst Report reiterating the

BUY/BUY rating. At the time the report was issued, 24/7 Media was trading at $44.625 per share.

In this Analyst Report Defendants stated:

> We believe TFSM remains undervalued relative to comparable
> stocks, especially in light of recent acquisition activity in the sector
> (which actively obviously makes TFSM a much more acquisition
> target). We plan to revisit our price target after the Company reports
> Q3.

*      *      *

> We believe 24/7 has substantial value on a breakup basis as well.
> 24/7 owns 1.6 million shares of China.com and 5.2 million shares of
> Shopnow.com, together worth approximately $150 million. The
> public market value of Yesmail (its most direct competitor) suggests
> $40 per email address, or a valuation of approximately $480 million
> for 24/7 Mail. $1.1 billion in total market value for 24/7 less its
> public investments and the value of the Mail business implies a
> residual value of only $450 million for the Ad Network business, or
> only 3.2x the over $140 million we expect it will generate next year.

Shares of 24/7 Media closed up that day nearly $6 per share at $51.1875.

121.    One week later, on November 10, 1999, Defendants issued another Analyst Report

reiterating the BUY/BUY rating. At the time the report was issued, 24/7 Media was trading at

$52.6875 per share. In this Analyst Report Defendants reviewed 24/7 Media's Q3 results and again

discussed the value of 24/7 Media. Defendants wrote:

> TFSM remains undervalued on a relative and breakup basis, and we
> think our projections have topline and bottomline upside. We are
> maintaining our estimates and rating.

122.    On December 9, 1999, Defendants issued another Analyst Report reiterating the

49

BUY/BUY rating. At the time the report was issued, 24/7 Media was trading at $54 per share. In

this Analyst Report Defendants again stressed that 24/7 Media was worth more broken-up.

Defendants wrote:

> We believe 24/7 remains undervalued both on a revenue multiple (at
> 8x 2000E revenues) and breakup valuation basis. Trading levels of
> standalone email marketers implies a valuation for 24/7 Mail of
> approximately $700mm. 24/7's stakes in China.com and ShopNow
> are together worth $320mm.

Shares of 24/7 Media closed up that day nearly $4 per share at $58.125. The following day, 24/7

Media shares surged again, closing on December 12 at $63.4375.

123.    On December 20, 1999, Defendants issued another Analyst Report reiterating the

BUY/BUY rating and raising the 12-month target price to $85. At the time the report was issued,

24/7 Media was trading at $61.75 per share. In this Analyst Report, Defendants wrote:

> We believe that 24/7 Media is undervalued relative to its peers on
> both a revenue multiple and a breakup valuation basis, especially
> given the market's recent performance.

> *        *        *

> A breakup valuation implies a value for the core ad network business
> of less than 5x its 2000E revenues of $140 million. Of 24/7's $1.6
> billion in market value, publicly traded stakes in China.com and
> Shopnow are worth approx. $400 million. The email business is
> worth about $400-$700 million, and is growing in value, in our view.

124.    On January 11, 2000, Defendants issued another Analyst Report reiterating the

BUY/BUY rating and the recently raised 12-month target price of $85. At the time the report was

issued, 24/7 Media was trading at $48.375 per share.

125.    On February 18, 2000, Defendants issued an Internet Services Industry Report,

discussing regulatory and government scrutiny of online privacy and reiterating the BUY/BUY

rating. At the time the report was issued, 24/7 Media was trading at $46.125 per share.

126.    On March 1, 2000, Defendants issued another Analyst Report reiterating the

BUY/BUY rating.  At the time the report was issued, 24/7 Media was trading at $46.5 per share.  In

this Analyst Report, Defendants wrote, "The company will likely have a strong quarter on the

revenue line, which might act as a near-term positive catalyst."

127.    On March 6, 2000, Merrill Lynch Internet analyst Virginia Syer (who reported to

Defendant Blodget and co-authored many of the 24/7 Media Analyst Reports) drafted an Analyst

Report detailing the launch of a proprietary system by 24/7 Media and previewing Q4 1999 results.

Syer e-mailed the draft to Blodget for his approval and commented that she was **"trying to be**

**oblique to help stock in anticipation of downgrade on wed[nesday] - so we can say we were**

**expecting great Q4."** (ML 43008) (emphasis added).

128.    On March 7, 2000, Defendants issued another Analyst Report reiterating the

BUY/BUY rating.  Defendants backpedaled from their perceived negative comments in the March

1, 2000 24/7 Media Analyst Report, stating:

> Yesterday, 24/7 Media (finally) announced the launch of 24/7
> Connect, its proprietary ad serving system. The company is in the
> process of transitioning all of its network publishers from AdForce to
> 24/7 Connect. The company expects to complete the conversion of its
> U.S. clients by Q2.

*        *        *

> Although it is unclear how many clients, or how much of 24/7's
> inventory (which we estimate to be over 9B for Q4) has been
> converted to Connect, today's announcement would suggest that the
> transition is proceeding smoothly.

The market reacted strongly to the issuance of Defendants' report.  Shares of 24/7 Media closed up

that day nearly $2 per share at $53.5.  The following day, 24/7 Media shares surged again, closing

on March 7 at $55.125.

129. Just two days later, on March 9, 2000, Defendants issued another Analyst Report reiterating the BUY/BUY rating. At the time the report was issued, 24/7 Media was trading at $55.125 per share.

130. Four days later, on March 13, 2000, Defendants issued another Analyst Report reiterating the BUY/BUY rating and the 12-month target price of $85. At the time the report was issued, 24/7 Media was trading at $60 per share. In this Analyst Report, Defendants described an "upbeat analyst day" and wrote:

> We are maintaining our Buy rating and our $85 price objective, which we agree, still represents substantial underperformance to the sector. $85 values TFSM at 16x 2000E revenues, vs. DCLK at 28x and ENGA at 60x.

131. On April 5, 2000, Defendants issued an Internet Services Industry Report, previewing 24/7 Media's 1Q 2000 earnings. This Report reiterated the BUY/BUY rating for 24/7 Media and stated that Defendants felt there was an "Upside to revenue and EPS" for 24/7 Media. The Report also commented:

> The total market capitalization of the Internet sector is now more than $1 trillion, up from $1 billion in 1995. The total number of public internet companies is also now more than 400, up from 1 in early 1995 (AOL). Although these statistics illustrate the truly spectacular value-creation the Internet opportunity has produced thus far (as far as we know, no other opportunity has created so much market value in so short a time), we continue to believe that over the long-haul, the market value of the sector will grow to at least 2X-3X today's.

132. On May 5, 2000, Defendants issued another Analyst Report reiterating the BUY/BUY rating. At the time the report was issued, 24/7 Media had slumped considerably and was trading at $20.875 per share. In this Analyst Report, Defendants detailed 24/7 Media's litigation with competitor DoubleClick. They wrote:

52

This lawsuit demonstrates 24/7's belief that it can do more than just defend Sabela against DoubleClick's allegations, however, and that it actually has grounds to go on the offensive, based on its earlier filed patent.

Investors should also note that 24/7 will be reporting Q1 results this Wednesday after the close. For Q1, we are estimating $39mm in revenues and $0.53 in EPS. We expect the Company to comfortably exceed these estimates topline and bottomline, and would expect to increase our 2000 estimates, which currently stand at $220mm in revenue and $1.95 in EPS.

133.    Less than one week later, on May 11, 2000, Defendants issued another Analyst Report reiterating the BUY/BUY rating. At the time the report was issued, 24/7 Media had fallen even further and was trading at $18.5 per share.

134.    The very next day, as 24/7 Media continued to slide, Defendants issued another Analyst Report reiterating the BUY/BUY rating. At the time the report was issued, 24/7 Media was trading at $17.625 per share. In this Analyst Report, Defendants stressed that:

This note clarifies our comments yesterday with regard to 24/7 Media's cash position.

• We believe 24/7 Media has enough cash and marketable securities to reach profitability.

• We estimate that 24/7 is burning approximately $25mm in cash a quarter and will need more than $100mm in cash to reach profitability. The company currently has $28mm in cash, $200mm in China.com stock, and $40mm from Exactis (expected to close this summer), for a total of $268mm in cash and marketable securities. Given the volatility of internet stocks, we would more conservatively value the $200mm in China.com stock at perhaps half its current trading value.

• Therefore, we think 24/7 Media probably has about $150mm in liquid assets (following the closing of Exactis). Assuming no change to the projections, this should be enough cash to reach profitability in late 2002.

53

The market again reacted to the issuance of Defendants' report. Shares of 24/7 Media reversed their downward slide and trended upwards over the next few trading days to close on May 17 at $23.125, up nearly $6 per share.

135.   On June 6, 2000, Defendants issued another Analyst Report reiterating the BUY/BUY rating. At the time the report was issued, 24/7 Media had again retreated and was trading at $15.375 per share. In this Analyst Report, Defendants stated that "We are not making any change to our model…and are still looking for profitability in mid-2002."

136.   On July 5, 2000, Defendants issued an Advertising & Publishing Research Report which reiterated the BUY/BUY rating for 24/7 Media.

137.   On August 7, 2000, with 24/7 Media trading at 11.4375, down more than $53.1875 from its class period high, Defendants disseminated an Internet Commerce Industry Research Report. The Report adjusted Defendants ratings on various Internet companies, including 24/7 Media, which was downgraded to an ACCUMULATE/ACCUMULATE rating.

138.   On August 11, 2000, when 24/7 Media was trading at $10 1/16, Defendants issued another Analyst Report, reiterating the ACCUMULATE/ACCUMULATE rating. Though the report did not reiterate the previously announced 12-month target price of $85, Defendants did not lower the price target.

139.   On October 10, 2000, Merrill Lynch analyst Eve Glatt e-mailed Blodget a news article about software glitches at 24/7 Media. In her e-mail, Glatt comments that the article "probably confirms what you and Virg[inia Syer] have talked about **for some time.**" Blodget responded, "**that it's a pos? yes.**" (ML 64373). Later in this e-mail exchange, Blodget provides a decoder for his abbreviations:

lol     =     laughing out loud

| gt   | = | great                |
|------|---|----------------------|
| pos  | = | piece of shit        |
| nfw  | = |                      |
| pls  | = | puhleeeeez           |
| imho | = | in my humble opinion |

(ML 64372).

140.    The Class Period ends on November 9, 2000 when Defendants downgraded 24/7 Media to NEUTRAL/NEUTRAL.  At the time of the downgrade, 24/7 Media was trading at $4.64 per share.  In this Analyst Report, for the first time, Defendants acknowledged that 24/7 Media's equity investment in China.com was not as liquid as previously touted:

> We estimate that TFSM burned at least $40MM in the quarter ($26MM change in cash + $16MM gain on sale of stock). At this point (with no balance sheet info yet) we can only account for $27MM of the burn ($23MM loss from operations + $4MM Capex). We assume the difference is primarily the result of slower receivable payments. At the end of Q3, the company had $23.1MM in cash and as of yesterday has about $74MM in tradable securities (4.9MM shares of China.com [China D-2-1-9 $12.31], 4.3MM shares of Network Commerce and about 100,000 shares of i3 Mobile). Put succinctly, without the sale of these securities or raising add'l funds, the company will run out of cash in the next few months. **24/7 has board seats on both China.com and Network Commerce and thus is unable to sell shares during certain insider trading windows.** (emphasis added)

141.    In response to the issuance of Defendants' report, the price of 24/7 Media shares fell by more than 36%, from a close of $4.64 on November 8, 2000 to close at $2.9375 on November 9, 2000 on unusually heavy volume.

**THE 24/7 MEDIA ANALYST REPORTS WERE MISLEADING AND MANIPULATIVE**

142.    All of the 24/7 Media Analyst Reports issued by Defendants from May 12, 1999 through November 9, 2000, which are discussed herein, are collectively referred to herein as the "24/7 Media Analyst Reports."

143.    Defendants knew the issuance of the 24/7 Media Analyst Reports would raise or maintain the price of 24/7 Media securities at artificially high levels, compared to the price levels

55

that would have prevailed had the 24/7 Media Analyst Reports not been issued. Defendants issued the 24/7 Media Analyst Reports with the intention of increasing and inflating the price at which 24/7 Media securities would trade.

144.     When Defendants initiated their coverage of 24/7 Media, the common stock was trading at $45 per share. During the time period that Defendants issued the 24/7 Media Analyst Reports, the common stock climbed as high as $64.625 per share. After the close of the class period, when Defendants belatedly downgraded their rating, 24/7 Media common stock fell to $2.9375, down more than 95% from the Class Period high.

145.     Defendants issued the 24/7 Media Analyst Reports as part of Merrill Lynch's effort to obtain or maintain substantial investment banking and advisor fees, which it would obtain as the financial advisor to 24/7 Media in connection with potential IPOs, secondary offerings, acquisitions or mergers.

146.     As detailed above, in each of the 24/7 Media Analyst Reports, Defendants set forth a "Reason for Report." That "Reason for Report" was false and misleading because, in fact, the reason that Defendants had issued each of the 24/7 Media Analyst Reports was to assist Merrill Lynch in its efforts to obtain or maintain investment banking fees and to artificially inflate the price of 24/7 Media securities.

147.     The 24/7 Media Analyst Reports were deceptive and misleading because Defendants failed to disclose in those Reports that Defendants had based their decisions as to which companies to cover in their Analyst Reports and as to what they would say in those reports regarding those companies on the impact which those actions would have on Merrill Lynch's ability to obtain underwriting and investment banking engagements from that company or others.

56

148.    The 24/7 Media Analyst Reports, and particularly, Defendants' "ACCUMULATE" and "BUY" recommendations of 24/7 Media securities in those reports, were deceptive and misleading because they failed to disclose that Merrill Lynch and Blodget had a policy and practice throughout the Class Period of never issuing an analyst report on an Internet company in which their rating or recommendation of the securities of that company was other than a "BUY" or "ACCUMULATE." Defendants maintained that policy and practice, regardless of whether there was any rational economic basis for the recommendations that the applicable company's securities be acquired, because if Defendants had assigned an Internet company a rating of less than "BUY" or "ACCUMULATE" it would jeopardize Merrill Lynch's ability to obtain underwriting or investment advisory engagements from those companies or others. The 24/7 Media Analyst Reports were deceptive and misleading because Defendants did not disclose in those Reports the existence of, and Defendants' reason for, the above-described rating policy and practice.

149.    The 24/7 Media Analyst Reports were deceptive and materially misleading because they failed to disclose Defendants' "ACCUMULATE" or "BUY" recommendations of 24/7 Media lacked a reasonable basis in fact and were, in actuality, nothing more than undisclosed "momentum" plays – i.e. the stock should be bought because its price will rise, even though there are no rational economic reasons why the stock should trade at its current price and no rational economic reasons why the stock price should continue to rise.

**STATUTORY SAFE HARBOR**

150.    The statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the false forward-looking statements pled in this Complaint. None of the forward-looking statements pled herein were sufficiently identified as a "forward-looking statement" when made, nor did meaningful cautionary statements identifying

57

important factors that could cause actual results to differ materially from that in the forward-looking statements accompany those statements. To the extent that the statutory safe harbor does apply to any forward-looking statements pled, the defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by defendants who actually knew that those statements were false when made.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

151.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.  The following Counts are brought pursuant to the Exchange Act alleging that public representations failed to disclose material facts during the Class Period regarding its analysts' conflicts of interest and 24/7 Media as alleged herein;

b.  The omissions and misrepresentations were material;

c.  During the Class Period, 24/7 Media's common stock was traded on NASDAQ, which is an open and efficient market;

d.  Defendants BUY and ACCUMULATE recommendations were issued to the investing public;

e.  The market rapidly assimilated information about 24/7 Media which was available and communicated to the investing public; and,

f.  The omissions and misrepresentations and the conduct alleged herein would tend to induce a reasonable investor to misjudge the value of 24/7 Media common stock.

## CLASS ACTION ALLEGATIONS

152.    Lead Plaintiff Lentell brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons or entities who purchased or otherwise acquired 24/7 Media securities from May 12, 1999 through November 9, 2000, inclusive, and who were damaged thereby (the "Class").

153.    Excluded from the Class are Defendants; members of the individual defendant's immediate family; any director, officer, subsidiary, or affiliate of Merrill Lynch; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors and assigns.

154.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, 24/7 Media common stock was actively traded in an efficient market on the NASDAQ National Market.

155.    Lead Plaintiff Lentell's claims are typical of the claims of other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

156.    Lead Plaintiff Lentell will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

157.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants' acts and omissions as alleged herein violated the federal securities laws;

b. Whether Defendants participated in and pursued the illegal course of conduct complained of herein;

c. Whether statements disseminated to the investing public during the Class Period made misrepresentations or omissions of material information as alleged herein;

d. Whether the material misrepresentations and omissions complained of herein artificially inflated the market price of 24/7 Media common stock during the Class Period;

e. To what extent the members of the Class have sustained damages and the proper measure of damages.

158. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. As the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## COUNT I

### Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder

159. Plaintiff repeats and realleges each and every allegation set forth above.

160. During the Class Period, Defendants carried out a plan, scheme and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiff and other

60

Class members, as alleged herein; (ii) artificially inflate the market prices of 24/7 Media securities, and (iii) cause Plaintiff and other Class members to purchase 24/7 Media securities at artificially inflated prices.

161.   In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the investing public, in connection with the purchase of 24/7 Media securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

162.   Defendants' fraudulent devices, schemes and artifices and deceptive acts, practices and course of business included, *inter alia*, the following:  (i) issuing false and misleading research analyst reports concerning internet companies covered by Merrill Lynch which contained recommendations and ratings that in many cases did not reflect the analysts' true opinions of the companies; (ii) as a matter of undisclosed, internal policy, not issuing "reduce" or "sell" recommendations in research analyst reports concerning internet companies, and using only the remaining ratings of "buy," "accumulate" and "neutral," thereby converting a published five-point rating scale into a *de facto* three-point system; (iii) permitting research analysts to act as quasi-investment bankers for internet companies covered by Merrill Lynch, by often initiating, continuing, and/or manipulating research coverage for the purpose of attracting and keeping investment banking clients, thereby producing misleading ratings that were neither objective nor independent, as they purported to be; (iv) disregarding Merrill Lynch's stated policy requiring separation between its research analysts and its investment banking departments, a separation that was critical to the integrity of the recommendations issued to the investing public by Defendants; (v) linking research analysts' compensation to investment banking business they generated or

participated in, thereby encouraging them to produce investment banking business by currying favor with potential or actual investment banking clients by giving them special treatment, including, *inter alia,* allowing officers of clients or prospective clients to redraft their own coverage, write quotations in which the analysts would tout their companies, and indicate which ratings would be acceptable to them.

163.     Defendants acted knowingly or recklessly and for the purpose and effect of attracting and keeping lucrative investment banking business from internet companies that were clients or prospective clients of Merrill Lynch.

164.     The members of the Class reasonably relied upon the integrity of the market in which 24/7 Media securities traded.

165.     Plaintiff and the other members of the Class were ignorant of Defendants' fraudulent scheme. Had Plaintiff and the other members of the Class known of Defendants' unlawful scheme, they would not have purchased or otherwise acquired 24/7 Media securities or if they had, they would not have purchased or otherwise acquired them at the artificially inflated prices they paid for such securities.

166.     Plaintiff and the members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' scheme to defraud as alleged herein. Absent Defendants' wrongful conduct, Plaintiff and the members of the Class would not have been injured.

167.     In connection with their unlawful plan, scheme and course of conduct alleged herein Defendants used the means or instrumentalities of interstate commerce and the mails.

168.     By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

169.    As a direct and proximate result of Defendants' scheme to defraud, Plaintiff and the other members of the Class suffered damages in connection with their purchases of 24/7 Media securities in an amount to be proven at trial.

170.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege or prove that Defendants made *any* misrepresentations or omissions of material fact or otherwise [for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.]

## COUNT II

**Against All Defendants For Violations of Section 10(b) Of the Exchange Act
and Rule 10b-5(b) Promulgated Thereunder**

171.    Plaintiff repeats and realleges each and every allegation set forth above.

172.    During the Class Period, Defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate the market price of 24/7 Media securities; and (iii) cause Plaintiff and other members of the Class to purchase 24/7 Media securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

173.    The Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, all in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b). Defendants' material misrepresentations and omissions concerned, *inter alia*: (i) the fact that the ratings in many cases did not reflect the analysts' true opinions of the companies, including 24/7 Media; (ii) that as a matter of undisclosed, internal policy, no "reduce" or "sell"

63

recommendations were issued, thereby converting a published five-point rating scale into a *de facto* three-point system; (iii) that they failed to disclose that Merrill Lynch's ratings were tarnished by an undisclosed conflict of interest in that the research analysts were acting as quasi-investment bankers for the companies at issue, often initiating, continuing, and/or manipulating research coverage for the purpose of attracting and keeping investment banking clients, thereby producing misleading ratings that were neither objective nor independent, as they purported to be; and (iv) that they failed to comply with the rules and regulations of the SEC, NASD and other regulatory authorities regarding communications to the investing public.

174.    Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of obtaining lucrative investment banking business from 24/7 Media.

175.    Defendants ML&Co. and MLPF&S, however, knew or recklessly disregarded that their statements concerning the integrity and objectivity of their securities research and rating system were false at the time they made these statements, because those statements were flatly contradicted by the Defendants' unlawful plan, scheme and course of conduct alleged herein.

176.    Defendants ML&Co. and MLPF&S were required to comply with all relevant SEC and NASD regulations, including without limitations those set forth in ¶¶ 75-77 supra. In addition, said Defendants had a duty to fully disclose the truth concerning their business practices alleged herein by virtue of their issuance of research reports to investors, as a result of Defendant MLPF&S's status as a registered U.S. broker/dealer and its wrongful activities in such capacity alleged herein, and as a result of the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X [17 C.F.R. § 210.1, *et seq.*], S-K [17 C.F.R. § 229.10, *et seq.*], and other SEC regulations.

177.    Throughout the Class Period, Defendants' material misrepresentations and omissions induced a disparity between the transaction price and the true "investment quality" of 24/7 Media securities. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of 24/7 Media securities was artificially inflated during the Class Period and Plaintiff and the Class were deceived as to the true investment quality of 24/7 Media securities. In ignorance of the fact that the market price of 24/7 Media securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired 24/7 Media securities during the Class Period at artificially inflated prices and were damaged thereby.

178.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class known of the omitted material facts, Plaintiff and the other members of the Class would not have purchased or otherwise acquired 24/7 Media securities, or, if they had acquired 24/7 Media securities, they would not have done so at the artificially inflated prices which they paid.

179.    Plaintiff and the members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' material misrepresentations and omissions. Absent Defendants' wrongful conduct, Plaintiff and the members of the Class would not have been injured.

180.   By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

181.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of 24/7 Media securities in an amount to be proved at trial.

182.   This action is brought within one year after the discovery of the facts constituting this cause of action and not more than three years after such cause of action accrued.

## COUNT III

### AGAINST DEFENDANT MERRILL LYNCH
### PURSUANT TO SECTION 20(A) OF THE EXCHANGE ACT

183.   Plaintiff repeats and realleges each and every allegation set forth above.

184.   This claim is asserted against Defendant Merrill Lynch for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of all Class members who purchased, or otherwise acquired, 24/7 Media securities during the Class Period, and were damaged thereby.

185.   As set forth above, during the entire Class Period, Defendant Merrill Lynch was a "controlling person" of Defendant Blodget, within the meaning of Section 20(a) of the Exchange Act.

186.   Merrill Lynch was a "controlling person" of Blodget because it had the influence and power to cause, and did cause, Blodget to engage in the wrongful conduct complained of herein, and because it had the power to have prevented Blodget from engaging in the unlawful conduct alleged herein, but purposely and intentionally did not use that power to do so.

187.   As set forth in Count I, Blodget violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by his acts and omissions as alleged in this Complaint.  By

virtue of its status as a "controlling person" of Blodget, Merrill Lynch is liable, to the same extent as Blodget, for Blodget's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff Lentell, on behalf of himself and the Class, prays for judgment as follows:

a. declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

b. finding that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint;

c. awarding Plaintiff and the other members of the Class damages, together with interest thereon;

d. awarding Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

e. awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated: March 12, 2003

Respectfully submitted,

FINKELSTEIN, THOMPSON
& LOUGHRAN

By: _Douglas G. Thompson_
Douglas G. Thompson
Andrew J. Morganti
Adam T. Savett
1050 30th Street NW
Washington, DC 20007
Tel:  (202) 337-8000
Fax: (202) 337-8090

**Counsel for Lead Plaintiff John Kilgour
Lentell and Lead Counsel for the Class**

68

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was served upon the counsel of record or parties listed via Fedex this 12th day of March, 2003.

_Adam Savett_

Adam T. Savett

Edward J. Yodowitz
**Skadden Arps Slate Meagher & Flom LLP**
Four Times Square
New York, New York 10036
Tel:    (212) 735-3000

James D. Ossyra
**Foley & Lardner**
321 North Clark Street
Suite 2100
Chicago, IL 60610-4714
Tel:    (312) 755-6585

Edward F. Haber
**Shapiro Haber & Urmy LLP**
75 State Street
Boston, MA 02109
Tel:    (617) 439-3939

Herbert E. Milstein
**Cohen, Milstein, Hausfeld & Toll, P.L.L.C.**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Tel:    (202) 408-4600

Jacqueline Sailer
**Rabin, Murray & Frank LLP**
275 Madison Ave
34th Floor
New York, NY 10016-1101
Tel:    (212) 682-1818

Frederic S. Fox
**Kaplan Fox & Kilsheimer LLP**
805 Third Avenue
New York, NY 10022
Tel:    (212) 687-1980